Joseph Clifton Smith, Z-646
Holman Correctional Facility
P.O. Box 3700
Atmore, AL 36503

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| JOSEPH CLIFTON SMITH, | ) | Case  No. 05-474 |
|     Petitioner, | ) | DEATH PENALTY CASE |
| | ) | |
|     vs. | ) | |
| | ) | |
| DONAL CAMPBELL, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
|     Respondent. | ) | |

---

**PETITION FOR A WRIT OF HABEAS CORPUS BY PRISONER IN STATE CUSTODY**
**UNDER DEATH SENTENCE**

---

Petitioner, JOSEPH CLIFTON SMITH, now incarcerated on death row at Holman State Prison in Atmore, Alabama, petitions this Court for relief from his unconstitutionally imposed conviction and sentence of death. In support of this petition, Mr. Smith states the following:

**I.    INTRODUCTION**

1.    Mr. Smith makes application to this Court for a writ of habeas corpus under 28 U.S.C.§ 2254.  Mr. Smith was convicted of capital murder and sentenced to death in  the Mobile County Circuit Court in 1998.

2.    Mr. Smith is mentally retarded.  He thus functions in the very low range of intellectual ability. This cognitive deficit has been with Mr. Smith for his entire life, as confirmed

by his school records.  Those records reveal that Mr. Smith consistently performed at a below average level before ending his education in the seventh grade.  Mr. Smith's mental retardation is also characterized by deficits in adaptive skills.  Results from subsequent evaluations also suggest that Mr. Smith has organic brain damage, a condition that he likely suffered during multiple instances of head trauma, as a child, or during his late teenage years.

3.      Mr. Smith was convicted of capital murder and sentenced to death in a trial that was defined by the prosecutor's extreme misconduct, including his racially discriminatory jury selection practices. In violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), the prosecution used peremptory strikes to remove eight of the thirteen black members from the venire (61%).  Because trial counsel failed to make a *Batson* motion, the prosecutor was never made to offer reasons for any of these racially discriminatory strikes. As a result, Mr. Smith's jury was constructed in a racially discriminatory manner, in violation of his equal protection rights.

4.      Moreover, the conviction and sentence in this case are unreliable because the judge who presided over Mr. Smith's trial should have been recused. The presiding judge in this capital case was a former district attorney who had prosecuted Mr. Smith for a 1990 burglary. That conviction formed the basis for one of the aggravating factors in Mr. Smith's capital trial. Despite the obvious potential for bias created by the judge's role as Mr. Smith's former prosecutor, trial counsel raised no objection.

5.      The lack of assistance from counsel during the guilt phase of the trial is also evident in counsels' failure to challenge properly the voluntariness of Mr. Smith's custodial statements to the police and to raise whether Mr. Smith's wavier of rights could be voluntary, knowing and intelligent in light of his mental retardation. Despite the fact that trial counsel knew about Mr.

Smith's mental retardation well in advance of trial, they failed to move to suppress his statements on that ground. As a result, Mr. Smith's custodial statements were admitted against him at trial in violation of his constitutional rights.

6.     Despite the availability of substantial mitigating evidence, trial counsel so unreasonably limited their mitigation presentation, the judge and jury got only a glimpse of Mr. Smith's tortured, horrific life.  Had such evidence been presented, Mr. Smith would not have been sentenced to death.

7.     Numerous jury instructions at the guilt and penalty phases were incorrect statements of the law. Thus, the jury was not properly guided in, among other things, as to how to return a life verdict or about the importance of their verdict.

8.     The complete lack of assistance from counsel during both phases of the trial unquestionably undermines the reliability of Mr. Smith's sentence.  Mr. Smith's status as a mentally retarded individual also precludes the imposition of the death penalty. This, combined with other improprieties during Mr. Smith's trial, requires that habeas relief be granted.

## II.    PROCEDURAL HISTORY

9.     Joseph Clifton Smith was indicted in Mobile County on May 22, 1998, on one count of capital murder for the death of Durk Van Dam, in violation of ALA. CODE § 13A-5-40(2) (1975) (intentional murder during the course of a robbery).

10.     At his arraignment and plea, Mr. Smith was represented by Greg Hughes, of Mobile, Alabama.   At trial and sentencing, Mr. Smith was represented by Greg Hughes and James Byrd of Mobile, Alabama.

11.     After a jury trial in the Mobile County Circuit Court, Mr. Smith was convicted of

capital murder on September 16, 1998.  On September 17, 1998, the jury recommended that he be sentenced to death by a vote of 11-1.  On October 16, 1998, Judge Chris Galanos imposed a death sentence, finding the existence of three aggravating factors. The Court found as aggravating factors that the capital offense was committed while the Defendant was under sentence of imprisonment, that the capital felony was committed while the Defendant was engaged in the commission of a robbery, and that the capital offense was especially heinous, atrocious, and cruel. The Court found no statutory or non-statutory mitigating factors.

12.      On May 26, 2000, the Alabama Court of Criminal Appeals affirmed Mr. Smith's conviction and death sentence.  His application to the Alabama Supreme Court for writ of certiorari was denied in *Ex parte Smith,* 795 So. 2d 842 (Ala. 2001) on March 16, 2001. Justice Harwood dissented from the denial of Mr. Smith's petition for a writ of certoriari.

13.      On appeal to the Alabama Court of Criminal Appeals and on application for writ of certiorari to the Alabama Supreme Court, Mr. Smith was represented by Glen Davidson of Mobile, Alabama.

14.      Mr. Smith's timely application to the United States Supreme Court for writ of certiorari was denied on October 1,  2001.  *See Smith v. Alabama*, 534 U.S. 872 (2001).

15.      Mr. Smith filed a *pro se* Rule 32 Petition in the Mobile County Circuit Court on September 27, 2002. The State objected to the Petition's timeliness and the Circuit Court ruled that Mr. Smith's Petition was barred by the statute of limitations. Mr. Smith appealed that order and the Alabama Court of Criminal Appeals affirmed. On March 5, 2004, the Alabama Supreme Court reversed and remanded, holding that Mr. Smith's Petition was timely. *See Ex parte Smith*, 2004 WL 406765 (Ala. Mar. 5, 2004).

16. Mr. Smith filed an Amended Rule 32 Petition on June 4, 2004. On January 12, 2005, Mr. Smith filed a Second Amended Rule 32 petition and motions for discovery. Mr. Smith's amended petitions included claims of ineffective assistance of counsel, violations of *Batson v. Kentucky*, failure by the trial court to recuse itself, Mr. Smith's mental retardation and others. Despite the fact that the current circuit court judge had not presided over Mr. Smith's trial, the circuit court judge did not conduct an evidentiary hearing or grant any discovery motions.

17. February 11, 2005, the circuit court held a hearing on the state's motion to dismiss. At that hearing, the circuit court informed the parties that the state's motion to dismiss would be granted. Mr. Smith's counsel objected to Mr. Smith's absence from the hearing.

18. The circuit court asked the state to provide a proposed order dismissing Mr. Smith's petition. State's counsel informed the court that he was going on vacation and asked the court for time to submit the proposed order. On March 18, 2005, the court signed the state's proposed order. That order was entered in the circuit court clerk's office on March 21, 2005.

19. On April 20, 2005, Mr. Smith filed Petitioner's Objection to The Court's Final Order and Request for Reconsideration. On or about April 20, 2005, the circuit court set hearings on May 9th and 11th, on Mr. Smith's Objections and Motion for Reconsideration. On April 27, 2005, Mr. Smith filed a notice of appeal and request for transcripts.

20. On June 1, 2005, the Alabama Court of Criminal Appeals dismissed Smith's appeal as untimely filed. *Joseph Clifton Smith v. State*, CR-04-1491, slip op. (Ala. Crim. App. June 1, 2005). On June 9, 2005, Mr. Smith filed an application for rehearing and a Motion for Withdrawal of Certificate of Judgment. On June 15, 2005, Mr. Smith filed a petition for writ of certiorari to the Alabama Supreme Court, which was denied without written opinion on August 12, 2005.

## GROUNDS SUPPORTING THE PETITION FOR RELIEF

**III.    TRIAL COUNSEL WERE INEFFECTIVE DURING BOTH STAGES OF MR. SMITH'S TRIAL, AND THEREBY DEPRIVED MR. SMITH OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

21.    Mr. Smith's trial counsel, Greg Hughes and James Byrd, did not render reasonably effective assistance of counsel before, during, or after his capital murder trial and conviction. This failure of defense counsel denied Mr. Smith his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984); *see also Wiggins v. Smith*, 123 S. Ct. 2527 (2003). This Court must now grant habeas relief.

22.    A criminal defendant is entitled to effective legal representation. *Strickland v. Washington*, 466 U.S. 668, 686 (1994); *see Wiggins v. Smith*, 123 S. Ct. 2527 (2003); *see also Gideon v. Wainwright*, 372 U.S. 335 (1963). The adversarial system of justice depends on effective defense counsel. *United States v. Cronic*, 466 U.S. 648, 653 (1984).

23.    Counsel for Mr. Smith were ineffective at all stages of the criminal proceedings against him. The errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable" and Mr. Smith now seeks relief from his unconstitutionally-obtained conviction and death sentence. *Strickland*, 466 U.S. at 682. Performance of Mr. Smith's counsel fell below "an objective standard of reasonableness" and failed "to make the adversarial testing process work." *Id.* at 688, 690. None of the numerous errors of defense counsel could be construed as part of a "sound trial strategy." *Id*. at 691.

24.    These errors, induced in part by inadequate compensation, included a failure to formulate or argue any reasonable theory of defense, failure to investigate the case adequately, a

failure to challenge the State's investigation of the case adequately, a failure to obtain the necessary and proper rulings from the trial court through motions and argument, a failure to prevent the prosecution from engaging in numerous acts of misconduct throughout Mr. Smith's trial, and a failure to discover and present a wealth of powerful mitigating evidence.  Trial counsel also failed to develop and prevent much readily-available evidence of Mr. Smith's mental retardation. These errors, taken individually or cumulatively, rendered trial counsel's performance deficient and prejudiced Mr. Smith.  *Id.* at 686.

25.    The errors made by Mr. Smith's counsel were so serious as to "undermine confidence in the outcome" of the trial.  *Id.* at 694. Mr. Smith now seeks relief from his unconstitutionally obtained conviction and sentence.  But for defense counsels' ineffectiveness, there is a reasonable probability that Mr. Smith would not have been convicted of capital murder and would not have been sentenced to death. *Id.* This failure of defense counsel denied Mr. Smith his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Thus, habeas corpus relief is warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**A.    Trial Counsel Were Ineffective, In Part, Because Of Grossly Inadequate Compensation.**

26.    Counsels' ineffectiveness was, in part, the result of the grossly insufficient funding available for defense counsel in capital cases.  At the time of Mr. Smith's trial, Alabama Code §15-12-21 (1975) provided that court-appointed attorneys in capital cases could not be compensated more than $1,000 for out-of-court work for each phase of a capital trial, based on a $20 hourly rate.[1]  *See*

---

[1] The Alabama legislature has since recognized the inadequacies of this funding scheme and in 1999, amended the statute to significantly raise the level of funding for court-appointed lawyers

Ala. Code § 15-12-21 (1975) (amended 1999).

27.     Accordingly, Mr. Smith's counsel received no compensation whatsoever for out-of-court work in excess of fifty hours, and were compensated at rates far below market level even for the initial fifty hours.  This compensation scheme is inadequate for the time required to represent a capital defendant effectively.

28.     This inadequate and statutorily-limited compensation violated the separation of powers doctrine, constituted a taking without just compensation, deprived Mr. Smith of effective assistance of counsel, and violated the due process and equal protection clauses of the Fifth and Fourteenth Amendments to the United States Constitution. It is well-established that there "can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin v. Illinois,* 351 U.S. 12, 19 (1956). The failure to provide adequate funding to Mr. Smith's court-appointed counsel curtailed this most fundamental right, in violation of Mr. Smith's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Habeas corpus relief is therefore warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**B.     Trial Counsels' Investigation was Inadequate, In Part, Due to a Cap on Investigator Funds.**

29.     Mr. Smith's defense was also prejudiced by the fact that the trial court limited compensation for an investigator to $1,000. (R. 145-148).  One thousand dollars is inadequate to investigate properly a capital murder case.

30.     A proper mitigation investigation takes literally hundreds of hours. The $1,000 cap on investigator funds was consumed by the guilt phase investigation.  The private investigator hired

---

in capital cases. *See* Ala. Code § 15-12-21 (1975) (amended 1999).  Unfortunately, this change came too late to provide Mr. Smith with adequate funds for his defense.

by trial counsel preformed no mitigation investigation whatsoever.  Therefore, Mr. Smith was deprived of his right to have the jury consider "as a *mitigating factor*, any aspect of [his] character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original).  If trial counsel had demanded the funds necessary to hire someone to do a complete mitigation investigation, they would have uncovered a wealth of mitigating evidence, which the jury never heard.  The denial of funds necessary for effective representation constituted a denial of Mr. Smith's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Habeas corpus relief is therefore warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

     **C.**     **Trial Counsel Failed to Investigate Adequately the State's Capital Murder Charge Against Mr. Smith.**

31.     A duty to investigate the facts of a case has long been embodied in an attorney's duties to his client:

> It is not enough to assume that counsel . . . thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts.  No attempt was made to investigate.

*Smith v. Alabama*, 287 U.S. 45, 58 (1932).  Defense counsel is under an obligation to investigate thoroughly any criminal case, and this duty is heightened in the context of a capital proceeding. *Gregg v. Georgia*, 428 U.S. 153 (1976). The "failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003)(internal quotation and citation omitted). *See also Davis v. Alabama*, 596 F.2d 1214, 1217 (5th Cir. 1979)(trial counsel ineffective if they "fail[] to investigate sources of evidence which may be helpful to the defense"); *Voyles v. Watkins*, 489 F. Supp. 901, 910 (N.D. Miss. 1986)("Counsel may

not sit idly by thinking the investigation would be futile.")

32.     The American Bar Association Guidelines for the Appointment and Performance of

Counsel in Death Penalty Cases ("ABA Guidelines") that were in effect at the time of Mr. Smith's

trial stated:

> Counsel should conduct independent investigations relating to the
> guilt/innocence phase and to the penalty phase of a capital trial.  Both
> investigations should begin immediately upon counsel's entry into the
> case and should be pursued expeditiously.
> The investigation for preparation of the guilt/innocence phase of the
> trial should be conducted regardless of any admission or statement by
> the client concerning facts constituting guilt.  ABA Guideline
> 11.4.1(A),(B) (1989).
> As the investigations mandated by Guideline 11.4.1 produce
> information, counsel should formulate a defense theory.  In doing so,
> counsel should consider both the guilt/innocence phase and the
> penalty phase, and seek a theory that will be effective through both
> phases.

ABA Guideline 11.7.1(A) (1989).[2]

33.     Trial counsel failed to investigate adequately and prepare Mr. Smith's defense. While

trial counsel received funds for an investigator, the funds were insufficient. Even with the funds

allowed, trial counsels' performance fell below that of competent capital trial counsel and severely

prejudiced Mr. Smith, by allowing the State to present its version of the crime virtually

unchallenged. *See Strickland*, 466 U.S. at 686.

34.     The United States Supreme Court recently has reiterated that it "is the duty of the

lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues

---

[2] *See also Wiggins v. Smith*, 123 S. Ct. 2527, 2537 (2003)(noting that "[c]ounsel's conduct [ ] fell short of the standards for capital defense work articulated by the American Bar Association (ABA)-standards to which we have long referred as 'guides to determining what is reasonable'")(quoting *Strickland,* 466 U.S. at 688 and citing *Williams v. Taylor*, 529 U.S. 362 (2000)).

leading to facts relevant to the merits of the case and the penalty in the event of conviction."
*Rompilla v. Beard*, 125 S.Ct. 2456, 2466 (2005) (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d Ed. 1982 Supp.)). In this case, defense counsel failed to make a sufficient, independent investigation of the case.  Counsel only met with Mr. Smith on a few occasions prior to trial, and therefore failed to learn crucial facts that were important to Mr. Smith's defense.  Defense counsels' failure to conduct an independent investigation of the case made them reliant on the state's version of the crime for which Mr. Smith was convicted and sentenced to death.  In so doing, trial counsel violated Mr. Smith's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Habeas corpus relief is therefore warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**1.      Counsel Failed to Interview Mr. Smith's Family.**

35.      Counsel failed to investigate  sufficiently Mr. Smith's family background and failed to even interview available family members.  Several of Mr. Smith's close family members had absolutely no contact with defense counsel at all, despite the critical information they had about Mr. Smith's background and despite their availability.  Those who did meet with defense counsel, did so only on a few occasions, at their own request, for only fifteen minutes or less, and were not asked for pertinent information. An adequate and effective investigation of family background, sufficient for effective presentation of both a mental status defense and of mitigation evidence, required that counsel meet with and interview Mr. Smith's family, to develop evidence of his mental health, his mental retardation and other pertinent information necessary for both the guilt and sentencing phases. *See Florida  v. Nixon*, 125 S.Ct. 551, 563 (2004)(stating "in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed"). As a result of these errors and as further discussed *infra*, trial counsel denied Mr. Smith his rights to assistance

of counsel, a fair trial, and a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Habeas corpus relief is therefore warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**2.      Counsel Failed To locate Two Important Eyewitnesses.**

36.      There were two important eyewitnesses in this case that the defense failed to find and produce for trial.  According to Mr. Smith's statements to the police, after Mr. Reid killed Mr. Van Dam, an unknown white male, who had just finished his shift at a nearby warehouse,  drove Mr. Reid and Mr. Smith back to the HiWay Host Motel. This information was confirmed by Melissa Arthers, who testified that Mr. Reid and Mr. Smith were driven back to the Motel by a man she did not know, in a car that matched the description given by Mr. Smith in his statements to the police. (R. 359). Defense counsel failed to investigate and did not attempt to locate the white male driver, who was a critical eyewitness. *See Code v. Montgomery*, 799 F.2d 1481, 1484 (11th Cir. 1986)(noting that ineffective assistance of counsel arose where defense failed to interview all potential alibi witnesses and holding that trial counsel's complete failure to investigate a case and present a defense warranted habeas relief where the attorney's "limitation on his pre-trial investigation [was] wholly unsupported by reasonable professional judgment." )

37.      At trial, the State's witnesses gave conflicting testimony about Mr. Smith's appearance upon his return to the HiWay Host Sunday night.  Ms. Arthers testified that she saw blood on Mr. Smith's shirt when he returned to the hotel. However, Patricia Milbeck testified that Mr. Smith returned to the Motel wearing the same white t-shirt he was wearing when he left, and that there was not any blood on it.

38.      As a result of this conflicting testimony, the jury had to weigh Ms. Arthers'

credibility against Ms. Milbeck's. At trial, the jury heard testimony that Ms. Milbeck was currently in custody on a parole violation. However, the jury was prevented from hearing that, due to a probation violation, Ms. Arthers was also in custody at the time of trial. Defense counsel should have located the eyewitness to corroborate Mr. Smith's description of events and Ms. Milbeck's testimony. While defense counsel is not required "to be a private investigator in order to discern every possible avenue which may hurt or help the client, [the Constitution does] require that the lawyer make an effort to investigate the obvious. Pretrial investigation, principally because it provides a basis upon which most of the defense case must rest, is, perhaps, the most critical stage of a lawyer's preparation." *House v. Balkcom*, 725 F.2d 608, 618 (11th Cir. 1984).

39.      Defense counsel also failed to investigate and attempt to locate the clerk at a convenience store who also saw Mr. Smith and Mr. Reid shortly after they left Mr. Van Dam. In his statements to the police, Mr. Smith stated that he entered a convenience store and bought gas and cigarettes from the store's clerk for the man who drove him and Mr. Reid back to the HiWay Host Motel.

40.      Both the convenience store clerk and the driver could have testified about Mr. Smith's condition shortly after Mr. Van Dam was killed. Each of them could have substantiated Mr. Smith's statements to the police, that Mr. Reid was the primary actor in Mr. Van Dam's death. The jury could have used this information to find Mr. Smith guilty of a lesser included offense in the guilt phase, or as a mitigating factor in the sentencing phase. Trial counsels' failure to investigate and locate these two essential witnesses constituted ineffective performance which prejudiced Mr. Smith. *See Code*, 799 F.2d at 1483.

41.      Trial counsels' failure to investigate the crime "resulted in a 'factual vacuum'" that

c[an] not "withstand Sixth Amendment scrutiny because [trial counsel] did not *choose* strategically or otherwise to pursue one line of defense over another. Instead, [he] simply abdicated his responsibility to advocate his client's case." *Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985)(emphasis in original, internal citation and quotations omitted). *See also, Williams v. Washington*, 59 F.3d 673 (7th Cir. 1995) ("Because of his ignorance, counsel was both unable and unprepared to make any strategic decisions regarding [the State's evidence]"); *Griffin v. Warden*, 970 F.2d 1355 (4th Cir. 1992) ("An attorney's failure to present available exculpatory evidence is ordinarily deficient"). As a result of these errors and as further discussed *infra*, trial counsel denied Mr. Smith his rights to assistance of counsel, a fair trial, and a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *See Strickland,* 466 U.S. at 690-691 (establishing that "thorough investigation[s]" are "virtually unchallengeable" and underscoring that "counsel has a duty to make reasonable investigations"). Habeas corpus relief is therefore warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**D.    Trial Counsel Were Ineffective for Failing to Introduce Melissa Arthers' Incarceration at the Time of Trial, to Show Her Bias as a Witness for the State.**

42.    As stated *supra*, conflicting testimony was presented at trial by Melissa Arthers and Patricia Milbeck, the State's main witnesses.[3] Melissa Arthers testified that she saw blood on Mr. Smith's shirt after he returned to the HiWay Host Motel Sunday night. Patricia Milbeck testified that she saw no blood on Mr. Smith's shirt when he returned to the Motel and she was sure that it was the same shirt he was wearing when he left the Motel.

43.    The jury in this case had to weigh the credibility of Melissa Arthers and Patricia

---

[3] Indeed, at one point during the trial, the prosecutor asked the court if he could treat Russell Harmon as hostile because of all the inconsistent statements. (R. 347-348)

Milbeck. Both of the State's witnesses had criminal histories. Even though both of the witnesses were in State custody at the time of trial, only Ms. Milbeck's criminal history was disclosed to the jury. In fact, Ms. Milbeck was wearing a prison uniform at the time of her testimony. The jury was not, however, made aware of Melissa Arthers' criminal past. Although the State volunteered Ms. Milbeck's criminal background, it fought to keep Ms. Arthers' criminal past from the jury. (R. 368-369). The State pursued that strategy, because at that point in the trial, Ms. Arthers was contradicting key testimony by Ms. Milbeck and the State was attempting to preserve Ms. Arthers' credibility.

44. During cross-examination, Mr. Byrd asked Ms. Arthers where she was currently residing. (R. 368). At sidebar, after the State's objection, Mr. Smith's trial counsel informed the court that Ms. Arthers' probation had recently been revoked for a drug violation. (R. 368-369). Although the State never stated its reasons for the objection, the court limited defense counsels' questions to Ms. Arthers' drug use at the time the events occurred.[4] (R. 369). Defense counsel argued that Ms. Arthers' custody could be offered "strictly for impeachment and would go directly to her credibility." (R. 369). The trial court held that this would not be a proper mode of impeachment. *Id.*

45. Defense counsel were ineffective for failing to allege the proper basis for introduction of this testimony, which was that Ms. Arthers' custody status established her bias for the State. Mr. Smith had a right under the Fifth, Sixth, Eighth', and Fourteenth Amendments to effective cross-examination and confrontation of the witnesses against him. *Davis v. Alaska,* 415 U.S. 308, 315 (1974); *Pointer v. Texas*, 380 U.S. 400, 405 (1965)(stating that "the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him' secured

---

[4] Ms. Arthers admitted to using drugs on the date in question. (R. 369).

by the Sixth Amendment," and that "to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law"). This right includes the ability to show a witness' bias based on their "vulnerable status as a probationer." *Id.* at 318-19. "Cross-examination of a government 'star' witness is important, and a presumption favors free cross-examination on possible bias, motive, ability to perceive and remember, and general character for truthfulness." *United Sates v. Lyons*, 403 F.3d 1248, 1256 (11th Cir. 2005), *citing United States v. Phelps*, 733 F.2d 1464, 1472 (11th Cir.1984) (citation omitted).

46.     In this case, the defense asserted the wrong basis for arguing the admissibility of Ms. Arthers' State custody.  The defense should have offered it to show her "bias," which is always allowed, *Davis v. Alaska,* 415 U.S. 308, 315 (1974), and not for "impeaching her credibility."

47.     Because of defense counsels' failure to offer the proper reason for introducing Ms. Arthers' bias, the jury was denied the opportunity to weigh properly the conflicting evidence concerning Ms. Arthers, Ms. Milbeck, and Mr. Smith. *See Fugate v. Head*, 261 F.3d 1206, 1219-1220 (11th Cir. 2001)(stating that "a single specific instance where cross-examination arguably could have affected the outcome of either the guilt or sentencing phase of the trial," establishes *Strickland* prejudice). Mr. Smith was thereby denied due process and a fair trial, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Habeas corpus relief is therefore warranted.  *See* 28 U.S.C. § 2254(d)(1), (d)(2).

> **E.      Trial Counsel Were Ineffective at Jury Selection, Thereby Denying Mr. Smith His Right to be Tried and Sentenced Before a Fair and Impartial Jury, in Violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments**.

48.     Trial counsel were ineffective at jury selection, thereby failing to ensure that an impartial jury was selected to determine if Mr. Smith was guilty, and if so, whether he should live

or die. The importance of voir dire to the defendant is well recognized.  *See, e.g., Turner v. Murray*, 476 U.S. 28 (1986); *Gray v. Mississippi*, 481 U.S. 648 (1987). Trial counsels' failings during jury selection rendered their performance deficient and far below that of reasonably competent capital trial counsel. These errors deprived Mr. Smith of due process, a fair and impartial jury, and were "so serious as to deprive [Mr. Smith] of a fair trial, a trial whose result is reliable," *Strickland*, 466 U.S. at 686, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Habeas corpus relief is therefore warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**1.      Trial Counsel Were Ineffective for Failing to Ask the Relevant Questions Regarding Material Trial issues at Voir Dire.**

49.      The right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Fairness demands that voir dire be broad enough to reveal those prospective jurors who would automatically sentence a capital defendant to death. *Morgan v. Illinois,* 504 U.S. 719, 729 (1992)*; Wainwright  v. Witt*, 469 U.S. 412, 424-26 (1985)*; Witherspoon v. Illinois,* 391 U.S. 510, 519-23 (1968).  Defense counsel is constitutionally required to uncover such prospective jurors through voir dire.[5] Thus, Mr. Smith's counsel had a constitutional duty to remove for cause, any potential juror who would not consider his mitigating evidence at the penalty phase of his trial.  Nonetheless, during voir dire, trial counsel failed to question adequately prospective jurors to determine if they would be receptive to evidence about Mr. Smith's mental retardation that formed the basis of his mitigation at the penalty phase.

---

[5] *See* ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* 10.8 Commentary (2003)("As a practical matter, the burden rests with defense counsel to 'life qualify' the jury. Counsel should conduct a voir dire that is broad enough to expose those prospective jurors who are unwilling to follow the applicable sentencing law, whether they will automatically vote for death in certain circumstances or because they are unwilling to consider mitigating evidence.")

Defense counsel failed to question the jury about whether any of them had a bias against the mentally retarded. Indeed, defense counsel did not ask a single question of the prospective jurors to determine if any of them would be biased against such evidence at penalty phase. (R. 13-113).

50.    Mr. Smith suffered severe physical, emotional, and psychological abuse as a child. Defense counsel failed to ask prospective jurors any questions calculated to determine whether they would be able to consider child abuse as a mitigating factor. Defense counsel should have questioned the jury panel to find out if any prospective juror had a bias that would prevent them from considering and giving weight to child abuse as a mitigating factor.

51.    Trial counsel also failed to question the jury regarding their receptiveness to the statutory mitigating factor of being under the substantial domination or control of another. Ala. Code § 13A-5-51(5) (1975). According to Mr. Smith's statements to the police, Mr. Smith was under the domination of Mr. Reid at the time Mr. Van Dam was killed. This domination was in part due to Mr. Smith's mental retardation. It was also due to Mr. Reid's numerous threats against Mr. Smith's family. Evidence of this domination was presented at the guilt phase, through Mr. Smith's statements to the police, and at the penalty phase through Dr. Chudy's testimony regarding Mr. Smith's mental retardation. Trial counsel should have questioned the jury to find out if any of them would have difficulty in considering such evidence as mitigating.

52.    Trial counsel failed to question the jury to determine their receptiveness to the statutory mitigating factors of accomplice and minor participation. Ala. Code § 13A-5-51(4) (1975). The primary evidence in this case concerning Mr. Smith's participation in the crime consisted of his own statements to the police. Those statements showed that Mr. Smith had a minor role in Mr. Van Dam's death. It was Mr. Reid who planned and carried out the murder-robbery. (R. 451-511). Trial

counsel should have questioned the jurors to find out if any of them would have difficulty recognizing and giving weight to Mr. Smith's minor role as a mitigating factor.

53.    Trial counsel failed to question the jurors regarding the statutory mitigating factor which exists when "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Ala. Code §13A-5-51(6) (1975).  While evidence of Mr. Smith's mental retardation was provided at sentencing, trial counsel failed to question  any juror about whether he could consider and give weight to this mitigating factor. (R. 13-113).

54.    Trial counsel failed to insure or even question whether the jurors were people who could and would fully consider, and give full effect to, Mr. Smith's defense at the guilt stage and to Mr. Smith's mitigating evidence at the sentencing phase.  Trial counsels' failure to ask the questions necessary to elicit this information interfered with their ability to exercise effectively their peremptory strikes.  By failing to voir dire the jurors regarding subjects that would reveal material bias and permit challenges for cause to biased and impartial jurors, trial counsels' performance was deficient and prejudiced Mr. Smith.

55.     This failure to voir dire the jurors on material issues or to ask the questions necessary to determine each juror's biases cannot be seen as a strategic choice. It rendered counsel ineffective and deprived Mr. Smith of his constitutional right to an impartial jury. In *Turner v. Murray*, 476 U.S. 28 (1986), the Supreme Court recognized that "[b]ecause of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for [] prejudice to operate but remain undetected." 476 U.S. at 35.  Trial counsel should have asked questions to identify any jurors with a "prejudice" against those with mental retardation or with "prejudice" against someone from

a disadvantaged and abusive background. Their failure to do so rendered their performance ineffective. *See Strickland*, 466 U.S. at 686. Trial counsels' failure to conduct an adequate voir dire necessary to uncover potential juror bias, constituted a denial of Mr. Smith's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Habeas corpus relief is therefore warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**F.      Trial Counsel were Ineffective for Failing to Object Properly to the Involuntariness of Mr. Smith's Custodial Statements.**

56.      "A statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional privilege." *Colorado v. Spring,* 479 U.S. 564, 573 (1987)*, quoting Miranda v. Arizona,* 384 U.S. 436, 444 (1966). The voluntariness of a suspect's custodial statement depends upon "the totality of the circumstances," including police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health, as well as "the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation." *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). A court considering a waiver of *Miranda* rights conducts a two-pronged inquiry under the totality of the circumstances standard. *Moran v. Burbine,* 475 U.S. 412, 421 (1986). First, a court considers the voluntariness of the statement, and whether the waiver was the product of a free and deliberate choice rather than intimidation, coercion or deception. *Moran,* 475 U.S. at 421. Second, a court considers the separate question of whether the waiver was "knowingly and intelligently" made. *Id.*

57.      Because the United States Constitution requires that a suspect know what rights he is waiving as well as the consequences of his decision, "a suspect's limited intellectual ability factors

20

significantly into the determination of whether there is a valid waiver."*Smith v. Zant*, 887 F.2d 1407, 1430 (11<sup>th</sup>Cir.1989)(affirming grant of writ of habeas corpus on ground that defendant with IQ of 65 and mental age of 10 did not knowingly and intelligently waive rights).   Because Mr. Smith is mentally retarded, he could not knowingly, intelligently or voluntarily give consent to give a statement to the police.   When Mr. Smith was transferred to the Monroe County Excel junior high school, the county board of education classified Mr Smith as "Educable Mentally Retarded"[6] (EMR), based on his "psychological and educational evaluations, academic history, and other pertine[sic] information."   In addition, trial testimony established that Mr. Smith functioned intellectually at the bottom 3rd percentile of all adults. (R. 781).[7]  Although trial counsel knew about Mr. Smith's mental limitations, ( R. 912), they neither objected to the admission of this testimonial evidence at trial nor filed a pre-trial challenge to the admission of the evidence based on the involuntariness of Mr. Smith's statements to police. *See* (R. 145-179).

58.     It is the State's burden at a suppression hearing to prove that the defendant understood his Fifth Amendment  rights and the consequences of waiving them. However, at the hearing on the motion to suppress, the defense only argued one facet of the totality of circumstances inquiry – whether Mr. Smith's statement was the product of intimidation, coercion or deception.  *See Moran,* 475 U.S. at 421. Toward that end, trial counsel argued that the State's evidence regarding the time frame of Mr. Smith's interrogation was too vague and that "[t]here has been no showing that there

---

[6] "Educable" was the term formerly used for what is now referred to as "Mild" Mental Retardation. Diagnostic and Statistical Manual of Mental Disorders 43 (4th ed., 2000, Text Revision).

[7] *See Atkins v. Virginia*, 536 U.S. 304, 318 (2002)("Because of their impairments, however, by definition [mentally retarded defendants]  have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.")

wasn't an inducement or hope of reward or threat of coercion," during the unrecorded times on the interrogation tapes. (R. 179). Trial counsel ignored entirely, the second, distinct part of the totality of the circumstances analysis presented by Mr. Smith's mental retardation – whether at the time he provided the statement, Mr. Smith "understood that he had the right to remain silent and that anything he said could be used as evidence against him." *Colorado v. Spring,* 479 U.S. at 574. Instead, counsels' arguments were so confusing and irrelevant, the trial judge remarked: "Well, you know, one thing that would have been nice would have been to get a written motion so we would know exactly what it is you're objecting to." (R. 180). By failing to address both prongs of the totality of circumstance test or to challenge otherwise the waiver of Mr. Smith's right not to make a statement to police, trial counsel thus deprived Mr. Smith of his constitutional right to present a complete defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986)(holding that excluding testimony about the circumstances of a confession deprives a defendant of his constitutional right to present a complete defense).

59.    Trial counsel should have argued that based on Mr. Smith's mental retardation, his statements could not have been the product of a rational choice. The requirement of "knowing and intelligent" waiver of *Miranda* rights "implies a rational choice based upon some appreciation of the consequences of the decision.... Here [the defendant] surely had no appreciation of the options before [him] or of the consequences of [his] choice [to sign waivers]." *Brown v. Crosby*, 249 F. Supp.2d at 1292 (S.D. Fla.2003), *citing Cooper v. Griffin,* 455 F.2d at 1145. Trial counsels' failure to litigate this issue effectively denied Mr. Smith due process, by permitting the admission of unreliable evidence, and "[i]t is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without

regard for the truth or falsity of the confession, [citation omitted] and even though there is ample evidence aside from the confession to support the conviction." *Jackson v. Denno*, 378 U.S. 368, 376 (1964). As a result of these errors and as further discussed *infra*, trial counsel denied Mr. Smith his rights to assistance of counsel, a fair trial, and a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Habeas corpus relief is warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**G.    Trial Counsel Failed To Formulate Or Argue The  Reasonable Theories Of Defense Supported by Available Evidence and Applicable Law.**

60.    Trial counsel failed to pursue an available legal defenses supported by the evidence at trial. There were two defendants accused of Mr. Van Dam's murder -- Mr. Reid and Mr. Smith. The reports by Dr. Chudy, a licensed psychologist, established that Mr. Smith lacked the intent and ability to formulate the plan which led to Mr. Van Dam's death, thereby lessening his role in the death of the victim. *See Fortenberry v. Haley*, 297 F.3d 1213, 1226 (11th Cir. 2002)("The duty to investigate requires that counsel 'conduct a substantial investigation into any of his client's plausible lines of defense.'") Had trial counsel pursued this theory, it would have allowed the jury to acquit or to find Mr. Smith guilty of a lesser included offense during the guilt phase, such as murder or manslaughter, or to vote for life during the sentencing phase. *See Beck v. Alabama*, 447 U.S. 625 (1980)(holding that due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction). Trial counsels' failure to argue effectively viable, factually substantiated theories of defense, violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Habeas corpus relief is therefore warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

### 1.    Trial Counsel Were Ineffective in Opening and Closing Statements.

61.    Trial counsels' opening statement was inadequate because it failed to identify the available legal defense which the evidence would support. (R. 139-42).  At no point during opening argument did trial counsel set forth any available, viable theory of defense that would have allowed the jury to acquit Mr. Smith of capital murder. In fact, for all intents and purposes, counsel appeared to concede the robbery element of the indictment. Defense counsel also appeared to admit that Mr. Smith, their mentally retarded client,  participated in a "plan" to rob Mr. Van Dam. (R. 141).[8] However, defense counsel never presented at the guilt phase all of the available evidence which suggested that Mr. Smith could not form the intent for capital murder. Nor did defense counsel present available evidence which established that Mr. Smith's mental limitations impaired his ability to form and carry out a plan to commit robbery. Thus, Mr. Smith's counsel failed in opening statements to advocate on his behalf. As direct result of this failure to advocate during opening argument, the prosecutor was able to argue that Mr. Smith "hatched the plan" to commit a robbery which evolved into capital murder. ( R. 649).

62.    Similarly, trial counsel failed to argue any viable theory of defense Mr. Smith's behalf of during closing arguments. Trial counsel never pointed out the numerous inconsistencies in testimony by the state's witnesses. ( R. 660- 669). Since there were defenses available, based on the

---

[8] Defense counsel said in opening statements:

> I submit to you that there will be evidence that will suggest that Jody Smith, our client over here, did participate in the robbery of Durk Van Dam, and you're going to hear about that. But that doesn't answer the fact that he may or may not, and the evidence may suggest that he participated in the robbery of Durk Van Dam, that does not answer the question of whether or not there is an intentional killing. And the Judge will give you further instructions and details about that.

(R. 142).

evidence presented to the jury, such a failure constituted ineffective assistance of counsel. *See Herring v. New York*, 422 U.S. 853 (1975)(" . . . no aspect of such advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment."). As a result of these errors and as further discussed *infra*, trial counsel denied Mr. Smith his rights to assistance of counsel, a fair trial, and a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Habeas corpus relief is warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

> **2.    No Coherent Theory Of Defense Was Formulated Or Presented,  Even though a Legal Defense Was Supported by the Evidence and Readily Available to Defense Counsel.**

63.    Defense counsel simply relied on their cross-examination of the State's witnesses, and called no witnesses on Mr. Smith's behalf during the guilt phase of the trial. This, in and of itself, constitutes ineffective representation. Trial counsels' failure to investigate the crime "resulted in a 'factual vacuum'" that c[an] not "withstand Sixth Amendment scrutiny because [trial counsel] did not *choose* strategically or otherwise to pursue one line of defense over another. Instead, [he] simply abdicated his responsibility to advocate his client's case." *Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985)(emphasis in original, internal citation and quotations omitted). This failure to develop and present any defense strategy seriously prejudiced Mr. Smith because there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.  *See, e.g.*, *House v. Balkom,* 725 F.2d 608, 618 (11th Cir.), *cert. denied,* 469 U.S. 870 (1984).

64.    To impose a sentence of death, the State must present sufficient evidence of an intent to kill. *Enmund v. Florida,* 458 U.S. 782 (1982). Had defense counsel been effective, they could

have and should have shown that, due to his mental retardation, Mr. Smith lacked the ability to formulate the necessary intent and plan out the robbery and murder of Mr. Van Dam.

65.     Counsel could have and should have put on evidence showing that Mr. Van Dam's death was due to planning by several persons, namely the State's witnesses, and that the crime was not planned or even anticipated by Mr. Smith. *See, e.g., Nixon v. Newsome*, 888 F.2d 112, 115 (11th Cir. 1989)(counsel found ineffective for failing to impeach state witness when "[f]aced with glaring and crucial discrepancies between [prosecution witness'] testimony at the two trials, the attorney failed to follow up on his cross-examination by confronting her with her statements or by introducing the transcript.") Counsel could have and should have put on evidence showing that Mr. Smith was under the control and domination of Mr. Reid at the time Mr. Van Dam was killed. It is fundamental that "competent counsel would have been sufficiently familiar with his client's case to recognize the weak points in the State's case." *Young v. Zant*, 677 F.2d 792, 798 (11th Cir. 1982).

66.     Counsel failed to be effective advocates for their client. Had trial counsel been effective advocates and presented a coherent theory of defense, they could have shown that the State could not prove Mr. Smith's guilt beyond a reasonable doubt or, the jury could have found Smith guilty of lesser included charges.[9] *Daniel v. Thigpen*, 742 F.Supp. 1535, 1553 (M.D. Ala.1990)("Lesser included offense instructions provide a crucial procedural safeguard to defendants charged with capital offenses.") Mr. Smith was severely prejudiced by defense counsels' lack of any theory of defense grounded in fact or law. As a result of these errors and as further discussed *infra*, trial counsel denied Mr. Smith his rights to assistance of counsel, a fair trial, and a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to

---

[9]  It must be noted that Mr. Reid, the co-defendant in this case, is serving a sentence of **life *with* parole**.

26

the United States Constitution. Habeas corpus relief is warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**H.      Trial Counsel Were Ineffective for Failing to Have the Trial Judge Recused, on the Basis of Judge Galanos' Prosecution of Mr. Smith in 1990.**

67.      "[I]t ... violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." *Tumey v. Ohio*, 273 U.S. 510, 523 (1927).  However, trial counsel failed to move for the recusal of trial judge from Mr. Smith's capital murder trial, despite the judge's prior involvement in an essential element of the same matter in controversy.  The failure to seek and obtain the disqualification and removal of the trial judge violated Mr. Smith's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

68.      In 1990, Chris Galanos, acting as the prosecutor, indicted Mr. Smith for Burglary in the Third Degree.  Mr. Smith pled guilty and was sentenced to a term of 10 years.  The court ordered Mr. Smith to complete a 180-day boot camp and, pending good behavior, agreed to suspend the remainder of the sentence.  In 1994, Chris Galanos was elected to serve as the Circuit Judge for Mobile County.  In his capacity as Circuit Judge, Chris Galanos was assigned to Mr. Smith's 1998 capital murder trial.  At the penalty-phase, the state asserted that this 1990 conviction was an aggravating circumstance supporting the capital murder charge against Mr. Smith. (C.R. 184). Acting in reliance on this conviction, Judge Galanos' sentencing order stated that: "The capital offense was committed while the Defendant was under sentence of imprisonment. The State introduced into evidence a certified copy of a conviction for two burglaries and one receiving stolen property, dated February 22, 1990. That sentence had not been completed on November 23, 1998. Therefore, this Section 13-49(1) aggravating circumstances is proven beyond a reasonable doubt

27

and is considered." *Id.* Notwithstanding Judge Galanos' former role as the prosecutor in Mr. Smith's 1990 predicate conviction, trial counsel failed to move for Judge Galanos' recusal.

69.     Legal grounds exist for recusal when "an objective disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *Glassroth v. Moore,* 229 F.Supp.2d 1283, 1285 (M.D. Ala.2002), *quoting Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir.1988). In capital cases, where the defendant's life is at stake, the need to avoid the appearance of impropriety is heightened. *See Furman v. Georgia,* 408 U.S. 238 (1972)(declaring that the death penalty must be imposed fairly, and with reasonable consistency, or not at all). The United States Supreme Court has held that the constitutional requirements of Due Process and of a fair trial turn on the appearance of prejudice rather than a finding of actual prejudice. *See In re Mucherson*, 349 U.S. 133, 136 (1955) ("A fair tribunal is a basic requirement of due process . . . [s]uch a stringent rule may sometimes bar trial by judges who have no actual bias."); *Offutt v. United States*, 348 U.S. 11, 14 (1954) ("Justice must satisfy the appearance of justice."). Indeed, the right to a fair and impartial judge is such a fundamental component of due process that trial before an impartial judge is not subject to harmless error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 308 (1991), *citing Tumey v. Ohio*, 273 U.S. 510 (1927).

70.     The existence and validity of the 1990 conviction was an element of Mr. Smith's case before Judge Galanos. The courts have held that *any* prior involvement by the trial judge in the prosecution of the defendant in the same matter in controversy requires the disqualification of that judge. *See, e.g.*, *Callahan v. Haley*, 313 F. Supp.2d 1252, 1262 (N.D. Ala. 2004), *reversed on other grounds*, (granting federal habeas relief where the trial judge refused to recuse himself from ruling

on the voluntariness of the defendant's confession after participating in the interrogation that produced the confession). In the instant case, a defense motion to recuse Judge Galanos was warranted precisely because his actual participation as the prosecutor in Mr. Smith's 1990 prosecution cast doubt on his ability to consider impartially the conviction that formed the basis for an aggravator in Mr. Smith's 1997 capital murder trial and because Judge Galanos would be required at the final judicial sentencing phase to consider what weight to give the conviction as a an aggravating factor. *See Lewis v. Jeffers*, 497 U.S. 764, 782 (1990)(noting that "state court findings of aggravating circumstances often require a sentencer to 'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'") Putting aside Judge Galanos' long record of reversals for failure to recuse himself,[10] trial counsel should have requested his recusal. If trial counsel had filed a recusal motion, Judge Galanos' failure to recuse himself would have been reversible error. *See In re Murchison*, 349 U.S. 133 (1955)*; See also Tumey v. Ohio*, 273 U.S. 510 (1927).

71.    "[I]n light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance," *Strickland,* 466 U.S. at 690, and prejudiced Mr. Smith's rights to a fundamentally fair trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and habeas corpus relief is warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

> **I.    Trial Counsel were Ineffective for Failing to Object to Numerous Instances of Prosecutorial Misconduct During the Guilt Phase, Depriving Mr. Smith of Due Process and a Fundamentally Fair Trial and Effective Assistance of Counsel.**

---

[10] *See, e.g., Ex parte Sanders*, 659 So. 2d 1036 (Ala. Crim. App. 1995); *Crumpton v. State*, 677 So. 2d 814 (Ala. Crim. App. 1995).

72. The prosecutor's duty in a criminal prosecution is to seek justice. *Berger v. United States*, 295 U.S. 78, 88 (1935). The prosecutor is prohibited by law from using improper methods calculated to produce a wrongful conviction. *Id.* The prosecutor violated these fundamental precepts of due process, fair trial, and a reliable sentencing by engaging in numerous instances of improper argument, in violation of Mr. Smith's constitutional rights. Trial counsel deprived Mr. Smith of effective assistance of counsel by failing to object to these instances of prosecutorial misconduct, in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

73. In *United States v. Young,* 470 U.S. 1, 18-19 (1985), the United States Supreme Court explained the dangers inherent in a prosecutor's vouching for the credibility of the prosecution's witnesses:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

In failing to object to several such instances of prosecutorial misconduct, trial counsel rendered ineffective assistance of counsel and thus deprived Mr. Smith of his rights to due process and to a fundamentally fair trial.

74. Trial counsel rendered ineffective assistance of counsel by failing to object when the prosecutor improperly argued facts not in evidence to obtain a death sentence, by improperly referring to a statement by Mr. Smith's co-defendant, and by improperly vouching for the credibility

of the statement, which was not in evidence. (R. 657). Mr. Reid's statements were never admitted into evidence and therefore were an improper subject for any prosecutor's comment. *See Bruton v. United States*, 391 U.S. 123 (1968). It is improper for the prosecutor to argue facts that are not in evidence or to misstate the facts. *See Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). Mr. Smith's trial counsel failed to object to this improper conduct, depriving Mr. Smith of the effective assistance of counsel.

75.     This kind of abuse unfairly plays upon the jury's susceptibility to credit the prosecutor's viewpoint.  The prestige and authority inherent in the role of the prosecutor may induce jurors to trust the prosecutor's opinion over that of defense counsel, or even their own.  Thus, misconduct by the prosecutor has a particularly prejudicial effect in a capital trial.  *See Berger v. United States*, 295 U.S. 78 (1935)(stating that the average juror has such confidence in prosecutor's obligations to be fair, that improper remarks  by the prosecutor "are apt to carry much weight against the accused when they should properly carry none."); *Walker v. Davis*, 840 F.2d 834, 838 (11th Cir. 1988).

76.     Trial counsel were also ineffective for failing to object to the State's improper comments on Mr. Smith's character.  During closing arguments, the prosecutor referred to Mr. Smith as a "thief" (R. 648) and "a liar." (R. 656).  Although evidence of a person's character or a trait of character is inadmissible for the purpose of proving action in conformity therewith on a particular occasion, the prosecutor commented on Mr. Smith's character in order to convince the jury that he was guilty of capital murder.  The Supreme Court has held that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction . . . while [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones."  *Berger v. United States*, 295 U.S. 78, 88 (1935).

In addition, these statements were clearly meant to inflame the jury, and as such were improper. *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976); *see also Romine v. Head*, 253 F.3d 1349, 1366 (11th Cir. 2001)(stating habeas relief is due to be granted for improper prosecutorial argument at sentencing if "the improper argument rendered the sentencing stage trial fundamentally unfair").

77.     These improper comments, taken individually and collectively, denied Mr. Smith a fair trial, which resulted in the denial of his due process rights. *Darden v. Wainright*, 477 U.S. 168 (1986); *Kyles v. Whitley,* 514 U.S. 419 (1995).  A death sentence imposed under such circumstances lacks the requisite reliability mandated in capital cases. *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). Trial counsels' failure to object to this misconduct denied Mr. Smith's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and habeas corpus relief is warranted.  28 U.S.C. § 2254(d)(1),(d)(2).

**J.      Trial Counsel were Ineffective for Failing to Raise a *Batson* Challenge**

78.     It is firmly established law that race and gender are an improper basis for removal of a potential juror and are simply irrelevant to a person's fitness to serve as a juror. *Batson v. Kentucky*, 476 U.S. 79 (1986);  *See J.E.B. v. Alabama*, 511 U.S. 127 (1997).  In *Batson,* the United States Supreme Court held that a prosecutor's racially discriminatory use of peremptory challenges undermines the integrity of the judicial process and violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See Batson,* 476 U.S. at 89 ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.").

79.     "[T]he striking of one black juror for a racial reason violates the Equal Protection

Clause, even where other black jurors are seated, and even when valid reasons for the striking of some black jurors are shown." *United States v. David,* 803 F.2d 1567, 1571 (11th Cir.1986). Thus, "the presence of blacks on the jury, while significant, does not preclude a finding of racial discrimination." *Eagle v. Linahan*, 279 F.3d 926, 942 (11th Cir. 2001)(citations omitted); *see also Cochran v. Herring*, 43 F.3d 1404, 1412 (11th Cir.1995); *United States v. Allison,* 908 F.2d 1531,1537 (11th Cir.1990). In this case, the prosecutor systematically removed black jurors and Mr. Smith was denied his right to a jury formed without racial discrimination, in violation of his rights to Due Process and Equal Protection under the Fifth and Fourteenth Amendments to the United States Constitution. Defense counsel were ineffective for failing to object to and challenge this improper conduct. Their failure to do so rendered their performance deficient and prejudiced Mr. Smith, by depriving him of his Federal and State constitutional rights to due process, a fair trial, and to an impartial jury. *See Strickland*, 466 U.S. at 686.

80.     After the proper execution of strikes for cause, there were thirty eight people left on the jury venire. *See* (R. 13-113). Of those people, thirteen (34%) were black and twenty five (65%) were white. The defense and the prosecution were each given thirteen peremptory strikes. The prosecution used their strikes to remove eight of the thirteen black members of the venire (61%). They struck five out of the six black males on the venire (83%), while only striking one out of the eleven white males (9%). They also struck three out of seven black females (42%) and only four out of fourteen (28%) white females. *See* (R. 13-113). Defense counsel failed to object or make a *Batson* challenge, despite this clear evidence of a prima facie case of discrimination. *See Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003) ("statistical evidence alone raises some debate as to whether the prosecution was acting with race-based reason" where State used 10 of its 14 peremptory strikes to

remove 91% of the African-Americans from the venire); *Cochran v. Herring*, 43 F.3d 1404, 1410 (11th Cir. 1995)(finding prima facie case where prosecution used fifty percent of strikes to eliminate black prospective jurors).

81.     In addition, these strikes were even more disproportionate because the jury venire was broken up into panels, and the way in which the peremptory strikes were made from these panels highlighted the prosecution's discrimination. There were three full panels of fifteen persons per panel, and three persons from panel four, for a total of forty eight people.  After strikes for cause, panel one was comprised of three black prospective jurors and nine white prospective jurors. Of this entire panel, the prosecution struck two persons, both of whom were black. This means that the prosecution struck two out of three black jurors (66%), no white jurors (0%) and used 100% of their strikes to eliminate black jurors. This should also have caused Mr. Smith's counsel to object and raise a  *Batson* challenge.  Upon the prosecution's first peremptory challenge of an black venire member, Mr. Smith was entitled to a *Baston* hearing.  *See Cochran v. Herring*, 43 F.3d 1404, 1410 (11th Cir. 1995).

82.     In the second jury panel, after strikes for cause, there were thirteen remaining jurors, four black and nine white.  The prosecution struck five jurors, three of them black. This means that the prosecution struck three of the four prospective black jurors (75%) and only two out of the nine white jurors (22%). Defense counsel were again ineffective, in failing to object to and challenge the prosecutions discriminatory use of their peremptory challenges.

83.     In total, after two panels, the prosecution had struck (75%) of the possible black jurors and had used (75%) of their strikes to eliminate black jurors from the jury.  Clearly, at this point, defense counsel should have raised a *Batson* challenge, and failure to do so constituted

34

ineffective assistance of counsel.

84.     In the third panel, after strikes for cause, there were a total of eleven possible jurors. Of those eleven, four were black. The prosecution again struck (75%) of the black jurors. The Supreme Court has held that the burden a defendant must meet to establish a prima facie case under *J.E.B.* and *Batson* is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). A mere "inference" of discrimination satisfies a prima facie case. *Batson*, 476 U.S. at 96; *Johnson v. California*, 125 S. Ct. 2410, 2417 (2005)(confirming that "a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred"). In this case, there was more than an "inference" of discrimination: there was a clear pattern.[11] Based on the facts adduced above, upon the proper motion, Mr. Smith's trial counsel could have made out a prima facie case of discriminatory jury selection by "the totality of the relevant facts" about the prosecutor's conduct during his trial. *Miller-El v. Dretke*, 125 S. Ct. 2317, 2324 (2005); *Batson*, 476 U.S. at 94.

85.     "Where, as here, ... counsel fails to raise a [*Batson*] claim ... that is so obviously valid that any competent lawyer would have raised it, no further evidence is needed to determine whether counsel was ineffective for not having done so. ...[N]o conceivable reason that [counsel] might have proffered would have made [his] failure to pursue the claim reasonable. [His] failure to raise it, standing alone, establishes [his] ineffectiveness." *Eagle v. Linahan,* 279 F.3d 926, 943 (11th Cir. 2001)(granting habeas relief on counsel's failure to raise appellate *Batson* claim); *See Strickland*, 466 U.S. at 686. The validity of the *Batson* claim also establishes prejudice because, "had the claim been presented, the supreme court would have had two options: remand the case for an evidentiary

---

[11] The only reason why the prosecution could not strike the two black jurors from panel four was because they had already used their 13 strikes.

hearing concerning the prosecutor's motive for peremptorily challenging the black venire persons or remand the case for a new trial." *Eagle v. Linahan*, 279 F.3d at 943. Counsels' failure to make a *Batson* motion thus violated Mr. Smith's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and habeas corpus relief is warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

> **K.   Trial Counsel Were Ineffective During the Penalty Phase of Mr. Smith's Trial, Thus Resulting in the Unjust and Unconstitutional Imposition of the Death Penalty.**

86.   Mr. Smith's trial counsel were ineffective during the penalty phase of the trial, resulting in the jury's recommendation, by 11-1, for the death penalty, and the trial judge's imposition of the death penalty without finding *any* mitigating factors. Trial counsels' representation of Mr. Smith in the penalty phase of his capital trial was inadequate[12] and ineffective, and denied Mr. Smith a fair penalty phase determination as required under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *Williams v. Taylor*, 529 U.S. 362 (2000); *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Habeas corpus relief is warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

> **1.   Trial Counsel Failed To Investigate Adequately and Independently Mitigation Evidence Critical To Mr. Smith's Penalty Phase Defense.**

87.   The trial court and the jury must consider "any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Thus, trial counsel "has a duty

---

[12] Trial counsels' entire penalty phase presentation lasted less than 17 pages in the record. (R. 1106-28)

to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir. 1994). "'The primary purpose of the penalty phase is to insure that the sentence is individualized by focusing [on] the particularized characteristics of the defendant. By failing to provide such evidence to the jury, though readily available, trial counsel's deficient performance prejudices [a petitioner's] ability to receive an individualized sentence.'" *Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003), *quoting Brownlee v. Haley*, 306 F.3d 1043, 1074 (11th Cir. 2002)(alterations in original)); *see also Gregg v. Georgia*, 428 U.S. 153, 206 (1976)(a jury must consider "the particularized nature of the crime and the particularized characteristics of the defendant"); *Lockett*, 438 U.S. at 604 (sentencer must "not be precluded from considering *as a mitigating factor*, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death")(emphasis in original).

88.    The only way in which trial counsel can comply with this constitutional requirement to present the "particularized characteristics" of their client to the jury is by conducting a thorough investigation into his life and background. "Trial counsel performs deficiently by not providing readily available mitigating evidence to the jury at the penalty phase because he prejudices a convicted defendant's receiving an individualized sentence." *Hardwick*, 320 F.3d at 1163. Courts routinely vacate death sentences where counsels' failure to investigate has resulted in their inability to uncover and present the particularized characteristics of the defendant to the sentencer.[13] The

---

[13] *See, e.g, Brownlee v. Haley*, 306 F.3d 1043 (11th Cir. 2002) (trial counsel ineffective where they "failed to conduct any kind of substantive investigation into his background or character for purposes of presenting potentially mitigating evidence at sentencing until after the jury returned its advisory verdict, and that such constituted deficient performance within the meaning of *Strickland*"); *Battenfield v. Gibson*, 236 F.3d 1215 (3d Cir. 2001) (trial counsel ineffective during penalty phase where they "fail[ed] to conduct an adequate investigation . . . there was no strategic decision at all

ABA Guidelines in effect at the time of Mr. Smith's trial stated:

> Counsel should present to the sentencing entity or entities all reasonably
> available evidence in mitigation . . .
>
> 1. Medical history (including mental and physical illness or injury, alcohol
> and drug use, birth trauma and developmental delays);
> 2. Educational history . . .;
> 3. Military service . . . ;
> 4. Employment and training history . . .;
> 5. Family and social history (including physical, sexual or emotional abuse,
> neighborhood surroundings and peer influence); and other cultural or religion
> influence, professional intervention . . . or lack thereof . . .
> 6. Rehabilitative potential . . .;
> 7.  Record or prior offenses. . ..

ABA Guideline 11.8.6(B) (1989).  The performance of Mr. Smith's trial counsel does not come close

to meeting these guidelines.

89.    "An attorney who fails altogether to make any preparations for the penalty phase of

a capital murder trial deprives his client of reasonably effective assistance of counsel by any

objective standard of reasonableness." *Blake v. Kemp,* 758 F.2d 523, 533 (11th Cir.1985), *cert.*

*denied,* 1264 474 U.S. 998(1985); *See also, Middleton v. Dugger,* 849 F.2d 491 (11th

Cir.1988)(where a defendant's counsel at the penalty phase fails to discover and present substantial

available documentary evidence of defendant's psychiatric history, he has been denied the effective

---

because Shook was ignorant of various other mitigation strategies he could have employed"); *Jermyn v. Horn*, 266 F.3d 257 (3d Cir. 2001) ("Counsel was ineffective because he failed to conduct an investigation, failed to prepare adequately for the penalty phase of Jermyn's trial, and consequently, failed to present substantial mitigating evidence that would have directly undercut the state's penalty-phase case"); *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) ("[A] legal decision to forego a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation."); *Baxter v. Thomas*, 45 F.3d 1501, 1514 (11th Cir. 1995) ("'[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make reasonable choices between them") (*quoting Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991); *Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991) ("[T]he haphazard and desultory efforts made by counsel to secure mitigation evidence resulted in representation that fell below any objective standard of reasonableness.").

assistance of counsel.) Trial counsel for Mr. Smith failed to investigate or prepare adequately for the penalty phase and thus failed to obtain important and available information regarding Mr. Smith's family and social history, employment history, educational history, medical history, mental health history, correctional history, and community and cultural influences. Counsel thus failed to meet minimum, reasonable criteria for effective representation.[14]

90.     Trial counsel for Mr. Smith failed entirely to investigate matters relevant to the penalty phase. The private investigator retained by the defense performed no mitigation investigation. Neither the investigator nor trial counsel ever met with or interviewed the majority of Mr. Smith's family. Mr. Smith has four siblings and several step siblings, all of whom lived near Mobile County at the time of the trial. Each of these family members were available and willing to provide information regarding Mr. Smith's abusive childhood. Although trial counsel called Mr. Smith's two sisters and his mother to the stand during the penalty phase, numerous other family members, neighbors, and acquaintances were available to provide the mitigating information but were excluded from the evidentiary presentation. Mr. Smith also has several family friends, and extended family members who were available in Mobile County as sources of mitigating evidence

---

[14] American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 11.4.1(A)(2)(c)&(C)(adopted by the ABA House of Delegates Feb. 7, 1989). *See Strickland v. Washington*, 466 U.S. 668 (1984); *see also Wiggins v. Smith*, 123 S. Ct. 2527 (2003); *See Baxter v. Thomas*, 45 F.3d 1501 (11th Cir. 1995) (finding counsel ineffective in penalty phase due to lack of investigation into mental health mitigating evidence); *Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989) (finding counsel ineffective in penalty phase because of lack of investigation into family background and other mitigating evidence); *Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988) (finding counsel ineffective in penalty phase due to counsel's failure to request readily discoverable documentary mitigating evidence); *King v. Strickland*, 748 F.2d 1462 (11th Cir. 1984) (finding counsel ineffective in penalty phase because of failure to complete any reasonable investigation of mitigating evidence); *Douglas v. Wainwright*, 714 F.2d 1532 (11th Cir. 1983) (finding counsel ineffective in penalty phase due to complete lack of investigation into mitigating evidence and no contact with family members).

related to Mr. Smith and his family. None of these people were contacted by trial counsel. *See, e.g., Wiggins v. Smith*, 123 S.Ct. 2527, 2542 (2003)(noting that counsel failed to uncover evidence that client never had a stable home and was repeatedly subjected to gross physical, sexual, and psychological abuse).

91.     Even with the witnesses called, trial counsel failed to elicit sufficient testimony regarding available and material mitigating evidence. The jury heard only that Mr. Smith's parents divorced when he was young, that he and his siblings were abused as children, and that his mother was also the victim of domestic violence. (R. 802-814). Those accounts failed to describe fully Mr. Smith's traumatic life – his inability to function normally because of mental retardation, his history of severe head trauma, the severe psychological and physical torture he endured at the hands of family members, his family's dire poverty, his victimization by so-called friends, and horrific physical abuse inflicted upon his mother and siblings. Trial counsels' "minimal questioning of [Mr. Smith's family] resulted in the jury's being deprived of substantial mitigating evidence regarding [Mr. Smith]." *Cunningham v. Zant*, 928 F.2d 1006, 1017 (11th Cir. 1991). As result, "[t]he jury was called upon to determine whether a man whom they did not know would live or die; they were not presented with the particularized circumstances of his past and of his actions on the day of the crime that would have allowed them fairly to balance the seriousness of his transgressions with the conditions of his life. Had they been able to do so, ... it is at least reasonably probable that the jury would have returned a sentence other than death." *Collier v. Turpin*, 177 F.3d 1184, 1204 (11thCir. 1999).

92.     Had Mr. Smith's trial counsel been effective in the preparation and presentation of the mitigation portion of the trial, they would have interviewed the following persons and elicited their testimony on Mr. Smith's behalf: Leo Smith; Rose Ann Tuck; Sharon T. Morris; Hollis Luker;

40

Chris Smith; Jason Smith; Rebecca Smith; JoAnn Harrison; Billy Harrison; Nada Hinman; Terry Hinman; Teresa Autry; Bryant Autry; Mitchell Smith; Pat Smith; Maria Lee; Danny Lee; Helen Braman; Steve Brayman; David Smith; Tess Smith; Lynn Harrison; Glenda Smith; Pearl Hammons; Charles Dickenson; and Thelma Thorton. In sum, many others could have testified about Mr. Smith's background. "[T]he fact that others did not do so undoubtedly diminished the impact on the jury of the facts [that the few testifying witnesses] described." *Stephens v. Kemp,* 846 F.2d 642, 654 (11th Cir. 1988). Had trial counsel elicited all the relevant information from the persons who did testify and put on the other witnesses who did not testify, they would have been able to show the jury the following:

93.     Mr. Smith, his brothers, sisters and his mother were subjected to constant verbal, emotional and physical abuse throughout their lives. The abuse included severe beatings, torture, constant fear, name calling, and the witness of animal torture. This abuse was inflicted on Mr. Smith and others by his grandfather, father, and step-father. *See Williams v. Taylor*, 529 U.S. 362, 395 (2000)(finding counsel ineffective for failing to uncover and present evidence of defendant's nightmarish childhood, borderline mental retardation, and good conduct in prison"); *Brownlee v. Haley*, 306 F.3d 1043, 1070 (11th Cir. 2002).

94.     Mr. Leo Smith, Mr. Smith's father, is an abusive alcoholic. Often, Leo Smith would get drunk and beat Mr. Smith and his brothers. He would beat them with his fists, or whatever he could get his hands on, including fan belts and water hoses. The beatings happened on a regular basis and got progressively worse.

95.     At some point, Mr. Smith's mother gathered the courage to leave Leo Smith and shortly thereafter, married Mr. Hollis Luker. Unfortunately for Mr. Smith and his family, Mr. Luker was also an alcoholic, who was even more physically abusive than Leo Smith.

41

96.     While living with Hollis Luker, Mr. Smith and his family were in constant fear for their lives.  Mr. Luker would beat Mr. Smith and his mother without mercy.  On one occasion, Mr. Smith tried to save his mother when he thought that Mr. Luker was going to kill her. Mr. Luker reacted by taking a baseball bat and hitting Mr. Smith on the side of his head, inflicting a permanent deformity.  Mr. Luker also beat Mr. Smith's brothers and abused his sisters.  At the age of 16, and out of fear for her life, Mr. Smith's oldest sister went to live permanently with her grandparents. *See Cunningham v. Zant*,  928 F.2d 1006, 1018 (11th Cir. 1991)("[I]n light of the ready availability of this evidence and in the absence of a tactical justification for its exclusion, the failure by trial counsel to present and argue during the penalty phase any evidence regarding Cunningham's mental retardation, combined with their failure to present and argue readily available additional evidence regarding Cunningham's head injury, his socioeconomic background, or his reputation as a good father and worker, fell outside the range of professionally competent assistance.")

97.     Even Mr. Luker's sons, Mr. Smith's step-brothers, were abusive towards Mr. Smith. Once, while Mr. Smith was standing close to a fire to get warm, one of his step-brothers threw gasoline on Mr. Smith's legs. Mr. Smith's legs caught fire and left him with severe permanent scaring. He had to undergo extensive treatment and therapy, and was confined to a wheelchair for at least two weeks.

98.     At an early age, Mr. Smith and his siblings were forced to witness horrendous acts of animal cruelty. Mr. Smith's grandfather, who was also abusive to his grandchildren, would ask one of his grandchildren to go and "pick out" a kitten or a puppy. When the child would return with the chosen animal, the grandfather would "pop" the animal's head on a fence post, in front of the children. Leo Smith would often toss kittens into the family's wood burning stove and burn them alive. On one occasion, he was so angry with a small kitten, who was walking around under the

42

dining room table, that he stomped the kitten to death.

99.     Mr. Smith grew up in extreme poverty.  There were many times in his childhood when that went without meals.  Most of the family's money would go to buy beer for either Hollis Luker or Leo Smith. In the meantime, the children would often go without food. Sometimes, in order to eat, Mr. Smith and his siblings would pick pears and berries off of trees and vines in the neighborhood.

100.     Besides being undernourished, Mr. Smith never experienced the normal benefits of childhood.  Christmas and other holidays were almost never observed.  On a couple of occasions, Mr. Smith's mother would receive help from nearby churches, so that her children would have presents, but most of the time they would get nothing.

101.     Due to his poverty, mental retardation and childhood victimization, Mr. Smith has never had any meaningful relationships.  He has never had any close friends.  Most of the people who called themselves his friends, would use him and take advantage of his mental limitations. Mr. Smith was always a follower and always just wanted to "fit in."  Often, this would get him into trouble, because he lacked the ability to discern and understand consequences of his actions.

102.     Mr. Smith was hanging out with a group of boys his own age who were breaking into pawn shops, stealing merchandise and then selling it to other pawn shops.  A large group of these boys got caught and were sentenced to various time in prison. Mr. Smith was sentenced to 180 days of boot camp. Due to his inability to adapt to incarceration, he ultimately spent about 6 years in prison for this offense.

103.     When he got out of prison, Mr. Smith went to live with his father at the HiWay Host Motel. The Motel was known in the Theodore, Alabama area as being a high crime area.  Several burglaries of nearby shops and other stores were attributed to residents of the HiWay Host.  In 2000,

the city of Mobile bought the Motel and demolished it.

104.    While growing up, Mr. Smith was never surrounded by positive role models.  His father, step-father, brothers, step-brothers, cousins and uncles have all had run-ins with the law. Many of them have extensive criminal backgrounds.

105.    Much of their criminal behavior can be attributed to their alcoholism.  Most of the male members of Mr. Smith's family are alcoholics and many of them have drug problems.  When he was twelve years old, Mr. Smith's step-father introduced him to beer.  Mr. Smith drank heavily from the age of twelve years old.  Extensive alcohol abuse from an early age, mixed with Mr. Smith's limited mental abilities, led to several of Mr. Smith's problems while growing up.

106.    Mr. Smith never had success in school or with any type of education. He never received help or support for his schooling from his family.  The schools that he attended regularly advised his parents of his special needs and would suggest programs that might help him. Neither of his parents followed up on these suggestions or took any affirmative steps with regard to his education; they let him drop out of school forever, in the seventh grade.

107.    Mr. Smith also lacked basic life skills. This led to frustration and anger problems for Mr. Smith. His mental retardation affected his relationships, education, employment, and successful adaptability.

108.    Despite the severe abuse, mental retardation and extreme poverty, Mr. Smith managed to gain a soft and mild personality and developed a reputation in his community for being a good person. Often, Mr. Smith would do odd jobs around his trailer park for the park manager. Although he could only perform menial tasks, he was considered to be an honest and hard worker.

109.    "The jury never heard [the majority] of this and neither did the mental health experts

who examined [Mr. Smith] before trial." *Rompilla v. Beard*, 125 S.Ct. 2456, 2469 (2005). The evidence adduced above amounts to a mitigation case that bears no relation to the sketchy mitigation evidence actually put before the jury, and "although ... it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered 'mitigating evidence, taken as a whole, might well have influenced the jury's appraisal' of [Mr. Smith's] culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla,* 125 S.Ct. at 2469*; quoting Strickland,* 466 U.S. at 694; *Wiggins*, 539 U.S. at 538 and *Williams v. Taylor,* 529 U.S. at 398; *See also Woodson*, 428 U.S. at 305 (noting the qualitative difference in the need for reliability in a jury's determination that death is appropriate in a capital case).  Counsels' unprofessional errors violated Mr. Smith's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and habeas corpus relief is warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

>        **2.    Trial Counsel Were Ineffective in  Failing to Obtain Necessary Expert Assistance, in Violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

110.    Counsel were ineffective for failing to procure the assistance of a neuropsychologist. A criminal defendant's right to the benefit of expert assistance is constitutionally recognized  and protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *See Ake v. Oklahoma*, 470 U.S. 68 (1985); *Griffin v. Illinois*, 351 U.S. 12 (1956). In *Ake,* the Supreme Court established that one of the "basic tools of an adequate defense" is competent psychiatric assistance, when indicated. 470 U.S. at 80.  By failing to request funds for all necessary expert assistance, trial counsel deprived Mr. Smith of crucial defense testimony about his mental

45

state at the time of the crime; of the ability to assist in his own defense; and of the ability to discover, prepare, and present critical mitigating evidence that the jury and the judge should have considered before sentencing him to death.[15]

111.    Trial counsel referred Mr. Smith to Dr. James Chudy for an evaluation to obtain psychological information that might be helpful in his defense against the capital murder charges. In finding that Mr. Smith was borderline mentally retarded, Dr. Chudy advised that the testing instrument on which he relied, the Bender Gestalt, was not reliable for testing for organic problems. (R. 918). "In order to get a more accurate and thorough picture of such problems he would need to be tested by a much more comprehensive neuropsychological instrument." *Id.* Mr. Smith was constitutionally entitled to an expert who would examine him for possible organic problems. *Ake v. Oklahoma*, 470 U.S. 68 (1985); *see also Griffin v. Illinois*, 351 U.S. 12, 19 (1956)("There can be no equal justice when the kind of trial a man gets depends on the amount of money he has.") Therefore, once Dr. Chudy put defense counsel on notice this preliminary evaluation was inadequate to reveal whether Mr. Smith was suffering from any neuropsychological impairment, they had a duty to pursue an evaluation by a qualified expert. *See Cunningham v. Zant*, 928 F.2d 1006, 1018 (11th Cir.1991)(finding assistance ineffective when counsel ignored "red flags" that any reasonable attorney would have perceived to demand further investigation). Because Mr. Smith never received such an evaluation, he was deprived of his right to an expert who could explain the effects of his mental impairments at the guilt-phase and his relative culpability at the sentencing phase of the

---

[15] *See* ABA *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* 10.4 Commentary (2003) (stating that at "every stage of the case, lead counsel is responsible, in the exercise of sound professional judgment, for determining what resources are needed and for demanding that the jurisdiction provide them"); *See also Strickland,* 466 U.S. at 688-689 ("Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable").

proceedings.

112.    In addition to emotional and psychological abuse, Mr. Smith suffered physical abuse, which left him permanently deformed.  When he was young, Mr. Smith's ear was almost taken off by his step-father, using a baseball bat.  His legs were burned by his step-father and step-brother. He was beaten by his own father, and introduced to alcohol at a very early age.  It is very likely that the physical abuse caused or contributed to organic mental problems.  These organic problems may have led to his mental retardation or, at the very least, complicated it. Defense counsels' failure to obtain appropriate testing for Mr. Smith was ineffective, especially considering the recommendation made by their own expert.

113.    Due to Mr. Smith's early and numerous injuries, suffered at the hand of abusive parents, and due to his early exposure to alcohol and alcoholism, trial counsel should have secured the services of a substance-toxicologist; a Psychopharmacologist; an expert in the area of Environmental  Exposure; and an expert in the area of Post-Traumatic Stress Disorder. Counsel's failure to obtain the proper and necessary experts was ineffective and violated Mr. Smith's rights under the Fifth, Sixth, Eighth,  and Fourteenth Amendments to the United States Constitution, and habeas corpus relief is warranted.  28 U.S.C. § 2254(d)(1), (d)(2).

**3.    Trial Counsel Were Ineffective for Failure to Object to Improper Jury Instructions, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.**

114.    Trial counsel were ineffective in failing to properly object, to challenge and to litigate the erroneous jury instructions given by the trial court. During the sentencing phase of this case, the judge stated the following to the jury as instructions on mitigation evidence:

47

"[I]f after a full and fair consideration of all of the evidence in this case you are convinced *beyond a reasonable doubt that the mitigating circumstances outweigh the aggravating circumstances* ... your verdict would be to recommend the punishment of life imprisonment without parole."

"All right. *And to repeat,* in order to return an advisory verdict of death by electrocution at least 10 of your number must be satisfied beyond a reasonable doubt that aggravating circumstances have been proven and outweigh mitigating circumstances. In order to return an advisory verdict recommending life without parole at least 7 of your number must be *satisfied beyond a reasonable doubt of the existence of mitigating circumstances and* that those mitigating circumstances *outweigh* the aggravating circumstances."

(R. 847-848) (emphasis added).  While counsel did object to the second  misstatement of law, counsel did not object to the first, and did not ask the judge for a proper curative instruction. "[T]rial strategy cannot contemplate the abdication of a lawyer's responsibility to participate on his client's behalf in the process of charging the jury, especially in a case wherein the client faces the death penalty." *Daniel v. Thigpen*, 742 F.Supp. 1535, 1563 (M.D. Ala. 1990).

115.    Rather than explain to the jury that there was a misrepresentation of the law in Alabama as to the weighing of aggravating and mitigating factors and the burden of proof for mitigating evidence, the judge attempted to fix the misstatement by merely stating the correct standard for when a mitigating circumstance is in dispute:

"When a factual existence of an offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."

(R. 855). The judge never corrected the misstatement of the law with regard to telling the jury that they must be "convinced *beyond a reasonable doubt that the mitigating circumstances outweigh the aggravating circumstances*" (R. 847).  Therefore, the jury probably applied an  incorrect statement

of Alabama and United States law.[16]  *See Mills v. Maryland*, 486 U.S. 367 (1988) and *McKoy v. North Carolina,* 494 U.S. 433 (holding invalid capital sentencing schemes requiring juries to disregard mitigating factors not found unanimously); *see also Ex parte Smith,* 795 So.2d 842, 843 (Ala. 2001)(Harwood, J.,dissenting)(noting "that second statement not only fails to correct the earlier error-the statement that, in order to recommend a sentence of life without parole, the jury had to find beyond a reasonable doubt that the mitigating circumstances outweighed the aggravating circumstances -but that second statement could reasonably be understood to restate that earlier error.") Had counsel requested the proper charges, made the necessary objections, and secured accurate instructions, Mr.  Smith's jury would not have convicted him of capital murder.

116.    Trial counsel should have objected  properly and asked the judge to correct both of the erroneous instruction, and to inform the jury that the first two statements were incorrect. Instead, counsel let the jury hear incorrect statements of Alabama law, without proper instruction. Trial counsel allowed the jury to enter deliberations under the impression that they must be satisfied beyond a reasonable doubt that the mitigating factors outweigh the aggravating factors. (R.  847-48, 855).  Failure to make sure that the jury was given a proper curative instruction on this very important jury instruction was ineffective assistance of counsel and it prejudiced Mr. Smith because it deprived him of his right to due process,  a fair trial, and a reliable sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

---

[16] Alabama Code §13A-5-46(e)(3) (1975) provides: "If the jury determines that one or more aggravating circumstances as defined in Section 13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict recommending to the trial court that the penalty be death." "For the death penalty to be imposed in Alabama, it does not have to be proven that beyond a 'reasonable doubt' the aggravating circumstances outweigh the mitigating circumstances. The aggravating circumstances must simply outweigh the mitigating circumstances." *Williams v. State,* 601 So.2d 1062, 1082-83 (Ala. Crim. App.1991), *aff'd*, 662 So.2d 929 (Ala. 1992)

This error warrants habeas relief because it created a "reasonable likelihood that the jury ... applied the challenged instruction in a way that violates the Constitution. " *Boyde v. California,* 494 U.S. 370, 380 (1990). *See* 28 U.S.C. § 2254(d)(1), (d)(2).

## IV.  THE IMPOSITION OF THE DEATH PENALTY ON ONE WHO IS MENTALLY RETARDED VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS AND THE ALABAMA STATE CONSTITUTION

117.    Application of the death penalty to, and execution of, a mentally retarded person violates the Eighth and Fourteenth Amendments to the United States Constitution. *Atkins v. Virginia*, 536 U.S. 304 (2002). In *Atkins,* the Supreme Court set out a three prong test to identify mental retardation sufficient to prohibit application of the death penalty. That test requires (1) subaverage intellectual functioning, (2) "significant limitations in adaptive skills," and (3) the manifestation of the first two requirements occured before the age of 18. *Atkins*, 536 U.S. at 318. Mr. Smith meets all of these requirements.

> a.    Mr. Smith Has Demonstrated Deficits in Intellectual Functioning and Adaptive Skills that are Consistent with Mental Retardation

118.    While the Supreme Court declined to adopt a specific definition of mental retardation in Atkins, it cited extensively to the two most widely-accepted definitions:  the definition developed by the American Association on Mental Retardation (AAMR) and that developed by the American Psychiatric Association. *See Atkins*, 536 U.S. at 308 n.3.  At the time *Atkins* was decided, both definitions required that, prior to turning eighteen, a person demonstrate "significantly subaverage intellectual functioning" as well as significant deficits in two of ten areas of adaptive functioning

(communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure and heath and safety).[17]  *Id*.  It is "estimated that between 1 and 3 percent of the population has an I.Q. between 70 and 75 or lower, which is typically considered the cutoff I.Q. score for the intellectual function prong of the mental retardation definition." *Atkins*, 536 U.S. at 309 n.5 (quoting 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (7th ed. 2000).[18]

119.    In *Atkins*, the Court relied upon diagnostic criteria for mental retardation set forth in the 1992 edition of the AAMR publication Mental Retardation: Definition, Classification, and Systems of Support (9th Ed. 1992) (the "AAMR Manual"). Just after Atkins was decided, in late June of 2002, the AAMR published  the tenth edition of the AAMR Manual.  The tenth edition defines mental retardation as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social and practical adaptive skills. This disability originates before age 18."  AAMR Manual at 1. The current AAMR Manual notes five assumptions that it deems "essential to the application of the definition:"

---

[17]    Both definitions of mental retardation list these categories of adaptive skills.

[18]    The "Alabama Supreme Court [has] applied the broadest definition of mental retardation recognized in those states that prohibit the execution of a mentally retarded defendant. The Court stated 'Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an I.Q. of 70 or below), and significant or substantial deficits in adaptive behavior.  Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18.)'"  Morrow v. State, 2004 WL 1909275 (Ala. Crim. App. Aug. 27, 2004) (quoting Ex parte Perkins, 851 So. 2d 453, 456  (Ala. 2002)).  See also, Alabama Retarded Defendant Act, Ala. Code § 15-24-2(3) (1975) (defining as mentally retarded "[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments.")

1.    Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture.

2.    Valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor and behavior factors.

3.    Within an individual, limitations often coexist with strengths.

4.    An important purpose of describing limitations is to develop a profile of needed supports.

5.    With appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation generally will improve.

Id. Instead of the list of ten areas of adaptive behavior contained in the ninth edition of the AAMR manual, the tenth edition breaks adaptive behavior skills down into three basic categories, each of which contains specific skills: (1) Conceptual skills (receptive and expressive language; reading and writing; money concepts; self directions); (2) Social skills (interpersonal, responsibility, self-esteem, gullibility (likelihood of being tricked or manipulated); naivté; follows rules; obeys laws; avoids victimization); and (3) Practical skills ((a) Personal activities of daily living such as eating, dressing, mobility and toileting. (b) Instrumental activities of daily living such as preparing meals, taking medication, using the telephone, managing money, using transportation and doing housekeeping activities. (c) Occupational skills; and (d) Maintaining a safe environment. See AAMR Manual at 82. As detailed below, Mr. Smith satisfies these criteria.

  b. Mr. Smith Has Demonstrated Significantly Subaverage Intellectual Functioning

120.    Mr. Smith demonstrated significantly subaverage intellectual functioning long before

his eighteenth birthday. When he was in fourth grade, Mr. Smith was "tested by the school board and was placed in a learning disability class." (Chudy Report; R. 912.) When Mr. Smith was transferred to the Monroe County Excel Junior High School, the county board of education classified him as "Educable Mentally Retarded."[19]   This classification was based on his "psychological and educational evaluations, academic history, and other pertine [sic] information."

121.   Prior to trial, Mr. Smith was evaluated by James F. Chudy, Ph.D.  Dr. Chudy administered several tests to Mr. Smith, including the WAIS-R (Wechsler Adult Intelligence Scale - Revised).  The WAIS-R is a "standardized, individually administered intelligence test." See DSM 4 at 41. "On the WAIS-R [Mr. Smith] earned a Verbal IQ of 73, a Performance IQ of 72 and a full scale IQ of 72 which places him in the 3rd percentile in comparison to the general population." (Chudy Report; R. 917.)  "[T]here is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (e.g., a Wechsler IQ of 70 is considered to represent a range of 65 to 75).  Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." DSM 4 at 41-42.  As detailed below, Mr. Smith exhibits such significant deficits in adaptive behavior.

c.   Mr. Smith Has Demonstrated Significant Deficits in Adaptive Functioning

122.   Mr. Smith has demonstrated deficits in conceptual skills (receptive and expressive language; reading and writing; money concepts; self direction) throughout his life. See AAMR

---

[19] "Educable" was the term formerly used for what is now diagnosed as "Mild" Mental Retardation.  Diagnostic and Statistical Manual of Mental Disorders 43 (4th Ed. 2000, Text Revision). ("DSM 4").  A diagnosis of Mild Mental Retardation indicates an IQ level of 50-55 to approximately 70. Id. at 42.

Manual at 82.  Dr. Chudy reported that Mr. Smith was "quite weak in word knowledge and usage (vocabulary)." (Chudy Report; R. 917.)  According to Dr. Chudy, "Mr. Smith is barely literate in reading." Id. at 918.  Dr. Chudy also noted that Mr. Smith "displayed major deficiencies in areas related to academic skills." Id. at 917.  Further, Mr. Smith lacked self direction his entire life.  Dr. Chudy found that Mr. Smith's thinking and judgement is vague and he displays poor judgement, limited ego strength, a lack of self direction in life and he is generally ineffective in problem solving." Id. at 920.  Mr. Smith's family and friends recalled that he was always a follower and just wanted to "fit in." See *supra.* These are some of the hallmark traits of a person with mental retardation.  See AAMR Manual at 82.

123.    Mr. Smith has also demonstrated significant deficits in social skills (interpersonal, responsibility, self-esteem, gullibility (likelihood of being tricked or manipulated); naivté; follows rules; obeys laws; avoids victimization) throughout his life.  See AAMR Manual at 82.  Mr. Smith's lack of self-esteem, gullibility and victimization by others was a major theme of Dr. Chudy's report.  As a child, Mr. Smith was a "loner, doing poorly in school without developing any sense of competence or mastery in either academics or making friends." (Chudy Report; R. 913.)  Throughout his life, Mr. Smith had "fears of being misunderstood, unfairly judged, manipulated, deceived or hurt." (Chudy Report; R. 919.)  Dr. Chudy noted specifically that, due to Mr. Smith's low intellectual functioning, he is "drawn to others of similar character who he will follow into criminal activity." (Chudy Report; R. 920.)

124.    Mr. Smith has also demonstrated deficits in practical skills including (a) Personal activities of daily living such as eating, dressing, mobility and toileting. (b) Instrumental activities of daily living such as preparing meals, taking medication, using the telephone, managing money,

using transportation and doing housekeeping activities. (c) Occupational skills; and (d) Maintaining a safe environment. See AAMR Manual at 82. Dr. Chudy found that, because of his impairments, it would be "difficult for Mr. Smith to apply for most meaningful jobs. He particularly could not apply for any job that would require any level of competence in math." (Chudy Report; R. 918.) Mr. Smith's inability to keep himself safe from harm was demonstrated when, as a child, his brother poured gas on his foot and Mr. Smith walked near a fire which caused him a significant injury. (Chudy Report; R. 918.) During two of Dr. Chudy's meetings with Mr. Smith, Mr. Smith was "poorly groomed." (Chudy Report; R. 916.)

d.      Many Risk Factors for Mental Retardation Were Present Prior to and Following Mr. Smith's Birth

125.    The AAMR Manual contains a chart of the risk factors for mental retardation. See AAMR Manual at 127. The prenatal risk factors known to have been present prior to Mr. Smith's birth include poverty. Mr. Smith' family was very poor. He was also educationally deprived as he changed school many times. The level of poverty resulted in his being deprived of other critical social stimuli. As described above, Mr. Smith also experienced several severe head injuries.

**V.      THE PROSECUTION'S ELIMINATION OF QUALIFIED JURORS ON THE BASIS OF RACE DENIED MR. SMITH A FAIR TRIAL, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

126.    As above discussed, the prosecution engaged in the racially discriminatory exercise of its peremptory challenges, leading to the exclusion of otherwise qualified black venire jury members. The exclusion of people from jury service on the basis of race is a violation of due process and equal protection under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *See Powers v. Ohio*, 499 U.S. 400 (1991). In capital cases, such violations are particularly harmful, as the jury occupies a unique position, and is responsible for

55

"express[ing] the conscience of the community on the ultimate question of life or death." *McClesky v. Kemp*, 481 U.S. 279, 309 (1987), *quoting Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968).

127.    Therefore, because the State employed racial discrimination in the selection of the jury in this case, Mr. Smith is now entitled to relief from his unconstitutionally obtained conviction and sentence of death. The state court's adjudication of the claim resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent, thus warranting habeas corpus relief. 28 U.S.C. § 2254 d(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

## VI.    THE EVIDENCE WAS INSUFFICIENT TO SUPPORT MR. SMITH'S CAPITAL MURDER CONVICTION AND SENTENCE OF DEATH AS A MATTER OF LAW.

128.    The State has the burden of proving each element of the charged crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358 (1970). This burden requires that the State present evidence sufficient to persuade the jury that Mr. Smith was guilty beyond a reasonable doubt of each charged element of the offense. On appeal, the evidence must be sufficiently strong to overcome any "rational hypothesis" of Mr. Smith's innocence of the crime, as is required in circumstantial cases. Where insufficient evidence has been presented, the resulting conviction violates the Fifth, Sixth, Eighth, and Fourteenth Amendment of the United States Constitution.

129.    In this case, the State sought and obtained Mr. Smith's conviction on the basis of a murder during the course of a robbery. The State failed to introduce sufficient evidence to support this conviction. Under Alabama law, the essential legal aspects of this offense are: "the state must prove beyond a reasonable doubt: (1) a 'robbery in the first degree or an attempt thereof,' as defined

by §13A-8-41; (2) a 'murder,' as defined by § 13A-6-2(a)(1); and (3) that the murder was committed 'during' the robbery or attempted robbery, i.e., that the murder was committed 'in the course of or in connection with the commission of, or in immediate flight from the commission of' the robbery or attempted robbery in the first degree...." *Ex Parte Roberts*, 735 So. 2d 1270 (Ala. 1999).

130.   The State did not present sufficient evidence at Mr. Smith's trial to show that he substantially participated in this robbery or murder or that he had the intent to carry out either the robbery or the murder. In fact, the evidence at trial tended to show that others, including the State's own incarcerated witnesses, planned this event. The evidence at trial also showed that Mr. Smith was incapable of planning and participating in the robbery and that he was forced to be present at the scene of the robbery against his will. "It is well settled that '[t]he Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *In re Winship*, 397 U.S. 358, 364 (1970).

131.   Further, the State and the sentencing judge relied heavily on the unreliable statements of Mr. Smith as evidence to support the conviction. However, these statements show that Mr. Smith was an unwilling accomplice in this crime and that Mr. Reid, the co-defendant, was responsible and threatened Mr. Smith's family if he tried to stop the crime. *See* (R. 451-511).

132.   There is insufficient evidence to support Mr. Smith's capital murder conviction. The burden rests with the State to meet its constitutional obligation of proving each element beyond a reasonable doubt to the exclusion of every reasonable hypothesis. *See Jackson v. Virginia*, 443 U.S. 307, 317 (1979). The State's failure to meet this obligation violated Mr. Smith's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and

require that this court reverse Mr. Smith's conviction and death sentence as a matter of law. The state court's adjudication of the claim resulted in a decision that was both "contrary to" and an "unreasonable application of" clearly established United States Supreme Court precedent, thus warranting habeas corpus relief. 28 U.S.C. § 2254 d(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

## VII.    ALABAMA'S SENTENCING SCHEME IS UNCONSTITUTIONAL

133.    It was impermissible for the trial court in this case to sentence Mr. Smith to death because this sentence had never been authorized by a jury. *Ring v. Arizona,* 536 U.S. 584, 589 (2002) ("[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.") While the United States Supreme Court has recently held that *Ring* is not retroactively applicable, *Schriro v. Summerlin*, 124 S.Ct. 2519 (2004), Mr. Smith contends that in this case, the jury verdict constitutes a violation of his Sixth Amendment and Fourteenth Amendment rights.

134.    Pursuant to *Ring*, the jury verdict in this case is impermissible for five reasons: (1) the two fact-findings necessary for a sentence of death – that there are statutory aggravating circumstances found to exist beyond a reasonable doubt and that those aggravating circumstances are found to outweigh mitigation – were not reliably made by the jury in Mr. Smith's case but were rather made by the judge; (2) because the jury did not indicate or specify which, if any, of the three aggravating circumstances were found to exist, there is no basis for concluding that any of them were factually found by a unanimous jury to exist beyond a reasonable doubt; (3) the failure to instruct the jury accurately at the guilt phase about the consequences of its findings deprived Mr. Smith of due process and created an unfair advantage for the State; (4) the aggravating circumstances were

not specified in the indictment; and (5) it is now clear that federal law condemns imposition of a sentence of death by a judge. *Ring*, 536 U.S. at 613 (Breyer, J., concurring in the judgment). In this case, the jury's verdict and trial court's sentence of death constitute error.

135.    The hallmark of the modern death penalty is the guided discretion afforded the sentencer. *Gregg v. Georgia*, 428 U.S. 153 (1976). In this case, the jury verdict was arbitrary and violated Mr. Smith's right to equal protection, and his rights to due process, a fair trial and a reliable sentencing, as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The state court's rejection of this claim is not only based on an unreasonable determination of the facts, but is both contrary to and an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1), (d)(2); *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000).

        **A.**     **The Jury's Recommendation Of A Death Sentence Is Invalid,In Violation Of The Fifth, Sixth, Eighth and Fourteenth Amendments.**

               **1.**     **The jury was told they only made a recommendation**, **in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.**

136.    The Eighth Amendment to the Constitution requires that the jury making a sentencing determination be aware of and bear the full weight of its responsibility. *Caldwell v. Mississippi*, 472 U.S. 320 (1985).  The Eighth Amendment as applied by *Caldwell* requires a heightened need for reliability where a death verdict is a possibility.  Where any individual juror may "pass the buck" because of his perception that his determination is not the final determination, the juror is at risk of not properly engaging himself in the evidence and bearing the responsibility of his decision. *Caldwell*, 472 U.S. at 340.  The Alabama recommendation scheme thus violates *Caldwell*.    In

59

addition, in this case, the jurors were explicitly improperly told that they were not the final decision-makers. (R. 735, 736, 738. 834, 836, 839, 840, 845, 846, 847, 848). They were thus effectively instructed that their decision-making was unimportant and that they should or would "pass the buck." This violated Mr. Smith's rights to due process, a fair trial, and a reliable sentencing, as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Habeas relief is therefore warranted. See 28 U.S.C. § 2254(d)(1), (d) (2).

> **2.    The verdict is incapable of review as the jury's verdict form failed to specify which aggravating and mitigating factors were found, in violation of the Eighth and Fourteenth Amendments.**

137.    Inability to review which aggravating and mitigating factors were considered violates well-established Eighth and Fourteenth Amendment requirements that sentencing determinations be individualized and reliable in death penalty cases. *See, e.g., Zant v. Stephens*, 462 U.S. 862, 879 (1983); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *Lockett v. Ohio*, 438 U.S. 586, 601-05 (1978)(plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976) (plurality opinion). In this case, because the verdict form contained no identification of the either the aggravating or mitigating factors found by the jurors, there was no guarantee that the jury's determination was individualized. Further, the jurors' determination was not reviewable. This violated Mr. Smith's rights to due process, a fair trial, and a reliable sentencing, as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Habeas relief is therefore warranted. See 28 U.S.C. § 2254(d)(1), (d) (2).

**VIII.   The State Failed to Comply with its Discovery Obligations under *Brady V. Maryland*, in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.**

138.    The State failed to provide Mr. Smith with important exculpatory and impeachment

evidence. It is well established that a defendant is entitled to exculpatory evidence in a criminal proceeding. The State's suppression of this material violated Mr. Smith's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, the Alabama Constitution, and Alabama State Law.

139. In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court stated that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87; *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Evidence favorable to the defense includes evidence that would affect the jury's determination of the credibility of the witnesses. *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Bagley*, 473 U.S. 667 (1985). In the context of a capital proceeding, the state is under a heightened obligation to provide discovery to the defendant. This is because the possibility of a death sentence is a special circumstance that places an increased obligation on the state. The withholding of favorable evidence is grounds for the reversal of a death sentence. *See Brady*, 373 U.S. at 87.

140. Despite the heightened obligation upon the state in Mr. Smith's capital proceeding, the state failed to provide exculpatory evidence to Mr. Smith including favorable treatment given to state's witnesses. As stated *supra*, several of the state's witnesses were in state custody at the time of trial. The state failed to inform Mr. Smith of the favorable treatment some of the state's witnesses received at the time of trial and immediately thereafter concerning their custody status and status as probationers. For example, state's witness Melissa Arthers received favorable treatment with regard to her probation status shortly after testifying. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995)(prosecutors are responsible for "any favorable evidence known to the others acting on the

government's behalf in the case, including the police"). The State's failure to disclose *Brady* materials prevented Mr. Smith from preparing and presenting an effective defense, and denied Mr. Smith his constitutional rights as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and habeas corpus relief is warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**IX.     Mr. Smith's Rights to a Fair and Impartial Jury Were Violated by the Jurors' Failure to Disclose Crucial Evidence During Voir Dire, in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.**

141.    The right to a jury trial "'guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). To protect this right, defendants, especially capital defendants, have the right to expect honest answers during voir dire. *McDonough Power Equip. v. Greenwood*, 464 U.S. 548 (1984). When a juror answers falsely or fails to disclose material information on voir dire, habeas relief is warranted. *Id.* at 554.

142.    During voir dire, several jurors failed to disclose critical evidence, despite unambiguous questioning. It has been long-recognized that a defendant is entitled to receive truthful answers from jurors, and when a juror fails to truthfully respond during voir dire, reversible error occurs. Indeed, the burden of the defendant is light: Mr. Smith need only show that he might have been prejudiced by the juror's non-disclosure during voir dire. This jury misconduct denied Mr. Smith the right to a fair and impartial jury, as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Thus, habeas corpus relief is warranted. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**X.     Mr. Smith's Rights to a Fair and Impartial Jury Were Violated by the Jury's Consideration of Extraneous Evidence, in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.**

143.    The jury looked beyond the evidence and testimony presented at trial, and thereby denied Mr. Smith a fair trial and reliable sentence. Federal law requires that the verdict and sentence be based on the evidence developed at trial, and only upon such evidence. *Turner v. Louisiana*, 379 U.S. 466, 472 (1965). The consideration of extraneous evidence by the jury denied Mr. Smith the right to a fair and impartial jury, as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**XI.    The State Trial Court Violated Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution When it Instructed the Jurors That the Defense Was Required to Prove Beyond a Reasonable Doubt That the Mitigating Factors Outweighed the Aggravating Factors in Order for Them to Return a Life Verdict**.

144.    The Alabama statutory scheme requires that a capital sentencing jury must return a life verdict unless it finds that the aggravating circumstances outweigh the mitigating circumstances. See ALA. CODE § 13A-5-46 (e) (1975).  The "state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances." ALA. CODE § 13A-5-45 (e) (1975). At Mr. Smith's trial, the court charged the jury improperly on how to weigh the mitigating and aggravating circumstances to arrive at a verdict, and imposed an unconstitutional burden upon the Mr. Smith to prove the existence of any mitigating circumstances beyond a reasonable doubt. Specifically, the trial court instructed the jurors:

> [I]f after a full and fair consideration of all of the evidence in this case you are convinced *beyond a reasonable doubt that the mitigating circumstances outweigh the aggravating circumstances,* or *you are convinced beyond a reasonable doubt that the State has failed to prove at least one or more aggravating circumstances,* your verdict would be to recommend the punishment of life imprisonment withoutparole .... .          .

> In order to return an advisory verdict recommending life without parole at least seven of you must be satisfied *beyond a reasonable doubt* of the existence of mitigating circumstances and that *those mitigating circumstances outweigh the aggravating circumstances."*

(R. 847-49 (emphasis added).) Mr. Smith objected to this charge and requested that the judge correct it. (R. 851.) In response to defense counsels' objection, the trial court only clarified the burdens of proof necessary to establish either a specific aggravating or a mitigating circumstance, but did not address the weighing portion of his charge. (R. 855-56.)  The trial court's attempted curative instruction included the following statement:

> Only an aggravating circumstance must be proven beyond a reasonable doubt and the burden is always on the State of Alabama to convince you from the evidence beyond a reasonable doubt that such an aggravating circumstance exists and the burden is *also* on the State to prove to you beyond a reasonable doubt that the aggravating circumstance or circumstances, should you find that they exist, outweigh any mitigating circumstances which need only be proven by a preponderance of the evidence.

(R. 854-56.) (emphasis added). When Mr. Smith again objected, the judge refused and allowed the improper instruction to stand. (R. 857-59.)

145.    In his dissent from the denial of Mr. Smith's Petition for a Writ of Certiorari to the Supreme Court of Alabama, Justice Harwood noted that the "trial court's instruction that the jurors could recommend life without parole only if they were convinced 'beyond a reasonable doubt that the mitigating circumstances outweigh the aggravating circumstances' is plainly contrary to the requirements of the authorities Smith cited in his petition." *Ex parte Smith*, 795 So. 2d 842, 842 (Ala. 2001) (Harwood, J., dissenting).  Justice Harwood explained that, in its second statement, the trial court:

64

> "committed the additional error of misstating the burden of proof for a mitigating circumstance.  Moreover, the second statement not only fails to correct the earlier error – the statement that, in order to recommend a sentence of life without parole, the jury had to find beyond a reasonable doubt that the mitigating circumstances outweighed the aggravating circumstances – but that second statement could reasonably be understood to restate that earlier error."

Id.   Justice Harwood went on to explain that the trial court's alleged curative instruction compounded, rather than cured, the erroneous instructions above:

> trial court's attempted cure of its error concerning the burden of proof relating to mitigating circumstances does not address the separate error in the instruction that stated that the jury could recommend a sentence of life imprisonment without parole only if the jury found beyond a reasonable doubt that the mitigating circumstances outweighed the aggravating circumstances . . . a reasonable jury might conclude that in order to recommend the death penalty it must determine that the aggravating circumstances outweigh the mitigating circumstances, whereas in order to recommend a sentence of life without parole, it must determine beyond a reasonable doubt, that the mitigating circumstances outweigh the aggravating circumstances. . . . Misinforming the jury about the quantum of proof necessary to recommend a sentence of life without parole in a capital case is a significant error.

*Id.* at 844.

146.   Courts "generally presume that jurors follow their instructions." *Penry v. Johnson*, 532 U.S. 782, 800 (2001).  An instruction that inserts "'an element of capriciousness' into the sentencing decision . . . [is an] inadequate vehicle for the jury to make a reasoned moral response to [Smith's] mitigating evidence." *Id*. (*quoting Roberts v. Louisiana*, 428 U.S. 325, 335 (19786).  Jury instructions should be approached with a "'commonsense understanding of the instructions in light of all that has taken place at the trial.'" *Id*. (*quoting Boyde v. California*, 494 U.S. 370, 380 (1990).  "[W]here there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence" the instruction is

unconstitutional. *Boyde*, 494 U.S. at 380.[20] Here, "a reasonable jury might conclude that in order to recommend . . . a sentence of life without parole, it must determine beyond a reasonable doubt, that the mitigating circumstances outweigh the aggravating circumstances." *Smith*, 795 So. 2d at 844 (Harwood, J., dissenting).

147. The trial court's instruction required Mr. Smith to prove the existence of mitigating circumstances beyond a reasonable doubt. This violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The Alabama court's failure to reverse Mr. Smith's conviction due to trial court's unconstitutional penalty-phase instructions resulted both "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (d)(2). Mr. Smith is entitled to habeas relief on this ground.

**XII.    The State Trial Court  Prevented Mr. Smith from Cross-Examining the State's Key Witness about Her Then-Current Probationary Status, in Violation of Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

---

[20]    *See also Woodson v. North Carolina*, 428 U.S. 280 (1976); *Sumner v. Shuman*, 483 U.S. 66, 76 n. 4 (1987) ( jury instructions unconstitutional if they "'create the risk that the death penalty will be imposed in spite of factors which would call for a less severe penalty'") (*quoting Lockett v. Ohio*, 438 U.S. 586, 605 (1978)); *Jackson v. Dugger*, 837 F. 2d 1469, 1473  (11th Cir.) (any presumptions which favor imposing the death penalty "if employed at the level of the sentencer, vitiate[] the individualized sentencing determination required by the Eighth Amendment ...."); *State v. Marsh II*, 102 P.3d 445 (Kansas 2004) (holding capital sentencing statute unconstitutional where it allowed for the imposition of the death penalty if aggravating and mitigating circumstances were equally balanced ) *cert. granted*, 125 S. Ct. 2517 (2005).

148.    The State's case against Mr. Smith rested largely upon the testimony of Melissa Arthurs. At trial, the court prevented Mr. Smith from cross-examining Ms. Arthurs about the fact that her probation for a juvenile criminal conviction had been revoked.   Ms. Arthurs was the State's key witness who testified about Mr. Smith's participation in the crime. (R. 368.) Her testimony was significant due to the fact that she provided unique facts about Mr. Smith, including that he had the victim's papers in his possession and that he had blood on his shirt after the murder. (R. 360, 362-63.) Ms. Arthurs' was the only uncontested state witness who testified that Mr. Smith had admitted active and violent participation in the beating of the victim. (R.361.) Finally, Ms. Arthers was the only person who told the jury that the victim pleaded for his life for the sake of his two children. (R. 368.)

149.    On cross-examination Mr. Smith attempted to elicit Ms. Arthurs' then-current probationary status.[21] (R. 368-69.) Such information was clearly relevant to impeach Ms. Arthur because it both established that she had grounds for bias in favor of the prosecution and it attacked the overall credibility of her testimony.  However, the trial court sustained the State's objection and denied Mr. Smith the opportunity to expose to the jury Ms. Arthers' motivation to lie.  The trial court also refused to allow trial counsel to pose the question "where do you live?" to establish that she was in the State's custody. (R. 368.) While, defense counsel were able to cross-examine Ms. Arthurs about her marijuana use and inconsistencies between her recollection and that of others, the trial court prevented them from questioning her about her probationary status. (R. 369, R. 375-76.)  As a result, the jury never knew about the potential bias of the State's star witness.  The trial court thus denied Mr. Smith the right to confront

---

[21]It is unclear from the record exactly what the underlying offense was, although the prosecutor told the court out of the jury's hearing that it involved a drug violation. (R.368-69.)  The judge then allowed cross-examination only regarding her drug use on the day of the crime.

a key witness against him.

150.    The Confrontation Clause of the Sixth Amendment requires that "the accused shall enjoy the right. . . to be confronted with the witnesses against him." U.S. CONST., amend.. VI, cl. 4. *See Davis v. Alaska*, 415 U.S. 308, 316-17 (1974) (holding that restricting a defendant's opportunity to expose State's witness' juvenile record violates the Confrontation Clause: "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination"); *Alford v. United States*, 282 U.S. 687, 693-94 (1931) (reversing conviction after trial court prevented defendant's cross-examination of incarcerated government witness after only asking "Where do you live?"); *McKinzy v. Wainwright*, 719 F.2d 1525 (11th Cir. 1983) (reversing conviction where defendant was precluded from cross-examining state witness about prior arrest). "Cross-examination of a government 'star' witness is important, and a presumption favors free cross-examination on possible bias, motive, ability to perceive and remember, and general character for truthfulness." *United States v. Lyons*, 403 F.3d 1248, 1256 (11th Cir. 2005) (citation omitted).

151.    The trial court's failure to allow Mr. Smith to cross-examine Ms. Arthurs about the revocation of her probation violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Therefore, habeas relief is required. See 28 U.S.C. § 2254(d)(1), (d)(2).

**XIII.    The Trial Court Violated Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution When it Denied a Motion  for a Mistrial When the First Significant Prosecution Witness Testified That Mr. Smith Had Been Imprisoned Earlier.**

152.    Prior to trial, Mr. Smith moved the court *in limine* to prohibit the State from making *any* reference to his prior criminal history. (CR.163-64.) Despite this, one of the State's witnesses testified that Mr. Smith had been imprisoned for a prior crime. (R. 262-71.)

153.    On the first morning of testimony, the State presented as its fourth witness Patricia Milbeck, who testified as to her acquaintance with the victim, and with Mr. Smith and his biological father. (R. 262-71.)

Q [District Attorney]:    Did you speak to anybody there?

A [Milbeck]:    Yes, sir

Q:    Who did you speak to?

A:    His son, Jody.

Q:    Now, at that time did you know Jody?

A:    Yes, sir, by writing him *when he was in prison.*

MR. HUGHES [Defense counsel]: Your Honor, I object to that.

(R. 271 (emphasis added).) The jury was immediately excused, and defense counsel moved for a mistrial. After deferring its decision, the trial court denied defense counsel's motion. (R. 308.)  This violation of Mr. Smith's constitutional rights was compounded when the State began its closing argument by stating: "Jody, Joseph C. Smith, is a thief. He was a thief in November of 1997." (R. 648.)[22]

---

[22] Mr. Smith was in prison on third-degree burglary and second-degree receipt of stolen property from October 1989 to January 1996, and then reimprisoned following revocation of parole from September to November of 1997.

154.   The trial court attempted to cure the error by asking the jury to disregard the testimony. This was not sufficient to cure the violation of Mr. Smith's constitutional rights.

155.   Alabama law required that Ms. Milbeck's testimony be excluded as improper character evidence. ALA. R. EVID. 404 (b) (barring admission of prior criminal acts except in narrow inapplicable circumstances). Evidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant. *See United States v. Gaskell*, 985 F. 2d 1056 (11th Cir. 1993). This error was so severe that it rose to "the level of a denial of fundamental fairness" warranting habeas relief. *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998) (internal citation and quotation omitted). ("[W]hen a state trial court's evidence rulings deny a habeas petitioner fundamental constitutional protections, this [c]ourt's duty requires it to enforce the constitution's guarantees by granting the petition for a writ of habeas corpus.")

156.   The admission of Mr. Smith's prior conviction violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Therefore, habeas relief is required.  See 28 U.S.C. § 2254(d)(1), (d)(2).

**XIV.   The Trial Court Violated Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments  by Incorrectly Defining Flight and by Giving the Jury a Flight Instruction Where No Evidence of Flight Existed.**

157.   Evidence of flight is a constitutionally suspect method by which to prove the guilt of an accused. The United States Supreme Court has repeatedly doubted whether such evidence has any probative value. See Wong Sun v. United States, 371 U.S. 471, 483 n. 10 (1963) ("we have constantly doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime").  At Mr. Smith's trial, no evidence of flight was presented to the jury.  Yet, the trial court not only gave a flight instruction, it gave one that was an incorrect statement of the law.

158.    No  evidence of flight was presented to the jury. The evidence adduced by the State showed at the most that Mr. Smith was present at the victim's death, and then left without any haste. Mr. Smith was present at his home when the police arrived, and did not in any way flee from or otherwise resist arrest. (R. 146.) The State offered no evidence that Mr. Smith ever left the small corner of Mobile County where he lived and all the events in this case occurred. Despite the fact that no evidence of flight had been presented, the trial court gave a flight instruction. (R. 700.) Mr. Smith's counsel objected and requested that the charge be removed. (R. 710-11.) Rather than remove this instruction, the trial court compounded the problem by instructing the jurors that, as an initial matter, they had to determine if a flight had occurred. (R.719-20.)  The flight instruction the trial court proceeded to give was incorrect. The trial court instructed the jurors:

> "In this case you have heard testimony concerning flight. *That is, that the Defendant allegedly left from the scene of the purported crime.* With reference to evidence that was presented in this case bearing on the alleged flight by the Defendant from the scene of the alleged crime, *the jury is instructed that evidence may be offered tending to show flight of the Defendant ....*
>
> In the first place, *where evidence is offered to show the Defendant's flight, that is that he went away from the scene of the alleged offense,* it would be for you, the jury, to say whether it is flight as a matter of fact.

(R. 700 (emphasis added).) In other words, the trial court instructed the jury that flight was merely the leaving of the scene of the crime.  The instruction was incorrect as a matter of law. *See Goforth v. State*, 63 So. 8 (Ala. 1913) (defining flight as "the defendant absenting himself from the community in which the crime was committed") .

159.    This error  was so severe that it rose to "the level of a denial of fundamental fairness" warranting habeas relief. *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998) (internal citation and quotation omitted).  ("[W]hen a state trial court's evidence rulings deny a habeas petitioner fundamental

71

constitutional protections, this [c]ourt's duty requires it to enforce the constitution's guarantees by granting the petition for a writ of habeas corpus.") The trial court's erroneous flight instruction, given in the absence of any evidence of flight was severely prejudicial to Mr. Smith and violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Therefore, habeas relief is required.  See 28 U.S.C. § 2254(d)(1), (d)(2).

**XV.    The Trial Court's Errors in Instructing the Jury Denied Mr. Smith a Fair Trial and Accurate Sentence Determination in Violation of His Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

160.    The trial court gave numerous improper jury instructions during both phases of the trial. Both individually and collectively, these errors deprived Mr. Smith of his rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

A.    <u>The Jury Instructions Given During the Penalty Phase Denied Mr. Smith an Accurate and Reliable Sentence Determination</u>

1.    <u>The Trial Court Impermissibly Reduced the Jurors' Sense of Responsibility By Instructing Them Repeatedly That Their Verdict Was Only a Recommendation</u>

161.    "[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for the defendant's death rests elsewhere." *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985). Knowledge that "responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." *Id.* at 333.

162.    At Mr. Smith's trial, the trial court informed the jury not once but numerous times that its deliberations would merely be an "advisory verdict" or a "recommended" sentence. (R. 735, 736, 738,

834, 836, 839, 840, 845, 846, 847, 848.) This instruction made it highly likely that the jurors would minimize their role in the sentencing process. The jurors heard this instruction before the presentation of any evidence during the sentencing phase. This guaranteed that the jurors did not give the penalty-phase evidence the full consideration required by the Constitution.[23]

163.   The trial court's repeated statements to the jurors that their verdict was only a recommendation violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

> 2.     The Court Improperly Relied on Its Previously Given Erroneous Definition of Reasonable Doubt.

164.   During the sentencing phase, the trial court did not ever define for the jury the term "reasonable doubt." (R. 834.) Instead, the trial court reminded the jury of the definition it had given the day before. (R. 834, 836, 839.) This definition impermissibly lowered the burden of proof. See Cage v. Louisiana, 498 U.S. 39, 41 (1990). See *infra* (incorporated here by reference). The trial court's improper instruction allowed the jurors to find the existence of aggravating circumstances that the State had not proven beyond a reasonable doubt.  The trial court's incorporation of its improper guilt-phase reasonable doubt instruction into the penalty phase denied Mr. Smith his rights to a fair sentence under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Therefore, habeas relief is required.

---

[23] While jury's verdict is a recommendation, under Alabama's capital sentencing procedure, a jury's recommendation of life imprisonment without the possibility of parole "is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the 'triggerman' or a recommendation of leniency by the victim's family . . . ." *Ex parte Tomlin*, 2003 WL 22272851 at *1 (Ala. 2003) (internal citation and quotation omitted).

*See* 28 U.S.C. § 2254(d)(1), (d)(2).

>   3.    The Trial Court's Instructions About the Heinous, Atrocious or Cruel Aggravating Circumstance Violated Mr. Smith's Constitutional Rights

165.    A death sentence based upon the 'heinous, atrocious and cruel' aggravating circumstance is unconstitutional unless the jury is instructed in such a way as to ensure that a death verdict is returned only if "crimes must be said to have reflected a consciousness more 'depraved' than that of any person guilty of murder."  *Godfrey v. Georgia*, 446 U.S. 420, 432 (1980).  Any decision to impose the death sentence must be based on reason rather than caprice or emotion.  Id. at 433 (internal citation omitted).

166.    At Mr. Smith's trial, the trial court instructed the jury:

> [T]he capital offense was especially heinous, atrocious or cruel *compared to other capital offenses*.
>
> The term "heinous" means extremely wicked or shockingly evil.
>
> The term "atrocious" means outrageously wicked and violent.
>
> The term "cruel" means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.
>
> . . . *For a capital offense to be especially heinous or atrocious, any brutality*
>
> *which is involved in it must exceed that which is normally present in any capital offense.* For a capital offense to be especially cruel, it must be a consciousless [sic] or pitiless crime which is unnecessarily torturous to the victim. . . .

(R. 837-38 (emphasis added).)

167.    The trial court's instruction required the jurors to engage in a comparison of the events before them with other crimes without any guidance as to how to do so. (R. 837, 838.) The trial court's instruction concerning the "heinous, atrocious and cruel" aggravating circumstance did not serve to

narrow the application of the death penalty as required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. *See Godfrey*, 446 U.S. at 428 (there "was nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence."). Mr. Smith was sentenced to death, in part, based on the application of this aggravating factor. (C.R. 185-86.) Therefore, habeas relief is required. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

4.      The Trial Court Failed to Instruct the Jurors That They Had to Unanimously Find That The State had Proved the Existence of Each Aggravating Circumstance Beyond a Reasonable Doubt.

168.    The trial court failed to instruct the jurors that, before they could consider an aggravating circumstance as part of the weighing process, they were required to find *unanimously* that the aggravating circumstance exists beyond a reasonable doubt. *See Slaton v. State*, 680 So. 2d 879, 903 (Ala. Crim. App. 1995), *aff'd* 680 So. 2d 909 (Ala. 1996) ("any finding that an aggravating circumstance has been proven beyond a reasonable doubt must be unanimous") (quoting *Johnson v. State*, 620 So. 2d 679, 708 (Ala. Crim. App. 1992)).  The failure to give this instruction rendered Mr. Smith's trial fundamentally unfair because it allowed the jury to convict him of capital murder when some of the jurors might not have believed that at least one aggravating circumstance had been proven beyond a reasonable doubt. *See Sumner v. Shuman*, 483 U.S. 66, 76 n. 4 (1987) ( jury instructions unconstitutional if they "'create the risk that the death penalty will be imposed in spite of factors which would call for a less severe penalty'") (*quoting Lockett v. Ohio*, 438 U.S. 586, 605 (1978)).

169.    The trial court's failure to instruct the jurors that they were required to find the existence of any aggravating circumstances unanimously violated Mr. Smith's rights under the Fifth, Sixth, Eighth

and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. See

28 U.S.C. § 2254(d)(1), (d)(2).

> 5.    The Trial Court Failed To Instruct the Jurors That They Must Individually Consider the Existence of Mitigating Circumstances

170.    The trial court violated Mr. Smith's constitutional rights when it failed to instruct the jurors

that they must each consider any mitigating circumstance individually and that the jury as a whole did *not*

need to determine unanimously the existence of a mitigating factor for it to be found and considered. *See*

ALA. CODE § 13A-5-51 (Any mitigating circumstance may be offered by the accused, and the jury's

consideration of mitigating circumstances does not have to be based on unanimous findings.) The United

States Supreme Court has held that it is unconstitutional to require jurors to reach a unanimous conclusion

about the applicability of mitigating circumstances. *See McKoy v. North Carolina*, 494 U.S. 433, 444

(1990); *Mills v. Maryland*, 486 U.S. 367 (1988); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).[24] The trial

court instructed the jurors:

> In simple English, the law contemplates that different circumstances may be given different weights or values in determining the sentence in a case and *you, the jury,* are to decide what weight or what value is to be given to a particular circumstance in determining the sentence in light of all the other circumstances in this case. *You* must do that in a process of weighing the aggravating circumstances against the mitigating circumstances, and *as you weigh them determine what weight you will give to each.* And again, it's not like a ball game where *you* add up the aggravating circumstances and then you add up the mitigating circumstances and the side that has the most prevails. That is not the law. The law is that *you* consider each aggravating circumstance and each mitigating circumstance and after you have fully considered them you attach that degree of weight or significance to each one *as you deem appropriate* based on the evidence and the law.

(R. 845 (emphasis added)). Unlike other cases where the issue might be ambiguous, the trial court here

---

[24] Mr. Smith recognizes the Supreme Court's recent holding in *Beard v. Banks*, 542 U.S. 406 (2004) that *Mills* and *McKoy* are not retroactively applicable. However, Mr. Smith contends that specific jury instruction in his case was unconstitutional under prior Supreme Court precedent.

clearly specified that it is "you, the jury," who was responsible for each decision. (R. 845.) No room was left for individualized consideration of the mitigating circumstances.

171.    The failure of the trial court to instruct the jury properly deprived Mr. Smith of a jury empowered to make an individualized determination of his sentence. *See e.g.*, *Woodson v. United States*, 428 U.S. 280 (1976).  The above instruction violated Mr. Smith's rights to due process, a fair trial, and an accurate and reliable sentencing determination under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required.   *See* 28 U.S.C. § 2254(d)(1), (d)(2).

B.    The Jury Instructions Given During the Guilt Phase Violated Mr. Smith's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution

172.    The trial court committed numerous instructional errors at the guilt phase of Mr. Smith's trial.  These errors, both individually and cumulatively, deprived Mr. Smith of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

1.    The Court Erroneously Instructed the Jury About Reasonable Doubt.

173.    The presumption of innocence is "a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503 (1976); *see also Coffin v. United States*, 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.").  The Due Process Clause of the Fourteenth Amendment requires that the State's burden of proof must be beyond a reasonable doubt with regard to every fact necessary to constitute the crime. *In re Winship*, 397 U.S. 358 (1970). A trial court need not define "reasonable doubt" at all, but if it does, its instructions must accurately convey the concept to the jury.  *Victor v. Nebraska*, 511 U.S. 1,

5 (1994). Where there is a reasonable likelihood that the jurors will understand the instruction to allow a conviction based on proof insufficient to meet the requirements of due process, the instruction is unconstitutional. *Id*. at 6.

174.    Here, the trial court defined reasonable doubt as follows:

> A reasonable doubt is not a mere possible doubt because everything related to human affairs is open to some possible or imaginary doubt. A reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all the evidence in the case. It is a doubt based upon reason and common sense. *It does not mean a vague and arbitrary notion, but it is an actual doubt based upon all the evidence, the lack of evidence, a conflict in the evidence or a combination thereof.* It is a doubt that remains after going over in your minds the entire case and giving consideration to all the testimony. It is distinguished from a doubt arising from mere possibility, from bare imagination or from fanciful conjecture.

(R. 680 (emphasis added).)

175.    In *Cage*, the error which reversed the conviction was that the trial court equated reasonable doubt with "grave uncertainty" and "actual substantial doubt." 498 U.S. at 41. Here, the trial court committed the same error. By stating that imprecise notions of doubt are not sufficient, the trial court prohibited jurors from acquitting simply because they could not fully articulate their doubt. Similarly, requiring that reasonable doubt be "actual doubt" is equivalent to the instruction found unconstitutional in Cage.

176.    The instruction given here did not comport with *Cage* and *Victor*. Therefore, habeas relief is required. 28 U.S.C. § 2254(d)(1), (d)(2).

### 2. The Court Erroneously Instructed the Jury About the Proof Necessary for Accomplice Liability.

177.    The trial court instructed the jury that it could find that Mr. Smith aided or abetted in the crime charged without any direct proof of either his involvement in the crime or his mental state. The trial judge

instructed the jury that, Mr. Smith's role as an accomplice "need not ... be positively proved." (R. 682.) The trial court did not instruct the jury concerning the requisite mental state for a conviction of either the underlying robbery or capital murder. Under Alabama law, robbery is a specific intent crime. *Davis v. State*, 401 So. 2d 187 (Ala. Crim. App. 1981). "Mere presence" at a robbery does not in fact suffice to establish accomplice liability for the crime. *Brown v. State*, 390 So. 2d 693 (Ala. Crim. App. 1980). The trial court never instructed the jury that, to find Mr. Smith guilty of capital murder, they had to find that he had the specific intent to kill.

178.    At trial, defense counsel requested a jury instruction which stated,

> A defendant may not be convicted of a capital felony as an accomplice to that capital felony unless the evidence satisfies each and every member of the jury beyond a reasonable doubt that the Defendant had the particularized intent to kill the victim.

(S.R. 46.) This instruction was required by the United States Constitution because it is a violation of the Eighth Amendment to inflict the death penalty on someone who does not possess the requisite mental state. *See Enmund v. Florida*, 458 U.S. 782 (1982).

179.    The trial court's instruction that allowed the jury to find Mr. Smith guilty as an accomplice without direct proof either of his involvement in the crime or of his mental state, and the trial court's failure to instruct the jurors that they had to find that Mr. Smith had the particularized intent to kill before convicting him of capital murder violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. See 28 U.S.C. § 2254(d)(1), (d)(2).

180.    Each of the instructional errors listed above, either singly or cumulatively violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. See 28 U.S.C. § 2254(d)(1), (d)(2).

**XVI.  The Trial Court Violated Mr. Smith's Rights under the Fifth, Sixth, Eight and Fourteenth Amendments When it *Sua Sponte* Asked a Witness During the Guilt-phase for Testimony about Whether or Not the Crime Was Heinous, Atrocious, or Cruel.**

181.    During the guilt-phase of Mr. Smith's trial, highly improper and inflammatory evidence was admitted over Mr. Smith's objection solely to prove a penalty-phase issue: whether or not the crime was heinous, atrocious or cruel. (R. 629.)

182.    Dr. Julia Goodin, the medical examiner for Mobile County, testified towards the end of the guilt phase. After both the State and Mr. Smith had finished questioning her, the trial court asked her "[C]an you tell us how many separate and distinct injuries your external examination documented?" (R. 626.) Mr. Smith's counsel immediately asked to approach the bench, where outside of the presence of the jury, he argued that such a question was  improper. (R. 627-29.) Nevertheless, the Court noted the objection and then, in front of the jury, asked: (a) how many external injuries existed (R. 629); (b) how many internal injuries existed (R. 630); and (c) how many blows were inflicted to cause that number of injuries. (R. 630.)

183. The trial court stated that its reason for asking these questions was solely to elicit penalty-phase evidence:

> [T]his Court may at some point have to make a determination as to whether or not the acts which caused the death of Mr. Van Dam were heinous and atrocious and cruel. And in order to make that determination the Court needs to know as much as it can about the manner and cause, the mechanism and the timing of death. . . .
>
> And if it only took a certain number of injuries to kill this poor soul and your client beat the hell out of him time and time again *that would be heinous, atrocious and cruel and I don't know that that happened. That's what I'm trying to find out* what happened because neither side has asked the questions which satisfy me or this Code what constitutes heinous, atrocious and cruel. . . .
>
> [I]f this jury were to find him guilty of a particular offense evidence heard during this stage of the trial will be admissible at sentencing and *there's no need to bring her*

80

*back.*

R. 627 -29 (emphasis added).[25]

184.    This testimony was irrelevant at the guilt phase and served only to prejudice Mr. Smith.  The trial court's questioning of Dr. Goodin increased substantially the likelihood that the jury would find Mr. Smith guilty of capital murder and violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  *See Sumner v. Shuman*, 483 U.S. 66, 76 n. 4 (1987) (trial court's actions unconstitutional if they "'create the risk that the death penalty will be imposed in spite of factors which would call for a less severe penalty'") (*quoting Lockett v. Ohio*, 438 U.S. 586, 605 (1978)).  Therefore, habeas relief is required.  *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**XVII.  The Trial Court Violated Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution When it Permitted Inadmissible and Highly Prejudicial Hearsay Evidence to Be Presented to the Jury**.

185.    Mr. Smith was convicted and sentenced to death because of hearsay testimony which could not be confronted in court, tested, examined, or rebutted. Such a conviction and sentence are unreliable, and violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

A.    The Trial Court Violated Mr. Smith's Constitutional Rights When it Allowed a Witness for the State to Testify to Statements Made by Mr. Smith's Co-Defendant

---

[25]

Furthermore, the State decided not to submit any more evidence at sentencing with regards to whether or not the crime was more heinous, atrocious and cruel in comparison to other capital murders. (R. 758-59.) When the court asked what testimony it would rely upon, tile State pointed to two factors-Mr. Smith's statement to the police, and "specifically" the number of blows delivered to tile victim. (R.759.) Clearly the evidence was solely for penalty-phase purposes.

81

186.    Mr. Smith's constitutional rights were violated when Russell Harmon was allowed to testify to statements by Mr. Smith's co-defendant Larry Reid, who did not testify. (R. 343-47.)  Mr. Harmon testified that Mr. Reid (Larry) had stated that he and Mr. Smith (Jody) had taken money from the victim:

| | |
|---|---|
| Q [District Attorney]: | Russell, was there any conversation about any money from the dead man? |
| A [Harmon]: | They had said that they had got - that they had - |
| [Defense counsel]: | Your Honor, if it please the Court, I would object to "they," that he state specifically who said what. |
| The Court: | That's fair. Can you tell us who said what about the money, if anything was said about the money? |
| A [Harmon]: | Yes, sir. Larry and then Jody was mainly agreeing with Larry. Jody did not come out  right and say anything about the money, no. |

(R. 343-44.)

| | |
|---|---|
| Q [District Attorney]: | Now, you testified that Jody said that they had left a man for dead. |
| A [Harmon]: | Right. |
| Q: | Did they tell you or did you hear Jody say where the man was? |
| A: | I heard he was left under a mattress. |
| Q: | And who told you something about a mattress, do you recall who that was? |
| A: | I think - I'm not sure, but I think Larry did. |

| [Defense counsel]: | Well, that answers the question. If he's not for sure he's just speculating and guessing and we would object to it. |
| The Court: | It's sustained. You could lay a predicate, though, I mean. |
| Q [District Attorney]: | Do you recall who said anything about a mattress. |
| A: | I believe it was Larry. |

(R. 344, 346.)  Therefore, during  Mr. Harmon's testimony, he was allowed to introduce an out-of-court statement by Mr. Reid inculpating Mr. Smith in violation of Mr. Smith's rights to cross-examination and confrontation.

187.    It violates the Confrontation Clause of the Sixth Amendment for the statement of a codefendant implicating the accused to be used at trial, unless the accused has the opportunity to confront and cross-examine the co-defendant. *See Bruton v. United States*, 391 U.S. 123, 126 (1968); *see also Ohio v. Roberts*,  448 U.S. 56 (1980); *Idaho v. Wright*, 497 U.S. 805 (1990); *Crawford v. Washington,* ___ U.S. ___, 124 S. Ct. 1354 (2004). The introduction of this testimony rendered Mr. Smith's conviction and sentence of death unconstitutional. Therefore, habeas relief is required.  *See* 28 U.S.C. § 2254(d)(1), (d)(2).

B.    The Trial Court Violated Mr. Smith's Constitutional Rights When it Allowed a Witness for the State to Testify to Statements by Mr. Smith's Mother

188.    Sergeant Pyle was similarly allowed to offer prejudicial un-cross-examined testimony by repeating a statement that had been made by Mr. Smith's mother, Glenda.  Sergeant Pyle testified that, during the search of Mr. Smith's home: "[W]e were talking to Ms. Smith about where Jody had been, what he had been doing. I could hear the washer running and I asked her was she washing any amount of clothes in there and *she said no, Jody was."* R. 409 (emphasis added). The defense was not provided with an

opportunity to cross-examine Glenda Smith about this statement. Yet her alleged statement was used to explain why no forensic evidence, such as the victim's blood on Mr. Smith's clothes, was presented to the jury.

189.    When defense counsel objected to the admission of these statements, the trial court asked if these statements were made in the presence of the petitioner, to which Mr. Harmon replied that "Mr. Smith did not say or do anything when that was said." (R. 346.) The Supreme Court has observed, "[i]n most circumstances silence is so ambiguous that it is of little probative force." *Jenkins v. Anderson*, 447 U.S. 231, 249 (1980); (*quoting United States v. Hale*, *supra*, 422 U.S. at 176, 95 S.Ct., at 2136).  The introduction of evidence at trial that a defendant elected to remain silent when confronted with accusations violates the defendant's Fifth Amendment right to silence and his Fifth and Fourteenth Amendment rights to due process. *Doyle v. Ohio*, 426 U.S. 610 (1976); *United States v. Tenorio*, 69 F.3d. 1103 (11th Cir. 1995); *United States v. Rosenthal*, 793 F.2d. 1214 (11th Cir. 1986).

190.    The introduction of the statements by Mr. Reid and Glenda Smith violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Therefore, habeas relief is required.  *See*  28 U.S.C. § 2254(d)(1), (d)(2).

**XVIII.      Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments Were Violated by the Improper Introduction of Victim Impact Evidence During the Guilt Phase.**

191.    During the guilt phase of Mr. Smith's trial, the State impermissibly argued for a conviction based on the impact of the victim's death on his family. The United States Constitution forbids victim impact arguments at the guilt phase of trial because of the propensity of such argument to prejudice the jury. *Booth v. Maryland*, 482 U.S. 496 (1987); *South Carolina v. Gathers*, 490 U.S. 805 (1989), as modified by *Payne v. Tennessee*, 501 U.S. 808, 830 n.2 (1991).

84

192.     In its guilt-phase closing argument, the State improperly made reference to evidence that the victim had left behind two children. (R. 653, 675.) The State concluded its rebuttal argument by stating: *"He had two little boys* that he knew he would never see again. *I ask that you let that be the picture in your mind as you decide what intent is. . ."* (R. 675) (emphasis added). Out of the presence of the jury, Mr. Smith objected and moved for a mistrial based on this highly prejudicial argument. (R. 676.) The court denied the motion, and refused to instruct the jury to disregard any portion of the argument. (R.676.)

193.     The trial court's admission of prejudicial victim impact testimony into the guilt phase violated Mr. Smith's due process rights to a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. *See* 2254(d)(1), (d)(2).

**XIX.   The Trial Court Violated Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution in its Consideration of the Mitigating and Aggravating Circumstances at the Judicial Sentencing Hearing.**

194.     In sentencing Mr. Smith to die, the trial court's order failed to find and consider extensive evidence of mitigating circumstances. It also erred in its application of the applicable aggravating factors. These errors, both individually and cumulatively,  deprived Mr. Smith of a reliable sentence in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required.  *See* 28 U.S.C. § 2254(d)(1), (d)(2).

> A.     The Trial Court Did Not Actually Consider Undisputed
>        Statutory and Non-Statutory Mitigating Circumstances
>        Contrary to Federal Law.

195.     During the penalty phase of the trial, Mr. Smith presented evidence that he had grown up in an abusive, chaotic family environment as well as evidence of his past and present-day emotional, mental, and substance abuse problems.  In addition, Mr. Smith presented evidence that he is mentally

retarded. (R. 761-814.) Despite this unrefuted evidence, the trial court did not find any statutory mitigating circumstances. This failure to give the proper weight to the extensive mitigating evidence presented violated Mr. Smith's under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. See 2254(d)(1), (d)(2).

> 1. The Trial Court Confused the Statutory
>    Mitigation of Mr. Smith's Extreme Mental
>    and Emotional Disturbance with Guilt Phase
>    Issues of Competence and Appreciation of
>    the Wrongfulness of His Actions.

196. In Mr. Smith's case, evidence about his mental and emotional problems was presented to the court. Dr. James Chudy, a respected psychologist, testified that Mr. Smith suffered from six different problems, each of which significantly impacted his mental and emotional capacity. (R. 784-87.) The problems identified by Dr. Chudy included major depression, a schizo-typal personality disorder, post-traumatic stress disorder, alcohol dependence and a severe learning disability. All of these problems are compounded by the fact that Mr. Smith is mentally retarded. (R. 784-87.)

197. Despite this substantial and undisputed evidence, the trial court refused to find that the offense "was committed while the defendant was under the influence of extreme mental or emotional disturbance." ALA. CODE §13A-5-51 (2). Instead, the court found that such disorders should be balanced against testimony that Mr. Smith *"could appreciate the wrongfulness* of his acts and *was competent* and in control at the time of the crime." (SR-R. 7.) It is improper for a court to diminish or ignore a mitigating circumstance on the ground that a defendant was sane or competent. Moreover, even if the court did not find this statutory factor to exist, this evidence supported finding a finding of a nonstatutory mitigating circumstance. See infra. The trial court's failure to find this circumstance violated Mr. Smith's rights to fair

and reliable sentence determination. *Lockett*, 438 U.S. 586; *Magwood v. Smith*, 791 F.2d 1438 (11th Cir. 1986), *aff'd*, 548 So. 2d 516 (1988), *cert. denied*, 493 U.S. 923. Therefore, habeas relief is required. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

> 2.    The Trial Court Improperly Found that
> the Record Was "Devoid" of Facts Which
> Showed that Mr. Smith Acted Under
> Extreme Duress or the Substantial
> <u>Domination of Another.</u>

198.    Alabama law specifically states that facts which show that an accused "acted under extreme duress or under the substantial domination of another person" are mitigating. ALA. CODE § 13A-5-51 (5). In both of his statements to the police, Mr. Smith stated that Larry Reid had threatened the safety of his mother if he did not assist in the plan. (R. 510, 577.) Furthermore, in his second statement, Mr. Smith stated that he only consented to go along with Larry and the victim after first resisting Larry and Diane, and then succumbing to their cajoling. (R. 532-533.)

199.    Finally, Mr. Smith presented evidence that his psychological problems and mental retardation would make him especially vulnerable to being dominated by someone else. Dr. Chudy testified:

> [People like Smith have] problems primarily with trusting others. But also, they do not end up feeling like they are real competent or that they are really a master of their fate, that *they are really a victim of circumstances.* And so they end up with a poor sense of confidence, a real weak - what we call self-identity. *Their identity is poorly defined They don't kmow-they 're not clear about who they are and where they're going.* And then the most important thing, their ego strength.
>
> What we refer to as *ego strength is really weak.* And by ego strength we mean their ability to handle day-to-day normal problems that you and I would, you know, kind of go through and sluff off would affect these sorts of kids more intensely.

87

(R. 779 (emphasis added).) Dr. Chudy later testified that, "almost all people at this level of IQ, and with Jody in particular, what I saw in this testing, *he does not look like much of a planner. He's more of a reactor. And I would see him more as a follower than a leader."* (R. 782 (emphasis added).) Mr. Smith "would just randomly attach on to who was ever available to him and would show an interest in him." (R. 783.) When asked about his propensity for violence, Dr. Chudy testified, "I don't think he would be an instigator. I think it would be a protective sort of thing." (R. 789.) Dr. Chudy's written evaluation states this even more clearly:

> Occasionally he will become desperate enough that he will *set* out to find people to be with but *his low self-esteem and poor judgment causes him to end up with the wrong people. . . .*

> Mr. Smith is not someone who displays the typical characteristics of a criminal or psychopathic personality. Rather, his thinking and judgment is vague and he displays poor judgment, limited ego strength, a lack of direction in life and he is generally ineffective in problem-solving. When he does engage in criminal activity it will most often be based on impulsive thinking led by a lack of judgement. He fails to use good judgement because he has never learned how to incorporate successfully into society's norms. Moreover, *he is drawn to others of similar character who he will follow into criminal activity. Planning or carrying out criminal activity on his own is rather unlikely.*

(R. 919-20.) Expert testimony and other evidence proved that Mr. Smith "acted under . . . the substantial domination of" Mr. Reid.  Ala. Code § 13A-5-51(4).

200.    Despite this evidence, the trial court simply found, "Though Doctor Chudy's evaluation described the Defendant as one more likely to lead than follow, *this record is devoid* that the Defendant on November 23, 1997, acted under the domination of Larry Reid or anyone else." (CR. 188.) Aside from downplaying Dr. Chudy's extensive evaluation of the unlikelihood of Mr. Smith's actions absent the domination of someone like Mr. Reid, the record is *not* devoid of such facts. The court violated Mr. Smith's constitutional rights when it failed to consider the existence and weight of this mitigating circumstance in violation of Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments

to the United States Constitution. Therefore, habeas relief is required.  See 28 U.S.C. § 2254(d)(1), (d)(2).

> 3.    The Trial Court Failed to Properly Consider
>        Non-statutory Mitigating Circumstances
>        Such as Mr. Smith's Abusive Family Life and
>        His Mental Retardation.

201.    A sentencer must give effect to all mitigating evidence in any capital sentencing proceeding. *Lockett*, 438 U.S. 586. The United States Supreme Court has specifically held that evidence of a "troubled youth," and of an accused's mental retardation must be considered as mitigating circumstances. As set forth, *supra*, Mr. Smith is mentally retarded and, therefore, categorically excluded from the reach of the death penalty. *See Atkins v. Virginia*, 536 U.S. 304 (2002).  At the time of Mr. Smith's sentencing hearing, while *Atkins* had not yet been decided, the law was clear that evidence of mental retardation is mitigating evidence that must be given effect by the sentencer.  *See Penry v.  Lynaugh*,  492 U.S. 302 (1989); *Parker v. Dugger,* 498 U.S. 308 (1991); *Lockett v. Ohio*, *supra; Stephens v. Kemp*, 846 F.2d 642, 652 (11th Cir. 1988) (defendant deemed competent, but counsel found ineffective for failing to present mental health evidence during sentencing phase); *Eddings v. Oklahoma*, 455 U.S. 104, 107 (1982) (dysfunctional family history).

202.    Mr. Smith presented tremendous amounts of evidence relating to his troubled and violent family life as a child. Glenda Kay Smith, his mother, testified to the physical and verbal abuse which both his father and stepfather visited upon him when he was growing up. (R. 761-69.) She also testified to the extensive alcohol abuse on the part of both Mr. Smith's father and stepfather, and how it related to the violence inflicted on Mr. Smith throughout his childhood. (R. 761-64.) At one point, Mr. Smith's stepfather attacked him with a baseball bat and severely damaged his ear. (R. 765.) She explained Mr. Smith's learning problems, his dyslexia, and his need for special education classes. (R. 768.) She described

89

how the family continually moved from one city to another because of the stepfather's brutality, and how this transience interrupted Mr. Smith's already difficult education by forcing him to attend seven different schools in four years. (R. 768.)

203.    Mr. Smith's sisters, Rebecca Charlene Smith and Lynn Harrison, both testified as to the physical and verbal abuse which both their father and stepfather inflicted upon all of the children. (R. 800-01, 810-12.)  Both women left the home at the age of sixteen to escape their stepfather's wrath. (R. 801, 811.) Lynn testified as to their father's and stepfather's alcoholism, while Rebecca testified primarily as to their stepfather's alcoholism. (R. 810, 813, 800.) Finally, Lynn also testified that their grandfather was violent and perverse, killing kittens by smashing their heads against a pole. (R.813.) Lynn also later wrote a letter to the judge which was admitted at the sentencing hearing explaining that she has intentionally forgotten most of the abuse which she suffered in their household. (R. 900.)

204.    The family's neighbor from Uriah, Shirley Stacey, also testified as an eyewitness to Luker, the stepfather, beating the family and being drunk almost everyday. (R. 806-07.) She also would shelter the mother and the children, including Mr. Smith, from some of Luker's fits. (R. 807-08.)

205.    Evidence of Mr. Smith's mental retardation was presented primarily through expert testimony from Dr. Chudy. He administered an IQ test revealing that Mr. Smith falls in the bottom 3% of the population intellectually, placing him within the mentally retarded range. (R. 781.) Dr. Chudy testified that Mr. Smith's writing and reading skills were in the first and second percentiles respectively (approximately third and fourth grade levels). (R. 918.) Dr. Chudy also testified that Mr. Smith's arithmetic capacity is so impaired that he did not register above the 0.02 percentile. (R. 918.) In addition to being mentally retarded, Mr. Smith also suffers from dyslexia. (R. 768.)

206.    Dr. Chudy's report noted that by the first grade, schools had already recognized that Mr.

Smith was significantly impaired. (R. 912.) In fourth grade, Mr. Smith was placed in a class for the learning disabled. (R. 912.) Mr. Smith remained in special education classes, also referred to as classes for emotionally conflicted children. (R. 784, 768.) Mr. Smith was incapable of succeeding in school and dropped out in the eighth grade after having failed both seventh and eighth grades. (R. 906.)

207.    Despite all of this evidence about Mr. Smith's troubled family, mental retardation and learning disabilities, the trial court held that "though thoughtfully considered and applied, [these factors] do not merit significant consideration." (CR. 190.) The trial court admitted that "[i]t is *irrefutable* that this Defendant is the product of an abusive environment woefully lacking in nurturance *[sic]* and emotional support." (CR. 189.) But rather than find that this mitigation existed and weighing it as the statute requires, the trial court proceeded to discount this evidence:

> These factors, though regrettable, are not a *license* for violence, nor do they *justify* any act of senseless rage directed at an innocent human being. Were this the case every person from a deprived background could *explode at will without fear of consequence.*

208.    "Likewise, the Defendant's lack of intelligence is not an *excuse* for murder." (R. 189 (emphasis added).)

209.    The trial court's order demonstrates a fundamental misunderstanding of the role of mitigation. This misunderstanding precluded the sentencing court from giving any meaningful effect to the extensive, compelling mitigation presented. Mitigating circumstances are not excuses, but rather circumstances which provide "a basis for a sentence less than death." Lockett 438 U.S. at 604. The trial court tragically misapplied the function of mitigating evidence in a manner which deprived Mr. Smith of its constitutionally guaranteed effect. *See Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (presentation of mitigating evidence is insufficient unless sentencer is able to give it proper mitigating effect). "Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability

of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Penry, 492 U.S. at 319 (internal citation and quotation omitted).  The trial court's sentencing order indicates that the only evidence the court would have found mitigating would have been evidence that served as an "excuse" for murder.  The trial court's misunderstanding of the role of mitigating evidence deprived Mr. Smith of his rights to due process and a fair trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Therefore, habeas relief is required. *See* 2254(d)(1), (d)(2).

> C.   The Trial Court Improperly Applied the Heinous, Atrocious
> or Cruel Aggravating Circumstance Without Sufficient
> Basis for Its Finding.

210.   Under Alabama law, to be found "heinous, atrocious or cruel," a capital offense must be "conscienceless or pitiless" and "unnecessarily tortuous to the victim." *Lawhorn v. State*, 581 So. 2d 1159, 1174 (Ala. Crim. App. 1990), aff'd, 581 So. 2d 1179 (Ala. 1991); ALA. CODE § 13A-5-49 (8).  It also must involve such atrocity as to set it apart from other capital cases. *Ex parte Kyzer*, 399 So. 2d 330 (Ala. 1981). The constitutionality of this aggravating circumstance can only be upheld in this state if it is applied in a circumscribed, limited manner. *Maynard v. Cartwright*, 486 U.S. 356 (1988) (striking down "especially heinous, atrocious, or cruel" factor as unconstitutionally vague); *Godfrey v. Georgia*, 446 U.S. 420 (1980). Its use in this case was arbitrary and unsupported by the evidence, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

211.   The trial court's sentencing order places a great deal of weight on the length of time that it

took for the victim to die from his injuries: "The victim, furthermore, did not die quickly. According to Doctor Goodin, she opined that the likely mechanism of death was rib fractures, which probably resulted in a pneumothorax and a collapsed lung, probably leaving the victim gasping for breath, for an unspecified period of time." (SH-R. 6.) However, Dr. Goodin's testimony did not resolve the issue of the length of time it took for the the victim to die. Dr. Goodin did testify that the death was "within hours," and then clarified this: "Probably within two to three hours and *maybe a lot sooner.*" R. 625-26 (emphasis added).

212.    No testimony was presented as to whether or not the victim was conscious during this time. As a result, the evidence at trial did not reliably establish that the length of time for the victim to die reflects any information about whether or not this death was indeed more heinous, atrocious or cruel than other murders. The lack of a reliable finding in this circumstance deprived Mr. Smith of his rights to a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. *See* 2254(d)(1), (d)(2).

D.    The Trial Court Improperly Relied Upon a Non-Statutory
Aggravator in Deciding to Impose a Sentence of Death.

213.    During both the sentencing hearing and in the sentencing order, the trial court found that one of the important factors tipping the balance in sentencing Mr. Smith to death was his future dangerousness to society. During the sentencing hearing, the trial court stated: "Mr. Smith by his conduct is a *demonstrable danger* to a civilized society. Therefore, this Court accepts the advisory verdict of the jury. . .." (SH-R. 19 (emphasis added).) The court's sentencing order stated almost exactly the same finding: "This Defendant, by his conduct, is a *demonstrable danger* to civilized society." (CR. 190.) (emphasis added). "Demonstrable danger" is not among the aggravating factors enumerated by statute in

93

Alabama. See Ala. St. §13A-5-49; *Ex parte Stewart*, 659 So. 2d 122 (Ala. 1993) (reversing sentence based on non-statutory aggravator).[26] The use of demonstrable danger as an aggravating circumstances deprived Mr. Smith of his right to a fair sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Therefore, habeas relief is required. *See* 2254(d)(1), (d)(2).

> E.     The Trial Court Improperly Relied Upon the Sentence
> Recommendation of the Victim's Family.

214.    While victim impact evidence is admissible during the penalty phase of a capital trial, it is unconstitutional for the sentencer to rely on the opinion of the victim's family concerning the appropriate punishment in deciding upon a capital sentence. *Booth*, 482 U.S. at 508-09, *rev'd in part, Payne v. Tennessee*, 501 U.S. 808 (1991). *Payne* specifically noted that its holding reversing the prohibition on "evidence about the victim and its impact on the family" did not extend to victim impact evidence about the family's " feelings toward the defendant or the sentence." 501 U.S. at 830 n.2.

215.    Prior to the sentencing hearing, the trial court examined and became "quite familiar" with the pre-sentence investigation report. (SH-R. 8-9.) Attached to the pre-sentence report was a document entitled "FAMILIES IMPACT STATEMENT" signed by Mr. Van Dam's father, mother, sisters, and sons. (R. 909-11.) In one part, the statement expressly describes the sentence which should be imposed:

> HE CAN NOT BE ALLOWED TO EVER HURT ANOTHER INNOCENT PERSON. THAT IS WHY, WE THE FAMILY OF DURK VAN DAM UPHOLD THE VERDICT MADE BY THE JURY. GUILTY OF CAPITAL MURDER, DEATH BY ELECTROCUTION. . . .

---

[26] Even if "demonstrable danger" was a statutory aggravating factor, it would be unconstitutionally vague. See Maynard v. Cartwright, 486 U.S. 356 (1988) (holding that vaguely defined aggravating circumstance are unconstitutional).

(R. 910-11.)[27] Apparently one of his sisters added this vivid call for Mr. Smith's death:

> MY PARENTS FELL *[sic]* VINDICATED KNOWING THAT YOU ARE TO BE ELETRICUTED *[sic]* BUT FOR ME, THE ONLY REAL JUSTICE WOULD BE FOR YOU TO HAVE INFLICTED UPON YOU THE SAME TORTUROUS METHOD OF DEATH AS BESTOWED UPON MY BROTHER.

R. 911. This type of evidence is irrelevant an inadmissible in a capital sentencing procedure. Payne, 501 U.S. at 830 n.2. Its admission violated Mr. Smith's rights to a reliable individualized sentence and his right to a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments. Therefore, habeas relief is required. See 2254(d)(1), (d)(2).

**XX.    Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution Were Violated by the Prosecutor's Misconduct**.

216.    "'It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935). The misconduct of the prosecutor at Mr. Smith's trial deprived him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

    1.    The State Improperly Referred to Evidence of and Argued about the Credibility of the Never Admitted Statement of Larry Reid, Mr. Smith's Co-Defendant, Contrary to Bruton v. United States.

217.    During closing arguments, the State made direct reference to, and vouched for the

---

[27]The entire statement is capitalized, and these portions replicate that choice.

credibility of a statement which was never put before the jury. After describing the arrests of both Mr. Smith and his co-defendant Larry Reid, and the circumstances of Mr. Smith's first statement to the police, the prosecutor stated:

> So Detective Reynolds says, "Well, I'm going to go in now and. I'm going to talk to Larry and see what he's got to say."

> Well, Jody started thinking, "Better get my story straight," so, he's banging on the door, "Hey, tell that detective I want to talk to him, I need to talk to him again," and that's when Detective Reynolds comes back. *Now Larry's story is closer to the mark.* He's still lying about where the pawn shop was, *but he admits more of what he did.*

(R. 656-57 (emphasis added).)  There was no evidence presented concerning Reid's statements to the police, yet the State was allowed to describe them to the jury during closing arguments. The prosecutor not only argued facts not before the jury, he argued the substance of the un-cross-examined statement of Mr. Smith's co-defendant in violation of *Bruton v. United States*, 391 U.S. 123, 126 (1968) (reversing where jury, despite instructions to the contrary, might have deliberated upon "incriminating extrajudicial statements in determining [the accused's] guilt"). *See also United States v. Beckman*, 222 F.3d 512 (8th Cir. 2000) (reversing conviction where prosecutor argued facts not in evidence). Because the prosecutor argued facts not in evidence and Mr. Smith was given no opportunity to exercise his constitutional right to confront Mr. Reid, the prosecutor's arguments deprived Mr. Smith of his rights to due process and a fair trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Therefore, habeas relief is required.  *See* 28 U.S.C. § 2254(d)(1), (d)(2).

2.    The State Relied Heavily Upon Irrelevant, Inflammatory Remarks During the Closing Arguments of the Guilt Phase

218.    A prosecutor cannot appeal to passion or prejudice, or otherwise make inflammatory remarks to the jury. *Viricek v. United States*, 318 U.S. 236, 247-48 (1943). In this case the State made numerous

96

remarks which were irrelevant and clearly calculated solely to anger the jury toward Mr. Smith.

219.    The State began its closing argument in the guilt-phase by stating, "Jody, Joseph C. Smith, is a thief. He was a thief back in November of 1997." (R. 648.) This immediate attack on Mr. Smith's character was unnecessary and inflammatory. More importantly, this assertion immediately drew the attention of the jurors back to when the State's witness, Patty Milbeck, was allowed to testify that Mr. Smith had been in prison. (R. 271.) Although the trial court attempted to cure this remark, the State's argument only served to remind the jury of this inadmissible fact. See *supra*. The prejudicial effect of prior criminal activity is well-recognized; its injection into Mr. Smith's trial denied him a fair trial and reliable sentence. *Huddleston v. United States*, 485 U.S. 681, 686 (1988); *Boyd v. United States*, 142 U.S. 450 (1892).

220.    The State then heaped on the abuse by calling Mr. Smith a liar. The prosecutor stated: "And Jody gave them two statements. *The first statement he's lying through his teeth.* . . . Now that was a lie. Real nice way to put it, it was a lie." (R. 656 (emphasis added).) In arguing that Mr. Smith lied when he gave his first statement, the State implicitly argued that the second statement was more credible. Credibility determinations are the sole province of the jury. The State's argument was highly improper.

221.    Finally, the State, on rebuttal, reminded the jury of extrinsic, non-record information, which was wholly irrelevant to Mr. Smith's trial and could only serve to inflame the jury. The prosecutor remarked:

> It was, by some standards, a fairly short trial. We haven't been here a long time. And maybe we've gotten used to seeing on television out in California where they take weeks and months to try cases. Here you have a Judge who moves things along who knows what he's doing.

(R. 670.)  This statement was simply irrelevant to the issues before the jury. The obvious inference for the jury to draw was that in Mobile County justice was quicker and more sure in contrast to high profile criminal cases in California.  The State's closing argument was infected with statements designed solely

97

to inflame the jury, thereby denying Mr. Smith access to due process and a fair trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

C.      The State Misstated the Law to the Jury and Therefore Deprived Mr. Smith of an Impartial and Properly Informed Jury

222.    When a prosecutor misstates or confuses the law, he or she denies an accused his or her rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

223.    The prosecution misstated the laws of evidence to the jury when she stated, "I told you if the Judge let you hear it you could consider it. If the Judge let you see it, then it was evidence and you could consider it." (R. 658.) The prosecutor's statement was simply incorrect. The jury heard much objectionable testimony. After defense counsel's objection was sustained, the jury was not to consider the testimony or evidence. For example, during Russell Harmon's unclear and inconsistent testimony, Mr. Smith objected numerous times on many different grounds, and these objections were by and large granted. (R. 323, 324, 328, 329, 330, 334, 343-47.) According to the prosecution, despite the properly granted objections, the jury could still consider the testimony. Furthermore, the jury did see some items that were specifically not allowed into evidence. For example, the jury was given written transcriptions of each of the taped statements made by Mr. Smith that were later ruled inadmissible. (R. 447-48, 528.)

224.    The prosecution misled the jury on the burden of proof on the underlying robbery charge. On rebuttal, the prosecutor argued that Mr. Smith had conceded to the robbery charge and therefore the jury only needed to focus on whether or not he formed any specific intent: "I listened to Greg [Hughes, defense counsel] as he closed just now and I believe, if I'm not wrong, *he agreed with us, there was a*

98

*robbery* so *we're halfway there."* (R. 670.) The prosecutor's argument unconstitutionally minimized the State's burden to prove every element of the capital charge beyond a reasonable doubt by telling the jury that half of the case was conceded and proven. *See Brooks v. Kemp*, 762 F.2d 1383, 1389 (11th Cir. 1985), *cert. denied*, 478 U.S. 1022 (1986) (reversing conviction where improper instruction given on intent even though proper instruction also given); *see also In re Winship*, 397 U.S. 358 (1970); *Cage v. Louisiana*, 498 U.S. 39, 41 (1990). This argument deprived Mr. Smith of his right to due process and a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

D.     The ProsecutorsMade Highly Prejudicial Remarks During
       the Sentencing Phase Which Denied Mr. Smith His Right to a
       Just Sentencing Determination.

225.   The State may not make arguments designed solely to appeal to the passions and prejudices of the jury. *See Berger v. United States*, 295 U.S. 78, 88 (1935). At Mr. Smith's trial, the State made several such impermissible arguments. These arguments violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

A.     The State Impermissibly Argued That Mr.
       Smith Was More Worthy of the Death
       Penalty Because He Was Mentally Retarded.

226.   In its rebuttal argument in the penalty phase, the State argued that since Mr. Smith belonged to a cognizably distinct group of people, the mentally retarded, he must share prejudicial characteristics with this group. He argued:

> [F]rom your own common sense, from your own experience you know it to be true, there
> are folks out there with marginal IQ's who are street wise. They get along, they get by,

they survive sometimes better that the rest of us in certain situations. This man's been in prison, this man's been around, this man is street wise. He knew what he was doing.

(R. 831.) The State's argument sought to characterize the mentally retarded as somehow connected to a criminal underclass and therefore more deserving of the death penalty. No evidence was presented to the jury to establish that Mr. Smith was in fact "streetwise," even if such a characteristic would be relevant to determining a mitigating or aggravating factor.

227. The State's argument is also improperly sought to take a mitigating circumstance, the defendant's mental retardation, and instead use it as evidence of a non-statutory aggravator, an alleged "street wise" -ness. *See Zant v. Stephens*, 462 U.S. 862 (1983) (noting that prosecution must not apply aggravating label to facts which are unquestionably mitigation evidence, such as mental illness); *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (prior to Atkins, mental retardation was a significant mitigating factor); *Ex parte Stewart*, 659 So. 2d 122 (Ala. 1993) (reversing sentence based on non-statutory aggravator).

2. The State Impermissibly Argued to the Jury that Any Sentence Other Than Death Would Insult the Victim's Family.

228. Although some information about the victim may be necessary for the jury to properly weigh aggravating and mitigating circumstances, the United States Supreme Court has repeatedly stated that information about the victim's family's feelings regarding punishment cannot be used in determining a sentence of death. *See Payne v. Tennessee*, 501 U.S. 808, 830 n.2 (1991) (noting that its holding (reversing the blanket prohibition on evidence about the victim and its impact on the family) did not extend to evidence about the feelings of the family toward the defendant or the sentence).

229.   In this case, the State argued to the jury in closing:

> But what does [life without parole] say to Durk Van Dam's family? What does that say to them about their brother, about their father, about their son, about their uncle? It says Durk's life was valueless. There was no value in his life and there was no meaning in his death.

(R. 820-21.) This argument was incorrect, not relevant, was highly prejudicial and implored the juror's to sentence Mr. Smith to death based, on the feelings of the victim's family toward Mr. Smith.

230.   While each of these instances of prosecutorial misconduct violated Mr. Smith's rights, their cumulative effect also requires reversal in this case. *Kyles v. Whitley*, 115 S. Ct. 1555 (1995). Such misconduct violated Mr. Smith's rights to a fair trial and due process under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

## XXI.   Mr. Smith's Rights under the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution Were Violated When His Involuntary Statement Was Admitted at His Trial

231.   The State arrested Mr. Smith without any warrant in his home, contrary to the Fourth[28] and Fourteenth Amendments. *Payton v. New York*, 445 U.S. 573 (1980). As a result, Mr. Smith was unconstitutionally confined at the Sheriff's office for at least five hours until being coerced into making a statement without the benefit of a fresh *Miranda* warning. *Miranda v. Arizona*, 384 U.S. 436 (1966) (holding that statement made to police without benefit of recent warning on Constitutional rights must be excluded). Afterwards, Mr. Smith was left alone with other officers to talk to off the record until he made another statement to the sheriff's department. (R. 516.) These statements were the product of an illegal

---

[28] Mr. Smith did not receive meaningful appellate review of his Fourth Amendment clam. Therefore, it is not precluded by the rule of *Stone v. Powell*, 428 U.S. 465 (1976). *See Tukes v. Dugger*, 911 F.2d 508, 514 (11th Dcir. 1990).

101

arrest, and were coerced by police conduct and therefore should have been excluded when Mr. Smith moved to suppress them. His suppression motion was denied in a hearing outside the presence of the jury. (R. 205.)

232.   Detective Don Lunceford and Sergeant Patrick Pyle of the Mobile County Sheriff's Office handcuffed Mr. Smith at his home on November 25, 1997. (R. 146.) They took him to the Central Investigative Division offices where, according to their testimony, they advised him of his Miranda rights around noon. (R. 151.) Mr. Smith was then placed in the interrogation room, but no formal statement was taken until around 5:15 PM. (See R. 157 noting that Detective Reynolds met Mr. Smith at 5 PM); (R. 162. noting that unrecorded conversation prior to first recorded statement lasted about 15 minutes). This recorded statement lasted until 6:14 PM. (R. 515.) At approximately 8 PM, Detective Reynolds returned to tell Mr. Smith that Larry Reid had given a "more credible" statement, implicating Mr. Smith in the murder and shifting all of the blame onto Mr. Smith. (R. 164-65.) Detective Reynolds gave Mr. Smith Miranda warnings at 8:03 PM. (R. 165), and then proceeded to have another unrecorded conversation for an unknown length of time. (R. 171.) Finally, Mr. Smith then made his last recorded statement at 8:11 PM. (R. 529.)

> A.   Mr. Smith's Statements to the Police Were the Result of an
> Illegal Arrest and Therefore Were Inadmissible.

233.   The Fourth Amendment requires that the police obtain a warrant before arresting someone in his or her home. *Payton v. New York*, 445 U.S. 573 (1980) (holding that an arrest in the home without a warrant is unconstitutional). As the Supreme Court plainly held: "[T]he Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony

arrest." Id. at 576. Furthermore, when an arrest is illegal, subsequent statements made to the police must be suppressed regardless of whether or not *Miranda* warnings were given. *Dunaway v. New York*, 442 U.S. 200, 219 (1979) (holding *Miranda* warning insufficient to constitute the attenuation required to remove the taint of the illegal arrest).

234.    A warrantless arrest is presumed constitutionally invalid unless the arresting officer has probable cause as determined by the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983); *Beck v. Ohio*, 379 U.S. 89, 91 (1964). When the police went to arrest Mr. Smith on Wednesday morning, they only knew that one 15-year old informant of previously unknown credibility and with a drug problem, had told them of a crime and named Mr. Smith and Mr. Reid as the culprits. Mr. Reid had told them that Mr. Smith alone was responsible, but his statement was factually false given what could be corroborated. No facts as yet corroborated Mr. Smith's presence. (R. 187-194). Applying the Gates factors, it is clear that the police, at that time, did not have probable cause to believe that Mr. Smith had committed the crime.

235.    The police went to Mr. Smith's home in order to arrest him. They placed handcuffs on him at his home and took him to the Sheriff's office. (R. 146.)   At trial, when Mr. Smith contested the admission of his statements, the State did not challenge that an arrest occurred. (R. 179-80.) *See e.g., United States v. Edmonson*, 791 F.2d 1512, 1515 (11th Cir. 1986) (holding that arrest in context of *Payton* analysis still occurs regardless of degree of cooperation of the suspect). Thus, in order for the arrest to be valid, the State had to demonstrate that "exigent circumstances" existed such that the warrant requirement could be constitutionally excused. *See  Payton*, 445 U.S. at 583 (noting that exception may exist for "the sort of emergency or dangerous situation, described in our cases as 'exigent circumstances,' that would justify a warrantless entry into a home").

103

236.    At trial, the State did not demonstrate that exigent circumstances were present. The arrest of Mr. Smith in his home violated the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Therefore, habeas relief is required.  See 28 U.S.C. § 2254(d)(1), (d)(2).

### B.    Mr. Smith's Statements to the Police Were Involuntary

237.    The Fifth Amendment prevents the State from compelling an accused to incriminate himself. U.S. CONST., Amend. V. As a result, extrajudicial statements to the police are suspect, and presumptively inadmissible. *Miranda v,Arizona*, 384 U.S. 436 (1966). Any statement given after a defendant has allegedly waived his Fifth Amendment rights must be "voluntary in the sense that it was the product of a free and deliberate choice." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also Jurek v. Estelle*, 623 F.2d 929, 937 (5th Cir. 1980). Both of Mr. Smith's statements, which he gave after an illegal arrest, were the product of police coercion and therefore involuntary.

238.    An important factor in determining voluntariness is the defendant's relative intelligence and psychological state of mind. Courts must use a totality of the circumstances test in determining whether a defendant gave a statement voluntarily.  *Edwards v. Arizona*, 451 U.S. 477, 482 (1981).  When an accused suffers from mental defects, there is a far greater likelihood that his "will was overborne at the time he confessed and therefore [the confession is] not the product of a rational intellect and a free will." *Townsend v. Sain*, 372 U.S. 293 (1963), *overruled on other grounds, Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S. Ct. 1715 (1992). As detailed above, Mr. Smith is mentally retarded, dyslexic and suffers from several other mental illnesses.  *See supra*. In addition, more than five hours elapsed between the time Mr. Smith was brought in for questioning and the time he gave his first statement. (R. 157.)

239.    In giving his first statement, Mr. Smith did not make "an independent and informed choice of his own free will" when he gave inculpatory statements.  Those statements should not have been

104

admitted at capital trial. The admission of this statement deprived Mr. Smith of his rights to due process and a fair trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. *Colorado v. Connelly*, 479 U.S. 157 (1986).

240. After being in custody all day, Mr. Smith was re-Mirandized and interrogated again. (R. 172.) At that time, he made a second statement. Mr. Smith had not been allowed out of the interrogation room. (R. 172.) As detailed above, Mr. Smith's impairments and the length of time he was in custody are factors to be considered in determining the voluntariness of his statement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (relevant factors in determining whether a statement was voluntary include the accused's lack of education, his low intelligence, the length of detention, and the repeated and prolonged nature of the questioning).

241. When the police interrogated Mr. Smith for the second time, the level of police coercion increased. First, Detective Reynolds testified that some type of conversation occurred between police and Mr. Smith between interrogations. (R. 516, noting that Mr. Smith talked to Sergeant Pyle). Second, when the second interrogation began, Detective Reynolds made it clear to Mr. Smith that Larry Reid was shifting the "whole blame" onto Mr. Smith. (R. 173.) The police clearly gave Mr. Smith a Hobson's choice between self-incrimination or becoming the fall guy for the crime. The Supreme Court has made clear that a confession coerced solely by deceit and trickery cannot be admitted against the defendant. See, e.g., Spano v. New York, 360 U.S. 315 (1959) (misrepresentation by suspect's friend that the friend would lose his job as a police officer if the suspect failed to cooperate, in addition to other police pressure and suspect's fatigue rendered suspect's confession involuntary).

242. The admission of Mr. Smith's involuntary statements violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief

is required.  *See* 28 U.S.C. 2254 (d)(1), (d)(2).

**XXII.  Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution Were Violated When the Prosecutor Impermissibly Criticized His Exercise of His Right to a Jury Trial**

243.  Due process guarantees the right to a speedy and public trial "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. CONST. amend.. V & VI.   Attacks upon such a fundamental constitutional protection as the right to trial by an impartial jury are unconstitutional.[29]

244.  At the close of the penalty phase hearing, the prosecutor impermissibly argued to the jurors that they should penalize Mr. Smith for bringing them together as a sentencing jury. She argued,

> It is because of Jody that you all are being placed with this enormous and awesome responsibility. It is because Jody stood out on Shipyard Road and was making a decision about the life of Durk Van Dam that you are placed here today. It is Jody's fault, but *it's because of the decisions that Jody made that you are called upon today to make a decision about his life.*

R. 820 (emphasis added). The prosecutor's statements violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Therefore, habeas relief is required. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**XXIII.    Mr. Smith's Rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Were Violated When the Trial Judge Failed to Recuse Himself**

245.  The Eighth and Fourteenth Amendments require a higher degree of reliability and integrity

---

[29]  *See Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976) (prohibiting use of accused's post-arrest silence as evidence of guilt at trial).  *Brooks v. Kemp*, 762 F.2d 1383, 1411 (11th Cir. 1985), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (1987);  *Griffin v. California*, 380 U.S. 609 (1965) (failure of accused to testify); *Doyle*, 426 U.S. at 618-19 (silence);  *U.S. v. McDonald*, 620 F.2d 559, 564 (5th Cir. 1980) (right to counsel); *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990) (right of accused to present vigorous defense).

in any capital trial. *See Johnson v. Mississippi*, 486 U.S. 578, 584 (1988).  In the context of the decision as to who should try a capital case, the appearance of partiality seriously undermines any confidence that a death sentence not be the result of arbitrariness or caprice.

246.    In this case, the trial judge was Chris N. Galanos, who served as the district attorney in Mobile County from 1979 until 1994. During this time, Mr. Galanos was responsible for prosecuting Mr. Smith in 1990 on two charges of receiving stolen property and third degree burglary. A reasonable person might perceive that an accused is less likely to receive an impartial hearing and trial before the person who earlier prosecuted and convicted him. When such an appearance of impropriety exists, the Canons of Judicial Ethics govern and the judge should have recused himself.  The appearance of partiality was demonstrated at trial. (R.  758, R. 962-75, R. 324-25, R. 330.) Perhaps the most egregious example of the fact that the trial judge was not impartial was when he questioned Dr. Julia Goodin in front of the jury during the guilt phase solely to obtain information for the judge's  use during the penalty phase to determine whether or not the acts involved rose to the level of the "heinous, atrocious, or cruel" aggravating circumstance. (R. 627.) Over the Defendant's objections, Judge Galanos elicited evidence in open court that the victim suffered somewhere between thirty-five and forty-five blows.  (R. 629-30.) As detailed above, this was a violation of Mr. Smith's constitutional rights . See *supra*.

247.    A reasonable observer would perceive a pattern of partial treatment by Judge Galanos, the person responsible for prosecuting Mr. Smith on his prior offenses. Under the Canons of Judicial Ethics and the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Judge Galanos should have recused himself. His failure to do so warrants habeas relief.  See 28 U.S.C. § 2254(d)(1), (d)(2).

**XXIV.**     **Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution Were Violated When a Juror Was Randomly Removed from the Venire**.

248.    Because of the unique nature of the death penalty, modern jurisprudence has long recognized that death sentences are constitutional only when the State relies on procedures which protect against arbitrariness and capriciousness. *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). After granting challenges for cause and excusing jurors for health reasons, the trial court then ordered the court reporter to randomly pick a number. The court reporter chose the number thirty-five, and the court then excused Juror #35, Frandell Lucas, from the venire.[30]  No reason justified her removal; excusing her from service was wholly arbitrary and not in compliance with governing state law. Such arbitrariness denied Mr. Smith the right to due process and a fairly selected jury in this capital case, where heightened standards are required to protect precisely against this sort of randomness. This random action by the trial court violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**XXV.  Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution Were Violated When the Trial Court Denied His Motion for Individual, Sequestered Voir Dire**

249.    The trial court violated Mr. Smith's constitutional right to an impartial and unbiased jury when it denied his motion for individual sequestered voir dire. (CR. 157-58.) The Sixth Amendment right to a trial by an impartial jury is fundamental. *Irwin v. Dowd*, 366 U.S. 717, 721 (1961). In light of the grave nature of the charges against Mr. Smith, his counsel moved the court pretrial to allow for individualized voir dire. Defense counsel further moved to keep jurors apart during the voir dire to prevent their answers from being tainted by prior acquaintance with such questioning. (CR. 157-58.) Such voir dire would have ensured that

---

[30] It should be noted that Mrs. Lucas had served on a jury in a murder case six or eight years prior to this trial, and that jury returned a not guilty verdict. (R. 69).

the jury was not biased against Mr. Smith, not biased in favor of the death penalty, and fairly representative of the citizenry of Mobile County.  Such vor dire would have permitted review of the venire for exposure to pre-trial publicity. However, the use of voir dire at trial to reveal the possibility of exposure to pretrial publicity was almost non-existent.

250.    The trial court denied the motion, and thus denied Mr. Smith the fair and reliable verdict and sentence as required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  *See Turner v. Murray*, 476 U.S. 28, 36 n.9 (1986) (reaffirming constitutional right to impartial jury); *Murphy v. Florida*, 421 U.S. 794, 800 (1975) ("the juror's assurance that he is equal to [the] task cannot be dispositive of the accused's rights"). Trial judges must adopt procedures for voir dire that provide a "reasonable assurance that prejudice would be discovered if present." *United States v. Nash*, 910 F. 2d 749, 753 (11th Cir.1990) (*citing United States v. Nell*, 526 F. 2d 1223, 1229 (5th Cir. 1976)). Therefore, habeas relief is required. *See* 28 U.S.C. § 2254(d)(1), (d)(2).

**XXVI.**      **Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution Were Violated When the Trial Court Granted the State's Challenge for Cause and Excused a Prospective Juror Who Merely Had Reservations about the Death Penalty**

251.    A potential juror cannot be excluded from service for cause merely because he or she expresses some reservations about or is hesitant to impose the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) ("[W]e hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.").[31] Furthermore,

---

[31] It should be noted that Mr. Smith was never given the opportunity to individually question veniremembers as to whether they had fixed opinions in favor of imposing the death penalty.  See Morgan v. Illinois, 504 U.S. 719 (1992) (holding that Federal Constitution due process guarantees violated when jurors not asked about opinions in favor of automatically imposing death sentence).

the unseating of a juror for exercising her or his fundamental right to private thought and beliefs also violated the equal protection rights of those jurors. *Cf. J E.B. v. Alabama*, 511 U.S. 127 (1994) (holding that excluding jurors because of gender violated their equal protection rights). Yet the court granted, over Mr. Smith's objections, the State's motion to improperly exclude one juror for cause despite his equivocal answers. (R. 97.)

252.    During the group voir dire, the trial court asked the venire if there were any jurors who are "opposed to capital punishment for any reason." (R. 54.) A number of jurors stood at this point, and in front of the group, the trial court proceeded to ask each juror to explain her or his opposition. Michael Cook, in front of the entire venire, stated that he could not impose a sentence of death by electrocution. (R. 57.) However, Mr. Cook's opposition softened significantly when he was questioned outside of the presence of other jurors by Mr. Smith's counsel. (R. 92.) For example, Mr. Cook first stated that he "would probably lean toward life without parole." (R. 92.) He then stated "1 couldn't have gave them the *electric chair."* (R. 93.) (emphasis added). Mr. Cook's testified that, while it would be difficult, he could impose the death penalty:

| [Mr. Smith' counsel]: | [A]re you telling us that no matter what. . . it would be impossible for you to ever vote to give someone the electric chair? |
|---|---|
| PJ Cook: | *You're ninety percent, right. I can't say a hundred percent.* You - it would be hard. It would be hard. |

(R. 93-94 (emphasis added)).

253.    When Mr. Smith's counsel attempted to follow-up, they were precluded from doing so:

| [Defense counsel]: | What would there be in that ninety percent, in that ten percent, where you weren't sure what sort of information or factor would |
|---|---|

110

there be that might have you consider the death penalty?

[prosecution] :        Judge, again

The Court:             Okay, now I'll sustain it as to that because that is highly conjectural,
                       or a response to that would be highly conjectural.

(R. 96.)  Mr. Smith was not allowed to investigate this fully and determine whether or not this juror's

views rose to the standard for disqualification pursuant to *Wainwright v. Witt*, 469 U.S. 412 (1985).

254.    The removal of Mr. Cook deprived Mr. Smith of of his rights to due process and a fair jury

trial and sentencing, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United

States Constitution. Therefore, habeas relief is required. *See* 28 U.S.C. 2254(d)(1), (d)(2).

**XXVII.    Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the
            United States Constitution Were Violated When the Trial Court Failed to Admonish
            the Jurors**

255.    The trial court failed to admonish the jurors about their duties numerous times when they left

they left the courtroom. *See, e.g.*,  R. (241, 305, 395, R. 631, R. 593-630,  R. 726.) State law requires that

the judge must admonish the jurors when they leave the courtroom for lunch or for the evening to not discuss

the trial among themselves, converse with anyone about any subject connected with the trial, knowingly

expose themselves to outside comments or news accounts, or form or express any opinion about the case

until submitted for deliberation. ALA. R. CRIM. PROC. 19.3 (d). Without such warnings, the chances that the

jury was tainted by an outside source by prejudgment of the case become intolerable. The trial court's failure

violated Mr. Smith's rights to a fair trial and impartial jury under the Fifth, Sixth, Eighth and Fourteenth

Amendments to the United States Constitution.  Therefore, habeas relief is required. *See* 28 U.S.C. §

2254(d)(1), (d)(2).

111

**XXVIII.**     **Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution Were Violated the When the State Was Allowed to Introduce Cumulative and Prejudicial Photographs**.

256.     Although Mr. Van Dam died from a pneumothorax and a collapsed lung, the prosecution was allowed to introduce no less than eighteen different photographs of his dead body. (R. 606.) These photos did not add anything at all to the evidence of the victim's body, especially since the body's wounds were only given context by the oral expert testimony of the Medical Examiner, Dr. Julia Goodin. Photographs whose risk of prejudicing a defendant outweigh their probity should not be admitted. Where inflammatory photographs do not tend to prove or corroborate a disputed issue or elucidate a relevant fact, they also should not be admitted. The introduction of prejudicial photographs violated Mr. Smith's rights to due process, a fair trial, and a reliable determination of punishment. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989); *Osborne v. Wainwright*, 720 F.2d 1237, 1238 (11th Cir. 1983); *Dickson v. Wainwright*, 683 F.2d 348, 350 (11th Cir. 1982). The use of this evidence violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Therefore, habeas relief is required. *See* 28 U.S. C. § 2254(d)(1), (d)(2).

**XXIX.**     **Alabama's Method of Execution Results in the Infliction of Cruel and Unusual Punishment**.

257.     The Eighth Amendment requires states to take all feasible measures to minimize the risk of cruelty in administering capital punishment. *See Zant v. Stephens*, 462 U.S. 862 (1983). Justice Powell noted that "no court would approve any method of implementation of the death sentence found to involve unnecessary cruelty in light of presently available alternatives." *Furman v. Georgia*, 408 U.S. 238, 430 (1972).

258.     Alabama's method of execution does not comport with evolving standards of decency. *See,*

*e.g.*, *Hudson v. MacMillian*, 503 U.S. 1, 8 (1992) (holding that Eighth Amendment prohibition on cruel and unusual punishment "draws its meaning from the evolving standards of decency that mark the progress of a maturing society") (citations omitted).    Therefore, Mr. Smith's execution would  constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.  Therefore, habeas relief is required  28 U.S.C. § 2254 (d)(1), (d)(2).

**XXX.    The Alabama Statute Limiting Court-appointed Attorney's Fees to One Thousand Dollars Compensation for Out-of-court Work in Each Phase of Capital Cases Violates  Federal Constitutional Law**.

259.    The Alabama Code in place at the time of Mr. Smith's trial, provided that court-appointed attorneys trying capital cases could be compensated no more than $1,000 for out-of-court work for each phase of the capital trial, based on a $20 hourly rate. Accordingly, an attorney appointed to a capital case receives no compensation whatsoever beyond 50 hours of out-of-court work. *See* R. 44-45 (attorney recognizing that capital base becomes "pro bono" after a certain point).

260.    This inadequate and statutorily-limited compensation violated the separation of powers doctrine, constituted a taking without just compensation, deprived Mr. Smith of effective assistance of counsel, and violated the due process and equal protection clauses. *Strickland v. Washington*, 466 U.S. 668 (1984).  It is well-established that there "can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin v. Illinois,* 351 U.S. 12, 19 (1956).  As a result of all of these circumstances and as further discussed *infra*, Mr. Smith was denied his rights to assistance of counsel, a fair trial and a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Therefore, habeas corpus relief is required. *See* 28 U.S.C. § 2254 (d)(1), (d)(2).

**XXXI.**        **The Cumulative Effect of All of the above Claims of Error Violated Mr. Smith's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution**

261.    The cumulative effect of the errors of state and federal law enumerated herein deprived Mr. Smith of his rights to due process and a fair trial in violation of state law and the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. *See Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) (federal relief may be granted for cumulative errors in conduct of state trial where individual errors involved matters of constitutional dimension and errors so infected trial that due process was violated). Whether these instances of error are considered singly or together, Mr. Smith is entitled to habeas relief. *See Kyles v. Whitley*, 115 S.Ct. 1555 (1995) (reversing where lower courts failed to consider constitutional violations cumulatively); 28 U.S. C. 2254(d)(1), (d)(2).

**XIII.   PRAYER FOR RELIEF**

Wherefore, for all of the above stated reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, Joseph Clifton Smith respectfully asks this Honorable Court to grant him the following relief:

(A)  afford petitioner an opportunity to reply to any responsive pleading filed by respondent;

(B)  grant petitioner discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and a sufficient period of time to conduct discovery, and further grant petitioner authority to obtain subpoenas to further document and prove the facts set forth in this petition;

(C) grant petitioner an evidentiary hearing at which proof may be offered supporting the allegations set forth in this petition;

(D)  permit petitioner after additional factual development an opportunity to brief and argue the issues presented in this petition;

(E) issue a writ of habeas corpus granting Mr. Smith relief from his unconstitutionally obtained conviction and sentence of death; and

(F) grant such further and other relief as may be appropriate.

Respectfully submitted,

/s_Katherine I. Puzone
Katherine I. Puzone
Attorney ID PUZOK8657
FEDERAL DEFENDERS
MIDDLE DISTRICT OF ALABAMA
201 Monroe Street, Suite 407
Montgomery, AL 36104
Tel:    334-834-2099
Fax:    334-834-0353
Email: kathy_puzone@fd.org
*Counsel for Joseph Clifton Smith*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2005, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, and sent a copy by first-class mail, postage prepaid to:

Clay Crenshaw, Esq.
Office of the Attorney General
Capital Litigation Division
Alabama State House
11 South Union Street
Montgomery, Alabama 36130

Respectfully submitted,

/s_Katherine I. Puzone
Katherine I. Puzone
Attorney ID PUZOK8657
FEDERAL DEFENDERS
MIDDLE DISTRICT OF ALABAMA
201 Monroe Street, Suite 407
Montgomery, AL 36104
Tel:    334-834-2099
Fax:    334-834-0353
Email: kathy_puzone@fd.org

117