# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOSEPH CLIFTON SMITH,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 05-0474-CG-M** |
| | ) | |
| **KIM T. THOMAS, Commissioner,** | ) | |
| **Alabama Department of Corrections,** | ) | |
| | ) | |
| | ) | |
| **Respondent.** | ) | |

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Joseph Clifton Smith ("Petitioner" or "Smith") initiated this action on August 15, 2005 by filing a Petition for Writ of Habeas Corpus (Doc. 1) pursuant to 28 U.S.C. § 2254. Smith challenges a 1998 Alabama state court judgment of conviction and death sentence for capital murder. This matter is before the Court on Petitioner's Amended Petition for Writ of Habeas Corpus (Doc. 52), Respondent Kim T. Thomas'[1] Answer to same (Doc. 56), and Respondent's filing of the indexed record, which consists of 23 volumes.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Kim T. Thomas, the current Commissioner of the Alabama Department of Corrections, for Donal Campbell, who formerly served in that capacity.

For the reasons set forth below, Smith's claims are **DENIED** and his requests for discovery and for an evidentiary hearing[2] are **DENIED**.

# I.     FACTUAL AND PROCEDURAL BACKGROUND

## A. TRIAL

Upon extensive review of the record, the Court finds that the Alabama Court of Criminal Appeals succinctly stated the relevant facts in <u>Smith v. State</u> (<u>Smith I</u>), 795 So. 2d 788, 796-97 (Ala. Crim. App. 2000):

> The appellant, Joseph ("Jody") Clifton Smith, was convicted of murdering Durk Van Dam during the course of a robbery, an offense defined as capital by § 13A–5–40(a)(2), Ala. Code 1975. The jury, by a vote of 11 to 1, recommended that Smith be sentenced to death. The trial court accepted the jury's recommendation and sentenced Smith to die in Alabama's electric chair at a date to be set by the Alabama Supreme Court.

---

[2]    The Antiterrorism and Effective Death Penalty Act (AEDPA) governs the disposition of habeas petitions filed after April 24, 1996. "AEDPA expressly limits the extent to which hearings are permissible, not merely the extent to which they are required." <u>Kelley v. Sec'y for Dep't of Corr.</u>, 377 F.3d 1317, 1337 (11th Cir. 2004). 28 U.S.C. § 2254(e)(2) provides the legal standard for determining when an evidentiary hearing in a habeas corpus case is allowed:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>      (A) the claim relies on—
>           (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>           (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>      (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

<u>Id.</u>

Whereas Smith's claims do not rely on new law or new evidence, and whereas, as set forth herein, Smith cannot establish any constitutional error, none of the statutory conditions has been met, and Smith has therefore failed to establish that an evidentiary hearing is warranted in this case.

The State's evidence tended to show the following.  On November 25, 1997, police discovered the badly beaten body of Durk Van Dam in his mud-bound Ford Ranger truck in a wooded area near Shipyard Road in Mobile County.  Dr. Julia Goodin, a forensic pathologist for the Alabama Department of Forensic Sciences, testified that Van Dam died as a result of 35 different blunt-force injuries to his body.  Van Dam had marks consistent with marks made by a saw on his neck, shoulder, and back; he also had a large hemorrhage beneath his scalp, brain swelling, multiple rib fractures, a collapsed lung, multiple abrasions to his head and knees, and defensive wounds on his hands.  Dr. Goodin testified that the multiple rib fractures that caused one lung to collapse were probably the most immediate cause of death.

Smith gave two statements to the police.  In the first statement he denied any involvement in the robbery-murder but said that he was with Larry Reid when Reid beat and robbed Van Dam.  Smith denied taking anything from the victim.  When police were questioning Reid, Smith repeatedly knocked on the interrogation room door and requested to talk to the officer who had taken his first statement.  In his second statement Smith admitted that he and Reid had planned to rob Van Dam because they had been told that Van Dam was carrying $1,500 in cash.  Smith said that he, Reid, and Van Dam left the Highway Host motel in Van Dam's red truck on November 23, 1997.  Van Dam was driving.  Reid directed Van Dam, who had been drinking, to an isolated location.  Once there, Reid began hitting Van Dam.  He said that when Reid kicked Van Dam in the face he thought Van Dam was dead.  Smith said that Van Dam then got up and Smith hit him on the head with his fist, kicked him in the ribs several times, threw a handsaw at him, and may have hit him with a hammer but he wasn't entirely sure because he suffers from blackouts.  Reid then got a power saw from the back of Van Dam's truck, Smith said, and ran the saw against Van Dam's neck.  Smith held Van Dam down while Reid took the money from his pockets.  Smith and Reid then attempted to move the truck, because they had planned to steal it, but it got stuck in the mud.  Smith also admitted that he took the victim's boots, because his shoes were wet, and that he took the victim's tools.  The two discussed where to take Van Dam's body and Smith suggested that they take it to a nearby lake.  However, they left the body, Smith said, under a mattress near Van Dam's truck.  Smith said that when they divided the money he got only $40 and Reid kept the rest, approximately $100.  Smith also told police that he had just been released from custody on Friday—two days before the robbery-murder on Sunday.

Russell Harmon testified that on November 23, 1997, he went to the Highway Host motel and saw Reid and Smith. He said that Smith told him that they were going to rob Van Dam and asked if he wanted to join them. Harmon declined and left the motel. Later that day he went back to the motel to see if the two had been successful with their plans. He said that Smith told him that he had beaten the victim on the head and that he had cut him with a saw. On cross-examination he admitted that he could not swear that Smith was the one who said he had cut Van Dam in the back but that it could have been Reid who made this statement. However, on cross-examination Harmon reiterated that Smith told him that he "hit the man, beat the man—hit the man in the head and cut him." Harmon testified that Smith asked him to go with him to get the tools from where he had left them in the woods. He said that he went with Smith and that they got the tools and took them to a pawnshop—Smith received $200 for the tools. Harmon testified that he was currently in the county jail because his probation had been revoked.

M.A. testified that she was living at Highway Host motel with her mother and sister at the time of Van Dam's murder. She said that her sister, M., was dating Smith. M.A. testified that on November 23, 1997, she saw Smith, Reid, and Van Dam drive away from the motel in a red truck. She said that when Smith and Reid returned sometime later they were in a black car, Van Dam was not with them, and Smith had blood on his clothes. M.A. testified that Smith told her that he had hit, cut, and stabbed Van Dam in the back.

Patty Milbeck testified that she saw Smith, Reid, and Van Dam on the day of the robbery-murder. When they returned, she said, Van Dam was not with them and Smith appeared nervous. Smith told her that Van Dam had become angry and left. Milbeck stated that at the time of her trial testimony she was in jail because she failed to report to her probation officer.

Joey Warner, an employee of 24-Hour Pawn pawnshop, testified that on November 23, 1997, Smith pawned several tools including saws, drills, and a router. He was given $200 and he showed his Alabama Department of Corrections identification card as identification to pawn the tools.

**B. Direct Appeal**

Petitioner pursued a direct appeal to the Alabama Court of Criminal Appeals, which affirmed Petitioner's conviction and death sentence in an opinion issued on May 26, 2000.  Smith I, 795 So. 2d 788.  Without opinion, the Alabama Supreme Court denied Petitioner's application for a writ of certiorari on March 16, 2001.  Ex parte Smith, 795 So. 2d 842, 842 (Ala. 2001).[3]  The United States Supreme Court denied review on October 1, 2001.  Smith v. Alabama, 534 U.S. 872 (2001).

### C. Rule 32 Petition/Collateral Attack

Pursuant to Alabama Criminal Procedure Rule 32, Petitioner filed a *pro se* petition for post-conviction relief with the Circuit Court of Mobile County, Alabama on September 27, 2002.  On October 9, 2002, the circuit court ruled that the petition was barred by the statute of limitations.  #R-78.[4]  The Alabama Court of Criminal Appeals affirmed on December 19, 2003.  #R-79.  The Alabama Supreme Court reversed and remanded, holding that the petition was timely, on March 5, 2004.  Ex parte Smith, 891 So. 2d 286 (Ala. 2004).  Petitioner filed a First Amended Rule 32 Petition on June 4, 2004 and filed a Second Amended Rule 32 Petition on January 12, 2005.  The State filed a Motion to Dismiss, and on February 11, 2005, after a hearing, the circuit court held that the motion would be granted.  The circuit court dismissed Smith's petition on March 18, 2005.  The Alabama Court of Criminal Appeals denied rehearing without opinion on June 29, 2005.  Smith v. State, 926 So.

---

[3]   Three justices dissented from the denial of certiorari.  Ex parte Smith, 795 So. 2d at 842-46.

[4]   The abbreviation "#R." and "Vol." refer to the tab number and volume number assigned by Respondent to various parts of the indexed record as set forth in Respondent's Habeas Corpus Checklist (Doc. 58).  Citations to "T.R." refer to the trial transcript.  Citations to "Supp. C.R." refer to the supplemental clerk's record from the Rule 32 proceedings.

2d 1095 (Ala. Crim. App. 2005) (table). The Alabama Supreme Court denied certiorari without opinion on August 12, 2005. Ex parte Smith, 946 So. 2d 545 (Ala. 2005) (table).

Petitioner filed an Alabama Criminal Procedure Rule 32.1(f) petition in circuit court on September 15, 2005.[5] The circuit court granted the petition on November 21, 2005. On December 22, 2005, Petitioner timely filed a notice of appeal. On September 26, 2008, the Alabama Court of Criminal Appeals denied the appeal. Smith v. State (Smith II), 71 So. 3d 12 (Ala. Crim. App. 2008). On January 20, 2010, the Alabama Supreme Court granted certiorari as to one claim for ineffective assistance of counsel, #R-90, but then quashed the writ without written opinion on April 15, 2011, #R-91.

### D. Federal Habeas Petition

Once Smith had exhausted his state appeals, this Court lifted the stay on his § 2254 habeas petition on May 18, 2011. Petitioner filed an Amended Petition for Writ of Habeas Corpus on July 25, 2011. Doc. 52. On October 13, 2011, Respondent filed an Answer to the Amended Petition and the 23-volume indexed record. Docs. 56-57.

## II. Statement of the Law

### A. THE ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996 ("AEDPA")

---

[5]   Meanwhile, Petitioner filed his original petition for writ of habeas corpus with this Court on August 15, 2005. This Court stayed proceedings during the pendency of state proceedings on January 2, 2006.

Section 2254(a) of Title 28 of the United States Code provides that "a district court shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a) (2006). Because Smith's habeas petition was filed after April 24, 1996, it is subject to the more deferential standard for review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Pub. L. 104-132, § 104, 110 Stat. 1214, 1218-19. "Under AEDPA the role of the federal court . . . is strictly limited." Jones v. Walker, 496 F.3d 1216, 1226 (11th Cir. 2007). This Court no longer has "plenary authority to grant habeas relief" but rather, this Court's "authority to grant relief is now conditioned on giving deference to the states." Id. Specifically, § 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court has held that only after determining whether AEDPA is satisfied may this Court review a petitioner's constitutional claims "without the deference the AEDPA otherwise requires." Panetti v. Quarterman, 551 U.S. 930, 932 (2007); see also Jones, 496 F.3d at 1228.

### 1) Section 2254(d)(1)

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362 (2000). Writing for the Court, Justice O'Connor maintained that "§ 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." Id. at 412 In other words, "[u]nder § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied – the state-court adjudication resulted in a decision that (1) 'was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or '(2) involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Id. at 412-13. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413; see also Ramdass v. Angelone, 530 U.S. 156, 166 (2000) ("A state determination may be set aside under this standard if, under clearly established federal law, a

state court has been unreasonable in refusing the governing legal principle to a context in which the principle should have controlled.").

In applying this test, the Supreme Court has instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neeley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), abrogated in part on other grounds as recognized by Parker v. Head, 244 F.3d 831, 835 (11th Cir. 2001). Even a summary adjudication of a claim on the merits is entitled to § 2254(d) deference. Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

In the second step, the court must determine whether the state court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or if 'the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405-06). The Supreme Court clarified that "[a]voiding these pitfalls does not require citation of our cases – indeed, it does not even require awareness of our cases, so long as neither the

9

reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002). "If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim." Williams v. McNeil, 2010 WL 144986, at *5 (N.D. Fla. Jan. 7, 2010).

If, on the other hand, this Court concludes that the state courts applied Supreme Court precedent correctly and finds that the facts of the Supreme Court cases and Petitioner's case are materially distinguishable, this Court must go to the third step and determine whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. See 28 U.S.C. § 2254(d)(1). The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a state court's decision was an unreasonable application of legal principle "must be assessed in light of the record the court had before it." Holland v. Jackson, 542 U.S. 649, 652 (2004) (per curiam) (citations omitted); cf. Bell v. Cone, 535 U.S. 685, 697 n.4 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

An objectively unreasonable application of federal law occurs when the state court "identifies the correct legal rule from the Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court

case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).

It is important to note that "[t]he question under AEDPA is not whether a federal

court believes the state court's determination was incorrect but whether that

determination was unreasonable – a substantially higher threshold." Schriro v.

Landrigan, 550 U.S. 465, 473 (2007); see also Williams, 529 U.S. at 412 ("an

*unreasonable* application of federal law is different from an *incorrect* or *erroneous*

application of federal law" (emphasis in original)).

      2)    **Section 2254(d)(2)**

    Besides obtaining relief under § 2254(d)(1), a petitioner may also obtain

federal habeas relief if the state court's adjudication of the claim on the merits

"resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §

2254(d)(2); see also Harrington, 131 S. Ct. at 785. In regards to this subsection, the

Supreme Court has held that "a decision adjudicated on the merits in a state court

and based on a factual determination will not be overturned on factual grounds

unless objectively unreasonable in light of the evidence presented in the state court

proceeding." Miller-El v. Cockrell, 537 U.S. 322, 348 (2003).

    When performing a review under § 2254(d)(2), a federal court presumes the

state court's factual findings to be sound unless the petitioner rebuts the

"presumption of correctness by clear and convincing evidence." 28 U.S.C. §

2254(e)(1); see Miller-El, 537 U.S. at 340 (explaining that a federal court can

disagree with a state court's factual finding, and when guided by AEDPA, "conclude

the decision was unreasonable or that the factual premise was incorrect by clear

and convincing evidence."); <u>Jones</u>, 496 F.3d at 1226-27 (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that the standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact").

As stated above, only if this Court finds that Smith satisfied AEDPA and § 2254(d), can this court take the final step of conducting an independent review of the merits of Petitioner's claims. <u>See</u> <u>Panetti</u>, 551 U.S. at 953-54; <u>Jones</u>, 496 F.3d at 1228. In this independent review, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Also of critical importance to the § 2254 analysis are notions of procedural default and exhaustion. "A state court's rejection of a petitioner's [federal] constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." <u>Borden v. Allen</u>, 646 F.3d 785, 808 (11th Cir. 2011) (citation omitted); <u>Conner v. Hall</u>, 645 F.3d 1277, 1287 (11th Cir. 2011) (as a general rule, "a federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that that is independent of the federal question and adequate to support the judgment" (internal quotation marks and brackets omitted)). "[A] habeas petitioner may overcome a procedural default if he can show adequate cause and actual prejudice, or, alternatively, if the failure to consider the merits of his claim would result in a

fundamental miscarriage of justice." <u>Borden</u>, 646 F.3d at 808 n.26; <u>see also</u> <u>Conner</u>, 645 F.3d at 1287 (to overcome procedural default, petitioner must "show cause for the failure to properly present the claim and actual prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice").

Section 2254 also generally requires petitioners to exhaust all available state-law remedies. In that regard, "[a] petitioner must alert state courts to any federal claims to allow the state courts an opportunity to review and correct the claimed violations of his federal rights. . . . Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues." <u>Lamarca v. Sec'y, Dep't of Corr.</u>, 568 F.3d 929, 936 (11th Cir. 2009) (citations omitted). For exhaustion purposes, it is not sufficient "that a somewhat similar state-law claim was made." <u>Kelley</u>, 377 F.3d at 1344-45. What is necessary is that "the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." <u>Powell v. Allen</u>, 602 F.3d 1263, 1269 (11th Cir. 2010) (citation and internal marks omitted).

## III. DISCUSSION

Smith's petition for a writ of habeas corpus alleges 49 errors in support of his prayer for relief. For clarity, the Court has numbered Petitioner's habeas claims 1-49, in the order in which they have been asserted in Smith's amended petition, as follows:

> **Claims 1-14, 38**: Smith's trial counsel was ineffective (Am. Pet. ¶¶ 28-162; 285-89);

**Claim 15:** Smith's status as mentally retarded precludes imposing the death penalty (Am. Pet. ¶¶ 163-201);

**Claim 16:** The prosecution eliminated jurors in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986) (Am. Pet. ¶¶ 202-03);

**Claim 17:** The evidence was insufficient to support Smith's conviction and death sentence as matter of law (Am. Pet. ¶¶ 204-08);

**Claim 18:** The State failed to comply with its discovery obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) (Am. Pet. ¶¶ 209-12);

**Claims 19, 22-28:** The trial court improperly instructed the jurors (Am. Pet. ¶¶ 213-16, 227-46);

**Claim 20:** Trial judge's refusal to allow defense counsel to cross-examine prosecution witness regarding her probationary status violated the Confrontation Clause (Am. Pet. ¶¶ 217-20);

**Claim 21:** The trial court improperly denied Smith's motion for mistrial (Am. Pet. ¶¶ 221-25);

**Claim 29:** The trial court erred when it improperly questioned a witness *sua sponte* (Am. Pet. ¶¶ 247-50);

**Claim 30:** Admission of out-of-court statements by Smith's co-defendant and mother was improper (Am. Pet. ¶¶ 251-56);

**Claim 31:** State improperly introduced victim impact evidence during closing arguments (Am. Pet. ¶¶ 257-59);

**Claim 32:** Court failed to find mitigating circumstance that Smith was under influence of extreme mental or emotional disturbance (Am. Pet. ¶¶ 262-63);

**Claim 33:** Court failed to find mitigating circumstance that Smith acted under extreme duress or the substantial domination of another (Am. Pet. ¶¶ 264-67);

**Claim 34:** Court failed to consider non-statutory mitigating circumstances, such as abusive family life and mental retardation (Am. Pet. ¶¶ 268-75);

**Claim 35:** Court improperly applied the heinous, atrocious or cruel aggravating circumstance without sufficient basis for its finding (Am. Pet. ¶¶ 276-78);

**Claim 36:** Trial court relied on a non-statutory aggravator in deciding to impose a sentence of death (Am. Pet. ¶¶ 279-82);

**Claim 37:** Trial court improperly relied on sentence recommendation of victim's family (Am. Pet. ¶¶ 283-84);

**Claim 39:** State made irrelevant and inflammatory remarks during guilt phase closing arguments (Am. Pet. ¶¶ 291-94);

**Claim 40:** State misstated the law during closing arguments (Am. Pet. ¶¶ 295-97);

**Claim 41:** State impermissibly argued that Smith was more worthy of the death penalty because he was mentally retarded (Am. Pet. ¶¶ 299-300);

**Claim 42:** State impermissibly argued that a sentence other than death would insult victim's family (Am. Pet. ¶¶ 301-02);

**Claim 43:** The Court should consider the cumulative effect of prosecutorial misconduct (Am. Pet. ¶ 303);

**Claim 44:** Smith's statements were improperly introduced into evidence (Am. Pet. ¶¶ 304-15);

**Claim 45:** Trial judge should have recused himself *sua sponte* (Am. Pet. ¶¶ 316-18);

**Claim 46:** Court improperly granted State's challenge for cause and excused a prospective juror with death penalty reservations (Am. Pet. ¶¶ 319-22);

**Claim 47:** Alabama's method of execution results in inflictions of cruel and unusual punishment (Am. Pet. ¶¶ 323-24);

**Claim 48:** Alabama statute that limits attorney reimbursement to $1,000 violates federal constitutional law (Am. Pet. ¶¶ 325-26);

**Claim 49:** Cumulative effect of all above claims of error violated Petitioner's constitutional rights (Am. Pet. ¶ 327).

Respondent has alleged that Claims 7-8, 11-13, 15, 17-18, 38, 47 are partially or entirely procedurally defaulted. Doc. 56 <u>passim</u>. Respondent further alleges

Claims 21, 29, 32-34, and 36-37 fail to state a claim for relief under AEDPA because they present only questions of state law.  Id.  Lastly, Respondent alleges that that the court is barred from considering Claim 44, in part, under the principles enunciated in Stone v. Powell, 428 U.S. 465 (1976).[6]  Doc. 56 at 194.  As explained in greater detail below, the Court concludes Claims 2, 4, 6, 8, 11, 17-18, 29, 32-33, 36, 38, 43, and 47 are not subject to federal review.  The remaining 36 claims will be considered under the purview of AEDPA.

## A. Procedurally Defaulted Claims

The Court will first consider those claims alleged by Respondent to be procedurally defaulted.

### 1)  Claims Not Raised in State Court—Claims 17-18, 38, 47

Having reviewed Respondent's allegations of procedural default, the Court finds that Claims 17-18, 38, and 47 were not presented to the state courts on direct appeal.  In Claim 17, Petitioner argues that the State "did not present sufficient evidence at Mr. Smith's trial to show that he substantially participated in this robbery or murder or that he had the intent to carry out either the robbery or the murder." Am. Pet. ¶ 206.  In Claim 18, Petitioner argues that the State was not forthcoming with favorable evidence as required by Brady v. Maryland, 373 U.S. 83

---

[6]  Federal courts are not permitted to conduct a post-conviction review of Fourth Amendment claims where state courts have provided an opportunity for full and fair litigation of those claims. Stone, 428 U.S. at 494; Bradley v. Nagle, 212 F.3d 559, 564 (11th Cir. 2000).  Under Stone, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone, 428 U.S. at 482.

(1963).  Id. ¶¶ 209-12.  In Claim 38, Petitioner argues that his counsel was ineffective for failing to object to the inclusion in the pre-sentence investigation report of a letter from the victim's family.  Id. ¶¶ 285-89.  Petitioner failed to raise Claims 17,[7] 18 and 38 on direct appeal.

With respect to Claim 47, Petitioner argues that Alabama's method of execution results in an infliction of cruel and unusual punishment.  Am. Pet. ¶¶ 323-24.  On direct appeal, Petitioner challenged electrocution, specifically, as failing to meet constitutional standards.  #R-31 at 100-01.  However, on July 1, 2002, the Alabama legislature made lethal injection the standard method of execution in Alabama.  See Ala. Code § 15-18-82(a) ("Where the sentence of death is pronounced against a convict, the sentence shall be executed at any hour on the day set for the execution, not less than 30 nor more than 100 days from the date of sentence, as the court may adjudge, by lethal injection unless the convict elects execution by electrocution as provided by law.  If electrocution is held unconstitutional, the method of execution shall be lethal injection.").  At the time of the amendment, Petitioner had not yet sought post-conviction collateral relief in circuit court, yet

---

[7]  With respect to Claim 17, Smith originally argued in his direct appeal brief that that the evidence was insufficient to charge him with committing a robbery while armed with a "power tool." Doc. 31 at 98.  However, in his Rule 32 Petition (and Second Amended Rule 32 Petition), Smith changed his theory of argument and argued that the State did not present sufficient evidence of his intent or that he substantially participated in the robbery.  By changing his theory of argument, Smith has failed to preserve this claim for federal review.  Kelly, 377 F.3d, at 1344-45 (recognizing that "habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain unchanged in substance" but explaining that "petitioners [should] present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation.").  By amending the factual basis for his claim, Smith has failed to preserve it for review.

Petitioner did not challenge the constitutionality of lethal injection in his initial, First Amended, or Second Amended Rule 32 petitions. Accordingly, whereas Petitioner has not exhausted a challenge to lethal injection in state court and the time to do so has lapsed, the claim is procedurally defaulted.[8]

Smith's failure to present these claims to the state courts in accordance with the state's procedural rules constitutes a procedural default. Teague v. Lane, 489 U.S. 288 (1989); Collier v. Jones, 910 F.2d 770, 773 (11th Cir. 1990). Because Smith has not pled cause or actual prejudice or averred that a fundamental miscarriage of justice would result upon not reviewing the merits of these claims, Claims 17, 18, 38, and 47 are procedurally barred from federal review. See Coleman v. Thompson, 501 U.S. 772, 751 (1991) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.").

### 2) Claims That Present Only a Question of State Law – Claims 29, 32-33 and 36

Respondent contends that Claims 21, 29, 32-34, and 36-37 present only questions of state law and, therefore, fail to state a claim for relief under AEDPA.

---

[8] Because lethal injection is now the standard method of execution in Alabama and electrocution is only an alternative, the Court declines to address the constitutionality of electrocution. See McGahee v. Campbell, 2007 WL 3025192, at *15 (S.D. Ala. Feb. 14, 2007); Coleman v. Mitchell, 268 F.3d 417, 443-44 (6th Cir. 2001) (declining to address the constitutionality of electrocution where, after petitioner's conviction and sentence, Ohio had adopted lethal injection as an option).

As discussed in greater detail below, the Court finds that four of these seven claims (29, 32-33, and 36) are not subject to federal review because they raise questions solely of state law.

In Claim 29, Smith argues that the trial judge committed error by posing his own questions to and eliciting testimony from a prosecution witness during the trial. Am. Pet. ¶¶ 247-50. Though not quite presented as such, this claim raises an issue of state evidence law inasmuch as Smith's challenge goes to the nature of evidence that was put before the jury. See id. ¶ 247 (arguing that "highly improper and inflammatory evidence was admitted over Mr. Smith's objection"); id. ¶ 250 (challenging forensic pathologist's testimony as irrelevant and prejudicial). The Court of Criminal Appeals properly resolved this matter on state law grounds, holding that the trial judge was permitted by Rule 614(b) of the Alabama Rules of Evidence and the Alabama Supreme Court's decision in Kmart Corp. v. Kyles, 723 So. 2d 572 (Ala. 1998), to interrogate witnesses. Smith I, 795 So. 2d at 811-12. Petitioner has failed to present this Court with a cognizable habeas claim because his allegation of error presents only a question of state law.

Similarly, Claims 32, 33, and 36 each raise issues of purely state law. In Claim 32, Petitioner argues that the "trial court refused to find that the offense 'was committed while the defendant was under the influence of extreme mental or emotional disturbance.'" Am. Pet. ¶¶ 262-63. In Claim 33, Petitioner argues that the trial court improperly concluded that there was no evidence that Petitioner acted under extreme duress or the substantial domination of another. Am. Pet. ¶¶

264-67.  In Claim 36, Petitioner argues that the trial court impermissibly relied upon Petitioner's "future dangerousness to society" as an aggravating factor in sentencing Petitioner.  Am. Pet. ¶¶ 279-82.  These three claims challenge the trial court's interpretation of three Alabama statutes, specifically Ala. Code §§ 13A-5-51(2) (Claim 32), 13A-5-51(5) (Claim 33), and 13A-5-49 (Claim 36).  This Court review of these claims is foreclosed because "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief."  See, e.g., Carrizales v. Wainwright, 699 F.2d 1053, 1055 (11th Cir. 1983).

### 3) Claims That the State Court Found Procedurally Barred Based on an Independent and Adequate State Procedural Rule – Claims 2, 4, 6, 8, and 11

As to the claims presented to the Alabama state courts and found to be procedurally barred, the Court must determine whether the state court denied Smith's claims based on an independent and adequate state procedural rule.  Bailey v. Nagle, 172 F.3d 1299, 1303 (11th Cir. 1999).  For this, the Eleventh Circuit has established a three-part test:

> First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim.  Secondly, the state court's decision must rest solidly on state law grounds, and may not be intertwined with an interpretation of federal law.  Finally, the state procedural rule must be adequate; i.e., it must not be applied in an arbitrary or unprecedented fashion.  The state court's procedural rule cannot be manifestly unfair in its treatment of the petitioner's federal constitutional claim to be considered adequate for the purposes of the procedural default doctrine.

Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001) (internal citation and quotations omitted).  For the reasons stated below, the Court finds that Claims 2, 4,

6, 8, and 11 were defaulted in state court on an independent and adequate state procedural rule and are therefore procedurally barred and will not be considered.

Claims 2, 4, 6, 8, and 11 each allege ways in which Smith's trial counsel was ineffective. These claims were raised by Smith in his Second Amended Rule 32 petition. The Alabama Court of Criminal Appeals held that they were procedurally barred. See Smith II, 71 So. 3d at 22-23, 25-30. Based on the Court's review of the state court rules applied and the record of Smith's trial, direct appeal, and Rule 32 proceedings, the Court is satisfied that the Court of Criminal Appeals clearly and expressly stated that it relied on state procedural rules to resolve these claims without reaching their merits, that the state court's decision rested solidly on state law grounds and was not intertwined with an interpretation of federal law, that the relevant state procedural law was firmly established and regularly followed, and that the procedural bar was fairly and non-arbitrarily applied. Therefore, Claims 2, 4, 6, 8, and 11 were defaulted in state court pursuant to independent and adequate state procedural grounds and are procedurally barred in this Court from federal review.

**4) Remaining Claims That Respondent Alleges Were Procedurally Defaulted**

As discussed in detail above, the Court concludes that Claims 2, 4, 6, 8, 11, 17-18, 29, 32-33, 36, 38, and 47 are procedurally defaulted. Respondent has further argued that Claims 7, 12-13, 15, 21, 34, 37, and 44, or certain facts in support thereof, are procedurally defaulted. Doc. 56 passim. At this initial level of review,

the Court must conclude that these claims proceed through to the next level of analysis. With respect to certain of these claims, Respondent may well be correct in pointing out that certain facts in support of the claims may not be considered by the federal court due to Petitioner's having not pled those facts sufficiently at the state level, see Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) ("review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"), but complete denial of the claims themselves is not proper at this time. The Court has thoroughly reviewed the Court of Criminal Appeals' opinions and concludes that that court's dismissal of these remaining claims was either on the merits or intertwined with an interpretation of federal law. Therefore, in denying these claims, the Court of Criminal Appeals did not rely solely on a state procedural bar. Because these remaining claims were not dismissed based on an "independent and adequate" procedural ground, these claims proceed to the next step of review. See Harris v. Reed, 489 U.S. 255, 263 (1989) ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." (quoting Caldwell v. Mississippi, 472 U.S. 320, 327 (1985))); Michigan v. Long, 463 U.S. 1032, 1040-41 (1983) (presumption that there is no independent and adequate state ground for a state court decision when the "state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy

and independence of any possible state law ground is not clear from the face of the opinion").

### B. Claims 1-14 and 38: Counsel Provided Ineffective Assistance

#### 1) Legal Standard

"To prevail on a claim of ineffective assistance, a habeas petitioner must show: (1) that 'counsel's performance was deficient' because it 'fell below an objective standard of reasonableness,' and (2) that 'the deficient performance prejudiced the defense.'" Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001) (quoting Strickland v. Washington, 466 U.S. 668, 687-88 (1984)) (internal citations omitted).

Deficient performance requires a showing that counsel's performance was "objectively unreasonable and falls below the wide range of competence demanded of attorneys in criminal cases." Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990); see also Gallo-Chamorro v. United States, 233 F.3d 1298, 1303 (11th Cir. 2000) (petitioner "must prove deficient performance by a preponderance of competent evidence, and the standard is reasonableness under prevailing professional norms"). In this Circuit, courts will presume that counsel's performance was reasonable and adequate, and habeas petitioners bear the "heavy—but not insurmountable—burden of persuading the court that no competent counsel would have taken the action that his counsel did take." Haliburton v. Sec'y for Dep't of Corr., 342 F.3d 1233, 1243 (11th Cir. 2003) (internal quotation marks and citation omitted). The test for reasonableness of performance

"is not whether counsel could have done something more or different"; instead, courts consider whether counsel's performance "fell within the broad range of reasonable assistance at trial." Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1209 (11th Cir. 2007). Failure to raise nonmeritorious issues does not constitute ineffective assistance of counsel. Bolender v. Singletary, 16 F.3d 1547, 1573 (11th Cir. 1994).

With respect to the prejudice prong, "a petitioner must establish that a reasonable probability exists that the outcome of the case would have been different if his lawyer had given adequate assistance." Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1323 (11th Cir. 2002). A petitioner must show that his attorney's errors "worked to his actual and substantial disadvantage." Cross, 893 F.2d at 1292 (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).

Because the petitioner bears the burden of satisfying both prongs of the Strickland test, the Court need not "address both components of the inquiry if the [petitioner] makes an insufficient showing on one." Strickland, 466 U.S. at 697. Courts are free to dispose of ineffectiveness claims on either of Strickland's two grounds. Oats v. Singletary, 141 F.3d 1018, 1023 (11th Cir. 1998).

### 2) Discussion of Petitioner's Claims

#### a) Claim 1: Counsel Was Ineffective Due to Grossly Inadequate Compensation and Claim 48: Alabama Statute that Limits Attorney Reimbursement to $1,000 Violates Federal Constitutional Law

Petitioner argues that counsel was ineffective "in part" due to "grossly insufficient funding available for defense counsel in capital cases." Am. Pet. ¶¶ 28-

30.  Smith pleads no facts in support of this claim.  Instead, his argument is based on the assumption that counsel was <u>ipso facto</u> inadequate because, in Smith's opinion, Alabama inadequately compensated his attorneys.  But Smith's conclusion does not follow.  Other capital defendants in this state have made similar claims based on Alabama's statutory scheme.  <u>See, e.g.</u>, <u>Hallford v. Culliver</u>, 379 F. Supp. 2d 1232, 1279 (M.D. Ala. 2004) ("The essence of [Petitioner]'s argument becomes simply that the court ought to presume counsel could not provide constitutionally adequate representation because of the inadequate compensation."), <u>aff'd</u>, 459 F.3d 1193 (11th Cir. 2006).  However, even if the Court were to agree that the compensation provided to defense counsel in death cases in Alabama is woefully inadequate,[9] "that fact is insufficient as a matter of law to overcome the presumption of effectiveness which attends the performance of counsel."  <u>Id.</u> Whereas "attorneys are expected to competently represent indigent clients" regardless of how much or little they are paid, <u>see</u> <u>id.</u> (citing <u>Waters v. Kemp</u>, 845 F.2d 260, 263 (11th Cir. 1988)), and whereas Petitioner has pled no facts to rebut that presumption, the Court does not find that counsel's performance was deficient and concludes that no habeas relief is due Petitioner on his inadequate compensation-based claim.

---

[9]    The U.S. Supreme Court recently criticized Alabama's statutory scheme for compensating counsel appointed in capital cases.  <u>See</u> <u>Maples v. Thomas</u>, 132 S. Ct. 912, 917 (2012) ("Appointed counsel in death penalty cases are also undercompensated.... Even today, court-appointed attorneys receive only $70 per hour."); <u>see also</u> <u>McFarland v. Scott</u>, 512 U.S. 1256, 1256 (1994) (Blackmun, J., dissenting from denial of certiorari) (citing Ala. Code § 15-12-21(a) and opining that "compensation for attorneys representing indigent capital defendants often is perversely low").  Nonetheless, the Supreme Court has not found Alabama's compensation statute to be unconstitutional.

Petitioner also challenges Alabama's compensation scheme directly, arguing that the statutory limit on reimbursement for out-of-court preparation that was in place in 1998 violated separation-of-powers doctrine, constituted a taking without just compensation, and violated the Due Process Clause.[10]  Am. Pet. ¶¶ 30, 325-26. Smith's unsupported and wholly conclusory arguments fail to indicate how, in rejecting these claims, the state court's determination was contrary to or unreasonably applied federal law.  Indeed, Smith has directed the Court to no case in which a court held Alabama's compensation scheme to be unconstitutional.  This Court finds no error in the state court's opinion, which is supported by a long line of state precedents.  See, e.g., Samra v. State, 771 So. 2d 1108, 1112 (Ala. Crim. App. 1999) (citing cases), aff'd sub nom. Ex parte Samra, 771 So. 2d 1122 (Ala. 2000).

### b)  Claim 3: Counsel Failed To Interview Family Members

In Claim 3, Petitioner argues that counsel was ineffective for failing to interview family members.  Am. Pet. ¶¶ 33-37.  Claim 3 is contradicted by the record.  Smith's counsel interviewed three of Smith's family members and a family friend, each of whom testified extensively at the sentencing hearing as to Smith's abusive past.  T.R. 761-70, 798-814.  Thus, Smith has not demonstrated that his counsel's performance was deficient under Strickland, and Claim 3 must fail.

---

[10]  In 1999, the Alabama legislature eliminated the limit on attorneys' fees in cases where the original charge is a capital offense.  See Ala. Code § 15-12-21(d)(1).

### c) Claim 5: Counsel Failed To Show Bias of the State's Witness, Melissa Arthers

In paragraphs 46-51 of his Amended Petition, Petitioner argues his attorney was ineffective for failing to articulate the proper basis for introducing the fact that a prosecution witness, Melissa Arthers, was in state custody at the time that she testified. Trial counsel argued that Arthers' incarceration could be offered solely for impeachment purposes. T.R. 369. However, the trial court did not allow counsel to impeach Arthers in that way. Id. Petitioner now argues that trial counsel should have instead offered the fact of Arthers' incarceration to show bias. But this Court agrees with the Alabama Court of Criminal Appeals that this "was not error, much less plain error." Smith II, 71 So. 3d at 26. In any event, Smith has failed to satisfy the prejudice prong of Strickland inasmuch as he has not shown that a reasonable probability exists that the outcome of the case would have been different had the fact of Arthers' imprisonment been admitted. See Van Poyck, 290 F.3d at 1323. As such, Claim 5 is **DENIED**.

### d) Claim 7: Counsel Failed To Challenge the Voluntariness of Custodial Statements

In paragraphs 61-64 of his Amended Petition, Petitioner argues that counsel was ineffective for failing to object to the admission of Smith's allegedly involuntary, custodial statements even though "trial counsel knew about Mr. Smith's mental limitations." Am. Pet. ¶ 62. The circuit court determined that Smith's mental deficiency is refuted by the record and found Smith's claim to be without merit. #R.84 at 21. As described more fully *infra* in the discussion of Claim 15, the Court agrees that Smith's cognitive abilities were not so deficient as to affect

the voluntariness of his custodial statements. Whereas an objection as to voluntariness premised on Smith's mental capacity would have been meritless, Smith's counsel was not ineffective for not having made it. See Bolender, 16 F.3d at 1573. Therefore, Claim 7 is due to be **DENIED**.

> ### e) Claim 9: Counsel Was Ineffective for Failing To Move for the Trial Judge's Recusal & Claim 45: Trial Judge Should Have Recused Himself <u>Sua Sponte</u>

Two of Smith's claims stem from the fact that, in 1990, Smith pled guilty to three felony charges that were prosecuted under the supervision of then-Mobile County District Attorney Christopher N. Galanos. Eight years later, Galanos was the circuit court judge assigned to preside over Smith's capital trial. In Claim 9, Smith argues that, because Galanos was the District Attorney when Smith was prosecuted in 1990, defense counsel should have moved for his recusal, and that counsel's failure to make such a motion rendered his assistance ineffective. Am. Pet. ¶¶ 72-98. In Claim 45, Smith argues that Judge Galanos should have recused himself sua sponte even in the absence of such a motion. Id. at 174-75. This Court agrees with the repeated determination of the Court of Criminal Appeals that neither claim has any merit, see Smith II, 71 So. 3d at 29; Smith I, 795 So. 2d at 803-04, and finds that Judge Galanos' failure to recuse himself sua sponte does not offend the Constitution.

Smith argues that defense counsel should have moved for Judge Galanos' recusal because "Judge Galanos[] [played a] substantial prior role as prosecutor of the offense alleged to be a qualifying aggravating circumstance." Am. Pet. ¶ 76. Putting aside Smith's wholly conclusory characterization of Judge Galanos' role as

"substantial," a careful examination of the record reveals that Smith's argument rests on a patently false premise, inasmuch as none of the convictions secured during Judge Galanos' tenure as District Attorney was offered as an aggravating circumstance. The only aggravating circumstances that were argued to the jury during the penalty phase of Smith's capital trial and to Judge Galanos at sentencing were that 1) Smith committed a capital offense while under sentence of imprisonment, <u>see</u> Ala. Code. § 13A-5-49(1); 2) Smith committed the capital offense while engaged in or was an accomplice in the commission of a robbery, <u>see id.</u> § 13A-5-49(4); and 3) the capital offense was especially heinous, atrocious, or cruel, <u>see id.</u> § 13A-5-49(8). T.R. 836-37. The fact that Smith was under sentence of imprisonment[11] at the time of Durk Van Dam's murder was proven by the testimony of a records custodian from the Alabama Department of Corrections and the admission of a document that indicated Smith was released to a community custody program on November 21, 1997. T.R. 751-57. The state did not elicit any testimony regarding the facts or circumstances of the convictions that resulted in the sentence Smith was under at the time of Van Dam's murder. In short, the convictions obtained while Judge Galanos was District Attorney did not directly affect Smith's sentence.

---

[11] "Under sentence of imprisonment" is statutorily defined as meaning "while serving a term of imprisonment, while under a suspended sentence, while on probation or parole, or while on work release, furlough, escape, or any other type of release or freedom while or after serving a term of imprisonment, other than unconditional release and freedom after expiration of the term of sentence." Ala. Code § 13A-5-39(7). Smith has never disputed the fact that he was under sentence of imprisonment at the time of Van Dam's murder.

Nonetheless, in support of his claim, Smith relies heavily on three cases in which the Court of Criminal Appeals held that Judge Galanos should have recused himself as a consequence of his prior service as District Attorney. Am. Pet. ¶¶ 81-83 (citing <u>Crawford v. State</u>, 686 So. 2d 199 (Ala. Crim. App. 1996), <u>Crumpton v. State</u>, 677 So. 2d 814 (Ala. Crim. App. 1995), and <u>Ex parte Sanders</u>, 659 So. 2d 1036 (Ala. Crim. App. 1995)). However, each case is easily distinguished. Unlike Smith, the defendants in the cases cited by Petitioner were arrested while Galanos was Mobile County District Attorney. <u>See</u> <u>Crawford</u>, 686 So. 2d at 200 (defendant arrested July 21, 1994); <u>Crumpton</u>, 677 So. 2d at 815 (defendant arrested July 17, 1994); <u>Ex parte Sanders</u>, 659 So. 2d at 1037 (defendant arrested July 8 & 12, 1994). In holding that Judge Galanos should have recused himself in those cases, the Court of Criminal Appeals cited the portion of the Alabama Code that prohibits judges from sitting in any case "in which he has been of counsel," Ala. Code. § 12-1-12, and an ethical canon that states that a judge should disqualify himself if "[h]e served as a lawyer in the matter in controversy," Ala. Canons of Jud. Ethics 3(C)(1)(b).[12] With respect to the capital prosecution of Smith, however, Judge Galanos was never "of counsel" or "a lawyer in the matter in controversy"; Smith

_____

[12]  Underlying these principles is the basic tenet that the "Due Process Clause entitles a person to an impartial and disinterested tribunal." <u>Marshall v. Jerrico, Inc.</u>, 446 U.S. 238, 242 (1980). It bears noting that Petitioner has cited several prejudicial rulings by Judge Galanos during the trial, that Petitioner contends, demonstrate that Judge Galanos was not impartial towards Petitioner. Am. Pet. ¶¶ 89-98, 316-18. However, these allegations were not raised in Petitioner's Rule 32 petition and therefore were not properly presented to the state courts, and therefore, are not properly before the Court for consideration. <u>See</u> <u>Borden</u>, 646 F.3d at 817.

was arrested for Van Dam's murder on November 25, 1997, more than three years after Judge Galanos left the District Attorney's Office and assumed the bench.

Murphy v. Beto, 416. F.2d 98 (5th Cir. 1969), a case decided by the old Fifth Circuit more than four decades ago, more closely addresses the issue presented by Smith's claims.  In Murphy, a state prisoner convicted of felony theft as a recidivist and sentenced to life imprisonment as a consequence of his criminal history sought a writ of habeas corpus from a federal district court arguing, inter alia, that he had been deprived of due process of law because the trial judge had been the district attorney at the time of one of his convictions alleged for the sentencing enhancement.    Id. at 99-100.    The court of appeals expressly held that "petitioner's . . . contention, that the trial judge was district attorney at the time of one of his convictions alleged for enhancement, is not a sufficient ground for disqualification and does not present a question cognizable in habeas corpus." Id. at 100.  Murphy remains good law in this Circuit and is controlling.[13]  See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) ("[D]ecisions of the United States Court of Appeals for the Fifth Circuit (the "former Fifth" or the "old Fifth"), as that court existed on September 30, 1981, handed down by that court

---

[13]  Murphy is merely analogous but not identical to the instant case because Smith's offense was aggravated by the fact that it was committed while Smith was under sentence of imprisonment — a *consequence* of a prior conviction — whereas Murphy's sentence was enhanced as a *direct result* of having been previously convicted of other crimes.    However, the fact that Judge Galanos' relationship to the aggravating factor in Smith's case is more attenuated than the relationship that the judge in Murphy had to the enhancement employed in that case only serves to further weaken Smith's argument that recusal was warranted under the circumstances presented here.  Cf. Jarrell v. Balkcom, 735 F.2d 1242, 1259 (11th Cir. 1984) (where the jury, rather than the judge, was the "trier of fact," judge did not err in failing to recuse himself).

prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.").

As described above, Petitioner's underlying claim lacks merit, and therefore, counsel was not ineffective for failing to raise the issue at trial. See Bolender, 16 F.3d at 1573 ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance."). Claims 9 and 45 are, therefore, **DENIED**.

> **f) Claim 10: Counsel Failed To Object to Prosecutorial Misconduct and Claim 39: State Made Irrelevant and Inflammatory Remarks During Guilt Phase Closing Arguments**

In Claim 10, Petitioner argues that his counsel was ineffective for failing to object to two specific instances of alleged prosecutorial misconduct during closing arguments. Am. Pet. ¶ 99-104. In Claim 39, Petitioner asserts that this misconduct denied him of due process and a fair trial. Id. ¶¶ 291-94.

Smith first contends that his trial counsel was ineffective for failing to object when the prosecutor made a reference to "Larry's story," which Smith suggests was an improper reference to a statement by Smith's co-defendant, Larry Reid, which had not been admitted into evidence. T.R. 657. Upon review of the context in which the reference was made, the Court of Criminal Appeals determined that the prosecutor meant to refer to Petitioner, not to Reid, and his failure to do so was merely "an inadvertent slip of the tongue." Smith I, 795 So. 2d at 825. The Court agrees and finds that Smith was not prejudiced by this misstatement. Therefore, this claim fails under the prejudice prong of Strickland.

Smith next claims that his trial counsel was ineffective for failing to object to the prosecutor calling Smith a "thief," T.R. 648, and a "liar," id. at 656. The Court agrees with the Court of Criminal Appeals that these characterizations of Petitioner were supported by facts in evidence, and therefore, did not constitute reversible error. Additionally, Petitioner has again failed to prove that he was prejudiced by either remark. Therefore, Claim 10 is **DENIED**, and Claim 39 fails because it is without merit.

### g) Claim 12: Counsel Failed To Adequately Investigate Independent Mitigation Evidence

In paragraphs 125-52 of his Amended Petition, Petitioner argues that his counsel failed to investigate, elicit sufficient mitigation evidence from testifying witnesses, and present evidence from available non-testifying witnesses. Specifically, Petitioner claims that counsel "failed to obtain important and available information regarding Mr. Smith's family and social history, employment history, educational history, medical history, mental health history, correctional history, and community and cultural influences." Am. Pet. ¶ 127. "When assessing a decision not to investigate, we must make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Waters v. Thomas, 46 F.3d 1506, 1514 (11th Cir. 1995) (quoting Foster v. Dugger, 823 F.2d 402, 406 (11th Cir. 1987)). The Court agrees with the Court of Criminal Appeals' assessment of counsel's performance. Smith II, 71 So. 3d at 32. Smith's trial counsel presented a highly detailed mitigation case during the penalty

phase. T.R. 761-815. Based on the record, it appears that Smith's trial counsel examined and presented to jurors much evidence of Smith's family troubles, difficulties in school, medical conditions, and educational shortcomings. Id. Counsel presented this information in an effort to present a sympathetic portrait of Smith. Smith has not demonstrated that his counsel's performance was deficient or that Smith was prejudiced by the alleged shortcomings of counsel's investigation and presentation of mitigating circumstances.

### h) Claim 13: Counsel Failed To Obtain Expert Assistance

In paragraphs 153-59 of his Amended Petition, Petitioner argues that his counsel was ineffective for failing to obtain the assistance of a neuropsychologist. Respondent claims that certain facts presented in Petitioner's amended habeas petition are procedurally defaulted because they were not presented to the state courts during the Rule 32 proceedings or on appeal from the denial of the Rule 32 petition. Doc. 56 at 61. Upon a thorough examination of all properly presented facts, the court agrees with the Alabama circuit court's findings of fact. Dr. Chudy testified that there was no evidence indicating Smith's mental deficiencies were neurologically-based. T.R. 796. "Nothing in Dr. James Chudy's written report or in his trial testimony raises any inference that Smith would have been entitled to additional expert assistance or that his trial counsel were ineffective for failing to secure additional, expert assistance." Supp. C.R. 423–24. Smith's counsel was not ineffective for failing to secure an expert that was not necessary.

### i) Claim 14: Counsel Failed To Properly Object to Improper Jury Instructions

In paragraphs 160-62 of his Amended Petition, Petitioner argues that his counsel was ineffective for failing to object to an allegedly improper penalty phase jury instruction. The Court's review of the record – which is bolstered by the decision of the Rule 32 trial court – confirms that trial counsel did, in fact, object to the allegedly improper instruction, T.R. 852, and that, as a result of the objection, the trial court recharged the jury concerning the burden of proof. T.R. 854-56. Petitioner's statement that "[t]he judge never corrected the misstatement of the law" is patently incorrect. Because Petitioner's claim lacks merit, Claim 14 is **DENIED**.

### j) Claim 16: The Prosecution Eliminated Jurors in Violation of <u>Batson</u>

In Claim 16 (Am. Pet. ¶¶ 202-03),[14] Petitioner argues that the State violated U.S. Supreme Court's decision in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986) by exercising its peremptory strikes against black jurors in a racially discriminatory manner. In <u>Batson</u>, the Supreme Court held that the Equal Protection Clause forbids the exercise of peremptory jury strikes on the basis of race. The Supreme

---

[14] The majority of Petitioner's <u>Batson</u>-related argument is contained in Paragraphs 105-22 of his Amended Petition. Respondent has alleged that "[t]he only facts that are properly before this Court are contained in paragraphs 105, 107, and 110-113 of the amended habeas petition because they were presented during the Rule 32 proceedings" and that "the facts in paragraph 106, the second sentence of paragraph 108, the last sentence of paragraph 109, the third and fourth sentences of paragraph 114, and the facts set forth in paragraphs 115-122 of the amended habeas petition" are not before this Court "because they were not presented to the state courts in the Rule 32 proceedings or on appeal from the denial of the Rule 32 petition." Doc. 56 at 47. Upon careful review of the record before the direct appeal and Rule 32 state courts, the Court agrees that certain facts presented in paragraphs 114, 116-17, 119-22 were not presented to the state court, and therefore, the Court does not rely on those facts and allegations contained therein.

Court has provided a familiar three-part framework for evaluating claims of racial discrimination in jury selection. First, for a defendant[15] to establish a prima facie case, he or she must produce evidence sufficient to support an inference that the prosecutor exercised its peremptory challenges on the basis of race. Johnson v. California, 545 U.S. 162, 170 (2005). "[E]stablishment of a *prima facie* case is an absolute precondition to further inquiry into the motivation behind the challenged strike." Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., 236 F.3d 629, 636 (11th Cir. 2000). If a prima facie showing is made, then, at the second step, the burden shifts to the State to offer non-discriminatory reasons for its challenges. Id. The State's proffered explanation at this stage need not be persuasive or even plausible, so long as it is not discriminatory. Purkett v. Elem, 514 U.S. 765, 768 (1995). At the third step, if both sides have carried their burdens, the trial court must determine whether the defendant has proven purposeful discrimination. Id. at 767. "At this point, the decisive question will be whether counsel's race-neutral explanation should be believed." McNair v. Campbell, 416 F.3d 1291, 1310 (11th Cir. 2005).

Because Smith's attorneys did not raise a Batson challenge at trial, the trial judge did not have occasion to assess whether Smith could make out a prima facie case of racial discrimination or to press the State to offer race-neutral explanations

---

[15] The Supreme Court in Powers v. Ohio, 499 U.S. 400 (1991) eliminated the requirement that a criminal defendant raising a Batson challenge must show commonality of race with excluded jurors. Thus, Smith, who is white, has standing to challenge the State's use of peremptory strikes against black jurors.

for its strikes.   When presented with the issue on direct appeal, the Court of

Criminal Appeals concluded that Petitioner failed to make out a prima facie case of

discrimination:

> Smith contends that the record reflects that of the 13 blacks on the venire the State removed 8 by its peremptory strikes.  He contends that the record supports his entitlement to a <u>Batson</u> hearing because, he says, the record establishes a prima facie case of racial discrimination.  We do not agree.
>
> There was no <u>Batson</u> objection to the State's use of its peremptory strikes. Smith contends that the strike list supports his motion to remand for a <u>Batson</u> hearing because it shows that 8 of the State's 13 strikes were used to remove prospective black jurors.  We note that the strike list also reflects that defense counsel used every one of it[s] 13 strikes to remove white prospective jurors.  The strike list is confusing. It fails to indicate what jurors were struck for cause, and it does not reflect the final composition of Smith's jury.
>
> As this Court stated in <u>Boyd v. State</u>, 715 So. 2d 825, 836 (Ala. Crim. App. 1997):
>
>> "In his appellate brief, the appellant argues that a prima facie case of gender discrimination exists because the prosecutor used 10 of his 14 peremptory strikes to remove 10 of 26 female jurors. However, a review of the strike list included in the record, as well as the voir dire examination, indicates that the appellant used 10 of his 13 strikes to remove female jurors.  There were no supporting circumstances to indicate gender discrimination or to render a failure by the trial court to find the existence of a prima facie case of gender discrimination plain error, i.e., error that would adversely affect the substantial rights of the appellant. Similarly, in <u>George v. State</u>, 717 So. 2d 827 (Ala. Crim. App. 1996), this Court found that the record did not supply an inference of gender discrimination.  'Before the plain error analysis can come into play in a Batson issue, the record must supply an inference that the prosecution engaged in purposeful discrimination.' <u>Pace v. State</u>, 714 So. 2d 316 (Ala. Crim. App. 1995)."
>
> The record fails to raise an inference of racial discrimination. We refuse to find error based on this inadequate record.

Smith I, 795 So. 2d at 802-03 (footnote and citations omitted). Accordingly, the premises on which the Court of Criminal Appeals rested its analysis can be expressed as four propositions: 1) There was no Batson objection lodged by defense counsel at trial; 2) Smith's argument is based on a strike list that shows eight of the State's thirteen peremptory strikes were used to remove eight of the thirteen black veniremen; 3) the strike list shows that all of defense counsel's thirteen strikes were used to strike white veniremen;[16] and 4) the strike list is "confusing." However, the evidence and argument presented in Petitioner's direct appeal brief was more comprehensive than the court's analysis suggested:

> After the initial winnowing of the venire for cause or excuse or by random selection, the venire was left 38 members, of whom 13 were black and 25 were white. However, according to the court's strike sheets, the State then proceeded to use eight of its thirteen strikes (62% of its strikes) to eliminate blacks from the jury. This emphasis on striking blacks is all the more damning given that blacks only consisted of 34% of the remaining venire.

#R-31 at 69 (internal citations omitted). Petitioner also presented evidence of discriminatory intent, tracking the factors set forth by the Alabama Supreme Court in Ex parte Branch, 526 So 2d. 609, 622-23 (Ala. 1987):

- Lack of common characteristics other than race: The blacks eliminated from the venire were retired from the air force, not employed, an

---

[16] The Court of Criminal Appeals' opinion does not make clear whether this fact entered into the court's calculation. Respondent has argued in its Answer to Smith's Amended Petition that Smith's claim lacks merit due to Smith's "unclean hands." Doc. 56 at 51-52. However, Batson and its progeny make clear that this fact can have no bearing on the issue. Bui v. Haley, 321 F.3d 1304, 1317 n. 19 (11th Cir. 2003) ("As Batson instructs us to be equally protective of the equal protection rights of the potential jurors as we are of those of the defendant, the fact that [Petitioner] himself may have unclean hands can have no bearing on our determination of whether the State's use of its strikes to remove blacks from the jury passes constitutional muster.").

electrician, retired from corporate employment, a mechanic, a maintenance worker at Wal-Mart, a musician at a church, and a laborer at the Kimberly-Clark company. The only thing which these people shared was the color of their skin.

- Pattern of Strikes: Not only did the State use eight out of thirteen strikes to eliminate black veniremembers, it used six of its first eight strikes to eliminate blacks.

- Past conduct: Courts recognize that the Mobile County District Attorney's office has frequently used racially discriminatory peremptory strikes.

- Type and Manner of Questions Made During Voir Dire: The only questions posed by the State during voir dire dealt with whether or not the juror knew any of the witnesses, whether or not they sat on a jury before, and whether or not they could consider inferential or circumstantial proof. No one answered that such proof would be a problem.

- Type and Manner of Questions Directed to Specific Juror: The only individualized voir dire was for jurors who indicated potential problems with the death penalty. The State only examined one of the eight jurors in question, John Turk, who unequivocally stated that he could impose the death penalty.

- Disparate Treatment: The State struck both potential jurors John Turk, a retiree from Kelly Air Force Base, and Matilda Pond, a retiree who had worked at the Gordon Corporation, but kept on the panel, Dorothy Mann, a white female, who was retired after working for the United States Department of Defense.

- Most or All of Peremptory Strikes Used to Dismiss Blacks: The state used 8 of its 13 strikes, or 62%, to strike blacks from the jury.

- Most or all of the Black Jurors Dismissed: The State removed eight of thirteen remaining black jurors from the panel, or 62%.

#R-31 at 70-71 (internal citations omitted).

While, in the Court's opinion, the state court's consideration of Smith's substantive Batson claim was perhaps given short shrift, the undersigned cannot conclude based on the record before the state court that its decision is unentitled to

AEDPA deference.[17]   In making the requisite determination, <u>Batson</u> requires that the court consider "all relevant circumstances," <u>Batson</u>, 476 U.S. at 96, including, but not limited to, whether there is "a 'pattern' of strikes against black jurors included in the particular venire [that] might give rise to an inference of discrimination," <u>id.</u> at 97.   Statistical evidence may support an inference of discrimination, but only when placed in context.   <u>United States v. Ochoa-Vasquez,</u> 428 F.3d 1015, 1044 (11th Cir. 2005). The Eleventh Circuit has explained that "[t]he number of persons struck takes on meaning *only* when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck." <u>Lowder</u>, 236 F.3d at 636-37) (internal citations omitted). However, the burden of placing statistical facts in proper context rests on Petitioner and Smith has failed to carry his burden.[18]   <u>See</u> <u>Chavez v. Sec'y Fla. Dep't of Corr.,</u>

---

[17]   The Court is reminded that its duty under AEDPA is to

> ask whether the state court's application of clearly established federal law was objectively unreasonable.  Although difficult to define, "unreasonable" is a common legal term familiar to federal judges.   For present purposes, the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law.   Because Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect," a federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather, that application must also be unreasonable.

<u>Williams</u>, 529 U.S. at 365.

[18]   The Court can glean several additional details from the record by comparing the strike list with the voir dire transcript.   The venire initially consisted of 48 people, 16 (33%) were identified as black and 32 (67%) were identified as white.   Vol. 7 at 57-58.   Juror number 13 (white male) and Juror number 31 (white female), were struck by agreement of both sides.   T.R. 85-89, 110.   Four jurors – Juror 8 (white female), Juror 16 (black male), Juror 38 (black female), and Juror 48 (black male), were struck by the State for cause because they indicated that they would not impose the death penalty under any circumstance.   <u>Id.</u> at 89-101, 105-09.   The State also struck a fifth juror for cause,

647 F.3d 1057, 1061 (11th Cir. 2011) (habeas pleading requirements "would mean nothing if district courts were required to mine the record, prospecting for facts that the habeas petitioner overlooked and could have, but did not, bring to the surface in his petition. . . . [D]istrict court judges are not required to ferret out delectable facts buried in a massive record. . . .").

The only context Petitioner provided the state court was that the "remaining venire" consisted of 34% black venirepersons, the State struck 62% of the 13 blacks who were part of that "remaining venire," and the State used its first 6 out of 8 strikes on black veniremembers. While the Court recognizes that the Eleventh Circuit has cited approvingly a Second Circuit decision that held that "a challenge rate nearly twice the likely minority percentage of the venire strongly supports a prima facie case under <u>Batson</u>," <u>see</u> <u>Lowder</u>, 236 F.3d at 637 (quoting <u>United States v. Alvarado</u>, 923 F.2d 253, 256 (2d Cir. 1991)), these statistics may not be viewed in a vacuum, and there are other factors present in this case that weigh against a finding that a prima facie case was established.

---

Juror 25 (white male), who indicated his experience of being arrested on a felony charge would affect his ability to give the State a fair trial. <u>Id.</u> at 48-49, 109. Defense counsel struck Juror 6 (white male) and Juror 41 (white male) for cause. <u>Id.</u> at 43-44, 110. After strikes for cause and the two strikes by mutual agreement, the venire consisted of 39 members. <u>Id.</u> at 111. The trial judge asked his court reporter for a number between 1 and 48, and struck Juror 35 (white female) at random, leaving 38 venire persons in the venire. <u>Id.</u> Out of the 38 members remaining, 13 were identified as black (34%) and 25 were identified as white (66%). <u>See</u> Vol. 7 at 57-58. Counsel were given 13 strikes each, and the jury was empanelled. T.R. at 113. The State does not appear to dispute the racial makeup of the jurors as listed on the strike sheet, <u>see</u> Doc. 56 at 50-51, and upon a review of the strike sheet and voir dire testimony, the Court finds no reason to presume that it is not accurate.

First, the strike sheet reflects that, armed with 13 peremptory strikes, the state could, but did not, strike all the black veniremen. See Lowder, 236 F.3d at 638 ("[T]he unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a prima facie case of discrimination in the peremptory striking of jurors of that race."). Because the State had thirteen strikes available, but struck only eight out of a possible thirteen African-American jurors, there is no inference of discrimination. United States v. Puentes, 50 F.3d 1567, 1578 (11th Cir. 1995) ("Although the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim."); see Lowder, 236 F.3d at 637 ("the number of jurors of one race struck by the challenged party may be sufficient by itself to establish a prima facie case where a party strikes all or nearly all of the members of one race on a venire"). With five black jurors, the jury seated was 41.6% black (or 42.8% black when considering the alternate).[19] While this fact is not necessarily dispositive, it certainly undermines Petitioner's argument. On this point, the Eleventh Circuit's analysis in United States v. Hill, 643 F.3d 807, 838-39 (11th Cir. 2011) is instructive. There, the court concluded that no prima facie case existed where the strike percentage against blacks was 64%, the State could have, but did not exclude, 5 black jurors, and 9 black jurors (or 50%) remained in the venire at the conclusion of voir dire. Id. Similarly, a prima facie case does not exist

---

[19] See United States v. Hill, 643 F.3d 807, 838 (11th Cir. 2011) ("in determining whether a prima facie case has been established[,] the peremptory strikes used to select alternates are to be considered together with those used to select the initial 12 jurors").

in Petitioner's case where the strike percentage is 62%, the State could have, but did not exclude, 5 black jurors, and 5 black jurors (or 41.6%) remained on the jury after voir dire.  See also United States v. Campa, 529 F.3d 980, 998 (11th Cir. 2008) (no prima facie case where strike percentage was 78%, 2 black jurors remained who could have been removed, and 4 black jurors (or 16%) made up the jury after voir dire).

Second, there was not "a substantial disparity" between the percentage of black jurors of struck (62%) and the percentage of their representation on the venire (41.6%).  See United States v. Novaton, 271 F.3d 968, 1002 (11th Cir. 2001) ("The existence of a 'substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury' may create such an inference of discrimination") (quoting Lowder, 236 F.3d at 637-38).

Third, there was no suggestion that the subject matter of the case suggested a motive for discriminatory use of peremptory strikes.  See Ochoa-Vasquez, 428 F.3d at 1045 n. 39 ("In some Batson claims, the subject matter of the case may be relevant if it is racially or ethnically sensitive."); see also Johnson, 545 U.S. at 173 (fact that black defendant was charged with killing his white girlfriend's child was a "highly relevant" circumstance proving prima facie case of discrimination against prosecution striking black venirepersons); United States v. Stewart, 65 F.3d 918 (11th Cir. 1995) (defendants' use of peremptory strikes against white venirepersons relevant where defendants were Ku Klux Klan members being prosecuted for a racially motivated hate crime against blacks).  Here, there was no evidence that the

crime was motivated by race. Also weighing against a finding of a prima facie case is the fact that defense counsel was given the opportunity to raise a <u>Batson</u> motion, but declined to do so. Based on the foregoing and guided by AEDPA, the Court concludes that Court of Criminal Appeals was not objectively unreasonable in light of the record before the court. See <u>Miller-El</u>, 537 U.S. at 348. Petitioner's Claim 16 is, therefore, **DENIED**, as Petitioner did not meet his burden of proving a prima facie case of discrimination.

### C. Claims 19, 22-28: The Trial Court Improperly Instructed the Jurors

#### 1) Claim 19: Trial Court Improperly Instructed Jurors That the Burden of Proof for Proving a Mitigating Circumstance Was 'Beyond a Reasonable Doubt' and That the Defense Was Required to Prove Beyond a Reasonable Doubt that Mitigating Factors Outweighed Aggravating Factors in Order To Return a Life Verdict

During the penalty phase of Smith's trial, the trial judge erroneously instructed the jury. In paragraphs 213-18, Petitioner argues that the trial court's improper jury instructions resulted in two errors, both of which violated Smith's constitutional rights. The Court of Criminal Appeals found that, upon defense counsel's objection, the trial court corrected its error. <u>Smith I</u>, 795 So. 2d at 835. The original instruction to which Petitioner objected was delivered as follows:

> "[I]f after a full and fair consideration of all of the evidence in this case you are convinced <u>beyond a reasonable doubt that the mitigating circumstances outweigh the aggravating circumstances</u>, or you are convinced beyond a reasonable doubt that the State has failed to prove at least one or more aggravating circumstances, your verdict would be to recommend the punishment of life imprisonment without parole. . . . In order to return an advisory verdict of death by electrocution at least 10 of your number must be satisfied beyond a reasonable doubt that aggravating circumstances have been proven and outweigh mitigating

circumstances.  In order to return an advisory verdict recommending life without parole at least 7 of your number <u>must be satisfied beyond a reasonable doubt</u> of the existence of mitigating circumstances and that those mitigating circumstances outweigh the aggravating circumstances."

T.R. 847-49 (emphasis added).

Counsel objected to the aforementioned instruction as follows:

Mr. Byrd:   We would also take exception to the two statements towards the end of your charge concerning the jury had to be convinced beyond a reasonable doubt that the mitigating circumstances outweigh the aggravating circumstances in order to recommend life without parole and also stating that they had to believe that a mitigating circumstance existed beyond a reasonable doubt.
        We respectfully submit that the jury should have been instructed that unless they are convinced by a preponderance of the evidence that a mitigating circumstances does not exist, then they should consider that; and if they were not so convinced, then they would weigh the mitigating circumstance against whatever aggravating circumstance they may believe was proved beyond a reasonable doubt.  It has placed too high a burden on the Defendant to establish mitigation beyond a reasonable doubt.

T.R. 851-52.   Counsel clearly voiced two objections here: (1) the instruction improperly stated that the jury had to be convinced beyond a reasonable doubt that the mitigating circumstances outweigh the aggravating circumstances in order to recommend life without parole, and (2)  the instruction improperly stated that the burden of proof for proving a mitigating circumstance was beyond a reasonable doubt.

The trial judge agreed to reinstruct the jury from the pattern instructions.

T.R. 854.  The trial judge recharged the jury as follows:

Ladies and gentlemen, I wish to make clear the distinction between the burden of proof as it relates to proof of an aggravating circumstance and proof of a mitigating circumstance.

Proof of a mitigating circumstance only requires proof by a preponderance of the evidence, which I will define again for you. Proof of an aggravating circumstance requires proof beyond a reasonable doubt.

And I repeat, a mitigating circumstance considered by you should be based on the evidence you have heard. When the factual existence of an offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence. The burden of disproving it by a preponderance of the evidence means that you are to consider that the mitigating circumstance does exist unless taking the evidence as whole it is more likely than not that the mitigating circumstances does not exist. Therefore, if there is a factual dispute over the existence of a mitigating circumstance, then you should find and consider that mitigating circumstance unless you find the evidence is such that it is more likely than not that the mitigating circumstance does not exist.

Only an aggravating circumstance must be proven beyond a reasonable doubt and the burden is always on the State of Alabama to convince you from the evidence beyond a reasonable doubt that such an aggravating circumstance exists and the burden is also on the State to prove to you beyond a reasonable doubt that the aggravating circumstance or circumstances, should you find that they exist, outweigh any mitigating circumstances which need only be proven by a preponderance of the evidence.

T.R. 854-56.

The trial court's recital of the pattern instruction clearly corrected the misstatement as to the burden of proof for proving a mitigating circumstance. Additionally, the judge stated several times not only that the state has the burden of proving aggravating circumstances beyond a reasonable doubt, but also that the state has the burden of disproving the existence of a mitigating circumstance by a preponderance of the evidence. As stated in Peek v. Kemp, 784 F.2d 1479, 1489 (11th Cir. 1986), it is well established that "a single instruction to a jury may not be

judged in artificial isolation, but must be viewed in the context of the overall charge." As to this error, the Court agrees with the Court of Criminal Appeals that the trial judge promptly and properly corrected the stated error.

With regard to the first error (i.e., instructing that the jury had to be convinced beyond a reasonable doubt that the mitigating circumstances outweighed the aggravating circumstances in order to recommend life without parole), the Court of Criminal Appeals only stated that "the trial court thoroughly instructed the jury that the aggravating circumstances must outweigh the mitigating ones and that the weighing is not merely a numerical one." Smith I, 795 So. 2d at 835. That court went on to say, "[t]he trial court's instructions on these principles of law were both thorough and accurate. No error occurred here." Id. On appeal to the Alabama Supreme Court, three justices dissented from the court's denial of a writ of certiorari, focusing primarily on the issue of whether the trial court's second statement of the law was sufficient to correct its erroneous instruction as to how the jury was to balance the aggravating and mitigating circumstances. As the dissenters noted correctly, "[m]isinforming the jury about the quantum of proof necessary to recommend a sentence of life without parole in a capital case is a significant error. . . ." Ex parte Smith, 795 So. 2d at 844.

At this stage of review, it is the Court's duty to determine whether the error rose to the level of constitutional error such that habeas relief is warranted. The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the instruction is

undesirable, erroneous, or even 'universally condemned.'" Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  To state it differently, "[t]he ultimate question is whether there is a reasonable possibility that the jury understood the instructions in an unconstitutional manner."  Peek, 784 F.2d at 1489.

The Court finds that the trial court's error was not so damaging as to deprive Petitioner of due process.  The Court is cognizant that "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155.  While, in isolation, the trial judge appears to state that the jury must be convinced beyond a reasonable doubt that the mitigating circumstances outweigh the aggravating circumstances, the instruction must be read in context.  See Cupp, 414 U.S. at 146-47 ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.").

Moreover, even assuming the instruction unconstitutionally raised the burden of proof necessary for recommending a life sentence without parole, the Court concludes that the error was harmless because the evidence of Petitioner's guilt was "so overwhelming that the error could not have been a contributing factor in the jury's decision to convict." Jarrell, 735 F.2d at 1257 (citing Mason v. Balkcom, 669 F.2d 222, 227 (5th Cir. Unit B 1982)); see also Chapman v. California, 386 U.S. 18, 24 (1967) ("before a federal constitutional error can be held harmless, the court

must be able to declare a belief that it was harmless beyond a reasonable doubt"). Therefore, Claim 19 is due to be **DENIED**.

> **2)  Claim 22: Jury Instructions Reduced the Jury's Sense of Responsibility**

In paragraphs 227-29 of his Amended Petition, Smith argues that the trial judge's penalty phase instructions improperly reduced the jury's sense of responsibility by repeatedly reminding the jurors that their verdict was merely a recommendation.  Petitioner cites Caldwell v. Mississippi for the proposition that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for the defendant's death rests elsewhere."   Caldwell, 472 U.S. at 328-29.   However, Petitioner's claim of Caldwell error fails because the trial judge did not mischaracterize the jury's advisory function under Alabama law.  See Dugger v. Adams, 489 U.S. 401, 407 (1989) ("To establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law."); Ala. Code § 13A-5-46 (describing jury's sentencing determinations as "advisory" ten separate times); see also Davis v. Singletary, 119 F.3d 1471 (11th Cir. 1997) ("The infirmity identified in Caldwell is simply absent in a case where the jury was not affirmatively misled regarding its role in the sentencing process." (internal quotation marks and citations omitted)). Claim 22 is **DENIED**.

### 3) Claim 23: Trial Judge Erred in Not Repeating Definition of "Reasonable Doubt" to the Jury

In paragraph 230 of his Amended Petition, Smith argues that the trial judge erred in failing to repeat the definition of "reasonable doubt." As further described *infra* in Part III.C.7., the reasonable doubt instruction did not violate the Supreme Court's decision in <u>Cage v. Louisiana</u>. The Court of Criminal Appeals properly concluded that the given instruction contained no plain error and it was not error for the court to refer to the instruction, rather than repeat it. <u>Smith I</u>, 795 So. 2d at 836-37 (citing <u>Griffin v. State</u>, 790 So. 2d 267 (Ala. Crim. App. 1999), <u>rev'd on other grounds sub nom.</u> <u>Ex parte Griffin</u>, 790 So. 2d 351 (Ala. 2000)). Because Smith has failed to show that the trial court's decision "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d), Claim 23 is **DENIED**.

### 4) Claim 24: Instruction on Aggravating Circumstance That the Crime was Heinous, Atrocious or Cruel was Erroneous

In paragraphs 231-33 of his Amended Petition, Smith argues that the trial judge's instruction on the aggravating circumstance of "especially heinous, atrocious or cruel" was improper because it "required the jurors to engage in a comparison of the events before them with other crimes without any guidance as to how to do so."

Am. Pet. ¶ 233.  The Court of Criminal Appeals reviewed the claim for plain error[20]

and found that the instruction was identical to the pattern jury instructions and

"tracks the case law definition of the especially heinous, atrocious, or cruel

aggravating circumstance." Smith I, 795 So. 2d at 837.  Citing Godfrey v. Georgia,

446 U.S. 420 (1980), the court concluded that there was no error.  Id.  This court

agrees that the judge's instruction did not constitute error, and that the court

properly applied Godfrey.  Therefore, plaintiff has failed to meet his burden and

Claim 24 is hereby **DENIED**.

> **5)** **Claim 25: Failure To Instruct Jurors That They Had to Find Unanimously That the State Had Proved the Existence of Each Aggravating Circumstance Beyond a Reasonable Doubt was Erroneous**

In paragraphs 234-35 of his amended petition, Smith argues that the trial

court failed to properly instruct the jury that before the jury could consider an

aggravating circumstance, they must unanimously find that it existed beyond a

reasonable doubt.  Petitioner's claim is without merit.  The trial court instructed the

jury that "the burden of proof is on the State to convince each of you beyond a

reasonable doubt as to the existence of any aggravating circumstance. . . . This

means that before you can even consider recommending that the Defendant's

punishment be death, each and every one of you must be convinced beyond a

reasonable doubt . . . that at least one or more of the aggravating circumstances

exist." R.839 (emphasis added).  The trial judge is not required to use the word

---

[20]  Trial counsel actually did in fact object to the trial judge's instruction.  See R. 851, 853-54.

'unanimous' when instructing the jury. The trial judge's use of the phrases "each and every one of you" and "'each of you' implies that any findings of aggravating circumstances had to be unanimous." <u>Taylor</u>, 808 So. 2d at 1211. The trial judge's instruction was not error, and the Court of Criminal Appeals properly applied <u>Lockett v. Ohio</u>, 438 U.S. 586, 605 (1978). Habeas relief on this ground is therefore not warranted.

**6) Claim 26: Trial Judge Failed To Instruct Jurors That They Must Individually Consider the Existence of Mitigating Circumstances**

In paragraphs 236-37 of his Amended Petition, Smith argues that the trial judge erroneously instructed the jury that they needed to collectively and unanimously consider and determine the existence of a mitigation circumstance before considering it. The Court agrees with the Court of Criminal Appeals' finding that this claim lacks merit. The trial judge clearly instructed that the burden of proof was on the state to disprove the factual existence of a mitigating circumstance by a preponderance of the evidence. T.R. 843. The trial judge clearly instructed the jury first to assume that the mitigating circumstance existed, explaining, "you are to consider that the mitigating circumstance does exist unless taking the evidence as a whole it is more likely than not that the mitigating circumstance does not exist." <u>Id.</u> Because Claim 26 is without merit, this claim is **DENIED**.

**7) Claim 27: Instructions on Reasonable Doubt During the Guilt Phase Were Erroneous**

In paragraphs 239-42 of his Amended Petition, Smith argues that the trial court's instruction on reasonable doubt ran afoul of <u>Cage v. Louisiana</u>, 498 U.S. 39

(1990), <u>overruled in part on other grounds by</u> <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991). In <u>Cage</u>, the Supreme Court held that the trial court's instruction that equated reasonable doubt with "grave uncertainty" and "actual substantial doubt" was unconstitutional because it could have been interpreted by a reasonable juror as allowing a finding of guilt based on a degree of proof below that required by the Due Process Clause. <u>Id.</u> at 41. Smith contends the instruction that reasonable doubt "does not mean a vague and arbitrary notion, but it is an actual doubt based on all the evidence, the lack of evidence, a conflict in the evidence or a combination thereof" is "equivalent to the instruction found unconstitutional in <u>Cage</u>" because it uses the phrase "actual doubt." Am. Pet. ¶ 241. The Court of Criminal Appeals concluded that the trial court's instruction was distinguishable from the instruction in <u>Cage</u>, and this decision was not contrary to and did not involve an unreasonable application of <u>Cage v. Louisiana</u>, nor did it result in a decision based on an unreasonable determination of the facts presented. <u>See</u> <u>Smith v. State</u>, 756 So. 2d 892, 922 (Ala. Crim. App. 1997) ("Although the trial court did refer to a reasonable doubt as an "actual doubt," it did not state that the doubt must be "grave" or "substantial," as the faulty charge in <u>Cage</u> instructed.") <u>see also</u> <u>Cage</u>, 498 U.S. at 41 ("It is plain to us that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard."). Claim 27 is, therefore, **DENIED**.

### 8) Claim 28: Accomplice Liability Instructions During the Guilt Phase Were Erroneous

In Claim 28, Smith argues that the trial court's instructions did not require any direct proof of either Smith's involvement in the crime or his mental state, thereby allowing the jury to convict Smith of capital murder without finding that Smith had a particularized intent to kill. Am. Pet. ¶¶ 243-46. The Court of Criminal Appeals thoroughly reviewed the trial court's instructions and concluded that there was no error, noting that the trial court had instructed the jury that, to find Smith guilty as an accomplice, "it must be shown beyond a reasonable doubt that he was present with the intent to aid and abet the principal actor *and it must also be shown that he possessed the same intent to kill*." Smith I, 795 So. 2d at 831 (emphasis added) (citing T.R. 682). Smith has failed to demonstrate that the state court's decision resulted in a decision that was contrary to, or involved an unreasonable application of, Supreme Court precedent or resulted in a decision based on an unreasonable determination of the facts.

The Supreme Court case that Smith cites in support of his claim, Enmund v. Florida, 458 U.S. 782 (1982), is distinguishable. In Enmund, the Supreme Court held that death is not a valid penalty where the defendant "neither took life, attempted to take life, nor intended to take life." Id. at 787. The Supreme Court compared the 36 federal and state jurisdictions that authorized capital punishment at that time and placed at one end of the spectrum those states (*e.g.*, Florida) that allowed the death penalty to be imposed solely for participation in a robbery in which another robber takes life and placed at the other end those states (*e.g.*,

Alabama) that make knowing, intentional, purposeful, or premeditated killing an element of capital murder. Id. at 789-91. Whereas Enmund blessed rather than repudiated Alabama's insistence on proof of intent to kill, and whereas the trial court's instructions in this case accurately stated the law with respect to the need to find that intent, Claim 28 is **DENIED**.

### D. Remaining Claims

#### 1) Claim 15: Petitioner's Status as Mentally Retarded Precludes Imposing the Death Penalty

In paragraphs 163-201 of his Amended Petition, Petitioner argues that he is mentally retarded and, therefore, that his execution is prohibited by the Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304 (2002). In Atkins, the Supreme Court held that "death is not a suitable punishment for a mentally retarded criminal" and that "the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." Id. at 321 (quoting Ford v. Wainwright, 477 U.S. 399, 405 (1986)); see also id. at 318 (holding that mentally retarded criminals' "deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability"). Atkins did not, however, dictate a national standard for determining whether a criminal defendant is mentally retarded. Rather, the Supreme Court offered two clinical definitions[21]

---

[21] Specifically, the Supreme Court observed that:

The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living,

and expressly left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." Id. at 317 (internal quotation marks and brackets omitted). Accordingly, to evaluate Smith's Atkins claim, this Court must examine Alabama law.

Four years ago, the Eleventh Circuit described the test that the Alabama Supreme Court set forth in Ex parte Perkins, 851 So. 2d 453 (Ala. 2002):

> [T]he Alabama Supreme Court has defined the test for mental retardation that rises to the level of prohibiting execution as having three components: (1) significantly subaverage intellectual functioning (i.e., an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the manifestation of these problems during the defendant's developmental period (i.e., before the defendant reached age eighteen).

Holladay v. Allen, 555 F.3d 1346, 1353 (11th Cir. 2009). Relatedly, Alabama's criminal procedure law defines an "intellectually disabled person" as "[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested

---

social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992).

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id., at 42-43.

Atkins, 536 U.S. at 308 n.3.

during the developmental period, as measured by appropriate standardized testing instruments." Ala. Code § 15-24-2(3).[22]

The Alabama Supreme Court has further discussed the three criteria that must all be met in order for a defendant to be considered mentally retarded under Alabama law:

> All three factors must be met in order for a person to be classified as mentally retarded for purposes of an Atkins claim. Implicit in the definition is that the subaverage intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18. This conclusion finds support in examining the facts we found relevant in Ex parte Perkins and Ex parte Smith, and finds further support in the Atkins decision itself, in which the United States Supreme Court noted: 'The American Association on Mental Retardation (AAMR) defines mental retardation as follows: 'Mental retardation refers to substantial limitations in present functioning.'" Therefore, in order for an offender to be considered mentally retarded in the Atkins context, the offender must currently exhibit subaverage intellectual functioning, currently exhibit deficits in adaptive behavior, and these problems must have manifested themselves before the age of 18.

Smith v. State (Jerry Smith), 2007 WL 1519869, at *8 (Ala. May 25, 2007) (not yet released for publication) (internal citation and emphasis omitted).

Though Smith's Atkins claim is properly before the Court because Smith raised it in his First and Second Amended Rule 32 petitions, many of the facts now alleged in support of that claim were not contained in Smith's state court

---

[22] Formerly, Section 15-24-2(3) referred to mentally retarded persons. However, in 2009, the Alabama legislature mandated that "[a]ll references to 'mentally retarded' shall be changed to 'people with an intellectual disability' and all references to 'mental retardation' shall be changed to 'intellectual disability.'" Ala. Code § 22-50-2.1(d). The legislature emphasized that the "change in terminology" was intended to be merely "a name change only" without any substantive effect. Id. For the sake of internal consistency within this Order, the Court will use the term "mentally retarded," which appears throughout the relevant federal and state case law.

submissions. Whereas this Court cannot "review . . . a state court adjudication on the merits in light of allegations not presented to the state court" without doing violence to both the AEDPA and "the 'historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts,'" see Borden, 646 F.3d at 816-17 (quoting Williams, 529 U.S. at 436), this Court will examine the reasonableness of the Court of Criminal Appeals' rejection of Smith's Atkins claim based only upon the limited allegations contained in his First and Second Amended Rule 32 petitions and the record presented to the state courts.[23]

In support of his Atkins claim, Smith argued only the following facts to the state courts:

- "When Mr. Smith was transferred to the Monroe County Excel junior high school, the county board of education classified Mr[.] Smith as 'Educable Mentally Retarded' (EMR), based on his 'psychological and educational evaluations, academic history, and other pertine[nt] information.'" #R-46 ¶ 115.

- "There was testimony at trial that Mr. Smith functioned intellectually at the bottom 3rd percentile of all adults." Id. (citing T.R. 781).

- "There was testimony at sentencing which showed his inability to adapt because he often acts out impulsively, lacks the ability to formulate a pre-meditated plan and acts as a follower in groups." Id. ¶ 116 (without any citation to the record).

---

[23] But for the addition of a single paragraph that outlines the differences between the manner in which the ninth and tenth editions of the American Association on Mental Retardation's manual categorize adaptive behavior skills, the sections of Smith's amended Rule 32 petitions that set forth his Atkins claim are identical. Compare #R-52 ¶¶ 112-16 (First Amended Rule 32 Petition) with #R-46 ¶¶ 114-19. (Second Amended Rule 32 Petition). The only additional allegation contained in that paragraph is the wholly conclusory assertion that "Mr. Smith has deficiencies in all three of these adaptive areas and clearly meets the mental retardation requirements set forth in Atkins." #R-46 ¶ 118.

- "School records indicate that Mr. Smith never progressed beyond the 5th grade. <u>Id.</u> ¶ 117.

- [T]hough he was in EMR classes while in the Monroe County school system, he either failed or performed at the 'D' level in all subjects." <u>Id.</u> ¶ 117.

A few additional facts were brought out during Smith's penalty phase examination of Dr. James F. Chudy, a clinical psychologist who testified that he psychologically evaluated Smith by reviewing Smith's school and jail records, conducting a clinical interview with Smith, and subjecting Smith to a "large battery" of tests that covered intelligence, organic problems, achievement, and personality. T.R. 771-74. Most significantly, Dr. Chudy testified that Smith's full scale IQ in 1998 (several months after the murder of Durk Van Dam) was 72. T.R. 781, 790. The school records reviewed by Dr. Chudy indicated that Smith's IQ was 75 at age 8 and 74 at age 12. Vol. 8 at 393. No other evidence of Smith's IQ was presented to the state courts.

Respondent argues that, because the Alabama Supreme Court set an IQ of 70 as the ceiling for significantly subaverage intellectual functioning — the first of the three <u>Perkins</u> prongs — the fact that Smith's IQ exceeds (and, apparently, has always exceeded) that threshold is fatal to Smith's <u>Atkins</u> claim. Doc. 56 at 78-79. Respondent also notes that Dr. Chudy found that, based on Smith's most recent IQ score, Smith is "in the Borderline range of intelligence[,] which means that he operates between the Low Average and Mentally Retarded range." <u>Id.</u> at 79 (quoting T.R. 917). Dr. Chudy's finding and a diagnosis of mental retardation are mutually exclusive, inasmuch as something cannot be both between two things and

the same as one of them. (The fact that Alabama is *between* Mississippi and Georgia precludes the possibility that Alabama *is* Mississippi.) Similarly, Dr. Chudy's finding that Smith's scores on the Wechsler Adult Intelligence Scale test "place him at a level *closer to those individuals who would be considered mentally retarded,*" R. 917 (emphasis added), is incompatible with a determination that Smith is mentally retarded himself. (To make another geographical analogy: Mobile is closer to Pascagoula than it is to Pensacola, but Mobile is not Pascagoula.)

Smith attempts to overcome this seemingly dispositive evidentiary shortcoming by urging this Court to do something that the Alabama Court of Criminal Appeals refused to do, namely to downwardly modify his most recent IQ score to produce an adjusted score within the mental retardation range. Am. Pet. ¶ 184. In addition to directing the Court to Dr. Chudy's testimony that, in Smith's case, "a standard error of measurement of about three or four points" could result in an IQ "as high as maybe a 75 [or] . . . as low as a 69," T.R. 781, Smith argues that "consideration should also be given to what is termed the 'Flynn effect.'" Am. Pet. ¶ 181. As recently described by the Eleventh Circuit, the Flynn effect is "a method that recognizes the fact that IQ test scores have been increasing over time" and "acknowledges that as an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population as a whole on that assessment instrument increases, thereby artificially inflating the IQ scores of individual test subjects." Thomas v. Allen, 607 F.3d 749, 753 (11th Cir. 2010).

Though the Eleventh Circuit has held that a federal habeas court has discretion to consider the standard error of measurement ("SEM") and the Flynn effect, id. at 758,[24] it by no means stated or implied that such consideration was required or even appropriate where, as here, the state court explicitly rejected application of one modifier and never heard any argument with respect to application of the other. Constrained by AEDPA, the question presented to this Court is simply whether the Court of Criminal Appeals unreasonably refused to apply a "margin of error"[25] to Smith's IQ score of 72 such that his score would be

---

[24]  This case is distinguishable from Thomas in several significant respects. First, in Thomas, the habeas court was not required to give any deference to the state court's conclusion that the defendant was not mentally retarded because defendant's Rule 32 proceedings predated the Supreme Court's decision in Atkins. See Thomas v. Allen, 614 F. Supp. 2d 1257, 1259 n.1 (N.D. Ala. 2009) (noting that post-conviction state remedies were exhausted in 2000). By contrast, Smith's claim was rejected on the merits six years after Atkins was decided, and the Court of Criminal Appeals' decision relied primarily on Atkins and its progeny, specifically Perkins. See Smith II, 71 So. 3d at 17-21. Accordingly, the state court's determination that Smith is not mentally retarded is entitled to AEDPA deference. Second, the parties in Thomas stipulated that "a SEM of approximately plus or minus five points" was appropriate, see Thomas, 607 F.3d at 753, whereas the Respondent here has not made a similar concession or even acknowledged the propriety of considering any adjustment whatsoever. Third, the defendant in Thomas presented evidence of four intelligence assessments conducted during his developmental period that yielded three unadjusted scores below 70 — 56 at age 9, 68 at age 13, and 64 at age 14 — and one borderline score of 74 at age 16. See id. at 753-54. In this case, however, every IQ test administered to Smith during his developmental period yielded an unadjusted score above the cutoff for mental retardation. See Vol. 8 at 393 (indicating IQ of 75 at age 8 and of 74 at age 12).

In holding that the district court did not clearly err in finding that the defendant in Thomas was mentally retarded notwithstanding that one of his four unadjusted, developmental period IQ scores was above the cutoff established in Perkins, the Eleventh Circuit observed that "[t]here is no Alabama case law stating that a single IQ raw score, or even multiple IQ raw scores, above 70 automatically defeats an Atkins claim when the totality of the evidence (scores) indicates that a capital offender suffers subaverage intellectual functioning." Thomas, 607 F.3d at 757. However, the totality of scores in this case does not warrant the same conclusion. The mean of Thomas' four developmental period scores was 65.5 (well within the mental retardation range), but the mean of Smith's scores is 74.5 (unquestionably above the Perkins threshold). Cf. Holladay, 555 F.3d at 1357-58 (affirming district court's determination that defendant demonstrated significantly subaverage intellectual functioning where mean of defendant's IQ scores was below 70).

[25]  The Court of Criminal Appeals used the term "margin of error" to refer to the SEM. Smith II, 71 So. 3d at 20 ("Smith urges this Court to adopt a 'margin of error' when examining a defendant's IQ

reduced and fall within the mental retardation range.  See Schriro, 550 U.S. 465 at 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").   The Court answers in the negative and finds that Smith's Atkins claim fails because the state court did not unreasonably apply federal law in holding that Smith was not exempt from execution on the basis of mental retardation.[26]

> **2)  Claim 20: Trial Judge's Refusal To Allow Defense Counsel To Cross-Examine Prosecution Witness Regarding Her Probationary Status Violated the Confrontation Clause**

In Claim 20, Smith argues that he was denied his Sixth Amendment right to confront the witnesses against him when the trial judge sustained the State's objection to a question concerning the residence of prosecution witness Melissa Arthers, who, at the time she testified against Smith, was in state custody because her juvenile probation had been revoked.  Am. Pet. ¶¶ 217-20.  Smith's argument relies primarily on Davis v. Alaska, 415 U.S. 308 (1974), in which the Supreme Court held that exclusion of a prosecution witness' juvenile record violated the Confrontation Clause where the witness' "vulnerable status as a [juvenile]

---

score and then to apply that margin of error to conclude that because Smith's IQ was 72 he is mentally retarded.  The Alabama Supreme Court in Perkins did not adopt any 'margin of error' when examining a defendant's IQ score.  If this Court were to adopt a 'margin of error' it would, in essence, be expanding the definition of mentally retarded adopted by the Alabama Supreme Court in Perkins.").

[26]  Because Smith has failed to prove that his intellectual functioning was or is significantly subaverage, the Court need not and does not explore whether Smith suffers from deficits in adaptive behavior and whether any such deficits manifested themselves before Smith reached the age of 18.  Jerry Smith, 2007 WL 1519869, at *8.

probationer" could arguably support an inference that the witness was biased in favor of the state and had an incentive to lie. <u>Id.</u> at 316-18. On direct appeal, Court of Criminal Appeals rejected Smith's <u>Davis</u> claim in a lengthy section of its opinion by distinguishing <u>Davis</u> on the facts[27] and further holding that any <u>Davis</u> error was harmless. <u>Smith I</u>, 795 So. 2d at 817-21.

Smith apparently desires for this Court to review his claim de novo, because, in lieu of alleging that the Court of Criminal Appeals misapplied federal law, he merely makes the conclusory assertion that "[t]he trial court's failure to allow Mr. Smith to cross-examine Ms. Arthurs [sic] about the revocation of her probation violated Mr. Smith's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments." Am. Pet. ¶ 220. Limited by AEDPA, this the Court cannot do. Whereas Smith has failed to demonstrate that the state court's adjudication of his Davis claim was contrary to or involved an unreasonable application of clearly established federal law, Claim 20 is **DENIED**.

---

[27] Specifically, the Court of Criminal Appeals noted that Smith's counsel sought to offer evidence of Arthers' incarceration strictly for impeachment purposes, whereas the defendant in <u>Davis</u> made it clear that he sought not to introduce the witness' juvenile adjudication for purposes of general impeachment but, rather, to show the witness' bias and prejudice. <u>Smith I</u>, 795 So. 2d at 817. The Court of Criminal Appeals also found significance in the fact that, unlike the juvenile in <u>Davis</u>, Arthers' probation had already been revoked, had no state action pending against her, and was not in the "vulnerable status [of] a probationer." <u>Id.</u> at 818 (quoting <u>Davis</u>, 415 U.S. at 318-19). Finally, the Court of Criminal Appeals found that "one major distinction not present in this case . . . is that the juvenile in <u>Davis</u> was a[] 'crucial' eyewitness to the accused's presence near the scene of the crime when it occurred and possibly a suspect in the crime," whereas Arthers' was not suspected to be an accomplice of Smith's and her testimony was corroborated by either other witnesses or Smith's own confession. <u>Id.</u>

### 3) Claim 21: The Trial Court Improperly Denied Smith's Motion for Mistrial

In paragraphs 221-25 of his Amended Petition, Smith argues that the trial court should have granted his motion for a mistrial when, in response to a question by one of the prosecutors, a witness revealed that Smith had previously been in prison.[28]  Smith contends, without support, that this error was "so severe that it rose to 'the level of a denial of fundamental fairness' warranting habeas relief."  Am. Pet. ¶ 224 (quoting Snowden v. Singletary, 135 F.3d 732, 737 (11th Cir. 1998)). Relying solely on state precedents, the Court of Criminal Appeals denied Smith's claim on the merits.  Smith I, 795 So. 2d at 822-23.  This Court does not have occasion to revisit that determination.  Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir. 1997) (acknowledging the "fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters").  It suffices to observe as the Eleventh Circuit did in United States v.

---

[28]  The record reveals that the witness volunteered the fact of Smith's previous incarceration even though that fact was not responsive to the prosecutor's question:

> Q [prosecutor]: Did you speak to anybody there?
>
> A [witness]: Yes, sir
>
> Q: Who did you speak to?
>
> A: His son, Jody.
>
> Q: Now, at that time did you know Jody?
>
> A: Yes, sir, by writing him when he was in prison.
>
> MR. HUGHES [defense counsel]: Your Honor, I object to that.

T.R. 271.

Veteto, 701 F.2d 136 (11th Cir. 1983), that "[w]hile use of such words as 'jail,' 'prison,' 'arrest' are, generally to be avoided, where irrelevant, the mere utterance of the word does not, without regard to context or circumstances, constitute reversible error per se." Id. at 139-40 (quoting United States v. Barcenas, 498 F.2d 1110, 1113 (5th Cir. 1974). Whereas the witness' reference to prison in this case was volunteered, was not responsive to the prosecutor's question, and added nothing to the state's case, Smith bears the burden of proving that the witness' answer clearly prejudiced him. Id. at 140. This Smith has not even attempted to do, and, therefore, Claim 21 is **DENIED**.

### 4) Claim 30: Admission of Out-of-Court Statements by Smith's Co-Defendant and Mother Was Improper

In Claim 30, Petitioner argues that the admission of out-of-court statements made by Smith's separately tried accomplice, Larry Reid, and by Smith's mother violated his Sixth Amendment right to confront the witnesses against him. Am. Pet. ¶¶ 251-56. Additionally, Smith argues — for the first time — that the admission of these statements violated his Fifth Amendment right to silence. Am. Pet. ¶ 255 (citing Doyle v. Ohio, 426 U.S. 610 (1976)). However, because Smith did not make that second argument on either direct appeal or collateral review, Smith's Doyle claim is procedurally defaulted, and this Court will assess only whether the admission of the statements was constitutionally offensive under the Confrontation Clause.

#### a) Statements by Smith's Co-Defendant Introduced Through Russell Harmon

Smith complains that, at trial, Russell Harmon, who was an acquaintance of both Smith and Reid, was asked the following questions and gave the following answers:

Q [prosecutor]: Russell, was there any conversation about any money from the dead man?

A [Harmon]: They had said that they had got -- that they had –

MR. HUGHES [defense counsel]: Your Honor, if it please the Court, I would object to "they," that he state specifically who said what.

THE COURT: That's fair. Can you tell us who said what about the money, if anything was said about the money?

A: Yes, sir. Larry [Reid] and then Jody was mainly agreeing with Larry. Jody did not come out right and say anything about the money, no.

\*      \*      \*

Q: And who told you something about a mattress, do you recall who that was?

A: I think -- I'm not sure, but I think Larry did.

MR. HUGHES: Well, that answers the question. If he's not for sure he's just speculating and guessing and we would object to it.

THE COURT: It's sustained. You could lay a predicate, though, I mean.

Q: Do you recall who said anything about a mattress.

A: I believe it was Larry.

T.R. 343-46.

According to Smith, Reid's statements were inadmissible hearsay and their admission violated the principles set forth in <u>Bruton v. United States</u>, 391 U.S. 123

(1968).  In <u>Bruton</u>, the United States Supreme Court held that admission of a non-testifying defendant's confession that implicated his co-defendant in the crime violated that co-defendant's Sixth Amendment right to confrontation.  The Court of Criminal Appeals denied Smith's <u>Bruton</u> claim on the merits, noting that any error was 1) invited by defense counsel's objection, <u>see</u> <u>Smith I</u>, 795 So. 2d at 813, and 2) harmless because Reid's out-of-court statements were cumulative of Smith's own admissions to the police, <u>see id.</u> at 813-14.  Though the Court of Criminal Appeals' decision rested entirely on state precedents, <u>see id.</u> (citing, *inter alia*, <u>McCorvey v. State</u>, 642 So. 2d 1351, 1354 (Ala. Crim. App. 1992)), those precedents are in line with a proposition that was clearly established by the United States Supreme Court nearly three decades prior, namely that <u>Bruton</u> error can be rendered harmless where the erroneously admitted testimony was "merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury." <u>Brown v. United States</u>, 411 U.S. 223, 231 (1973).  Whereas the state court's adjudication of this issue did not result in a decision contrary to clearly established federal law, Smith is not entitled to habeas relief on <u>Bruton</u> grounds.

### b) Statements by Smith's Mother Introduced Through Sergeant Pyle

Smith also claims his right to confrontation was violated when Sergeant Patrick Pyle testified that Smith's mother told him that Smith was using her washing machine to wash his clothes.  Am. Pet. ¶ 255.  Specifically, Sergeant Pike testified as follows:

Q [prosecutor]: And what did you search the house – what areas of the house did you look in?

A [Sgt. Pyle]: We searched the area that Ms. Smith indicated was the Defendant's bedroom area and we looked in the washing machine.

Q: And where was the washing machine located?

A: It was – if you walk in you're in a living room with a kitchen to the left and a small hallway. The washer and dryer were in that small hallway.

Q: And were the washer -- was the washer running?

A: Yes, ma'am, it was in a -- like a spin cycle.

Q: And what made you search the washing machine?

A: Well, we were looking, from what we had learned form the people we had talked to earlier, for some clothes and when we got to the house, [Detective] Lunceford and myself, we were talking to Ms. Smith about where Jody had been, what he had been doing. I could hear the washer running and I asked her was she washing any amount of clothes in there and she said no, Jody was.

T.R. 408-09.

The Court of Criminal Appeals did not conduct a Confrontation Clause analysis because it found that Ms. Smith's statement was not hearsay because it was offered to explain why the police officers searched Ms. Smith's trailer the way that they did, not for the truth of the matter asserted. See Smith I, 795 So. 2d at 814.[29] This Court finds no error in the state court's determination, whereas United States Supreme Court precedent had clearly established that the admission of nonhearsay "raises no Confrontation Clause concerns." Tennessee v. Street, 471 U.S. 409, 414 (1985). Claim 30 is **DENIED**.

---

[29] The Court of Criminal Appeals also found that any error was harmless, inasmuch as Smith told police that he had washed the clothes he had worn during the robbery-murder, thereby rendering Sergeant Pyle's testimony on this point merely cumulative. Smith I, 795 So. 2d at 814.

## 5) Claim 31: State Improperly Introduced Victim Impact Evidence During Closing Arguments

In paragraphs 257-59 of his amended petition, Petitioner argues that the prosecutor improperly argued victim-impact evidence during the guilt phase, which prejudiced Smith. Petitioner specifically objects to the prosecutor having argued that the victim "had two little boys that he knew he would never see again. I ask that you let that be the picture in your mind as you decide what intent is . . . ." T.R. 675. Defense counsel timely moved for a mistrial on the same grounds, which the judge denied, stating, "[h]e argued the facts in evidence. There is testimony in the record the credibility of which the jury must assess that the man begged for his life." T.R. at 676. The Court of Criminal Appeals did not improperly apply <u>Payne v. Tennessee</u>, 501 U.S. 808, 825 (1991). ("In the majority of cases, . . . victim impact evidence serves entirely legitimate purposes"). The prosecutor was responding to defense counsel's argument that there was absolutely no evidence of intent, R. 660-69, and argued facts in evidence, <u>see</u> T.R. 470. The prosecutor's statements did not "so infect[]the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 169 (1986). Therefore, Petitioner has failed to meet his burden under AEDPA, and Claim 31 must be **DENIED**.

## 6) Claim 34: Court Failed To Consider Non-Statutory Mitigating Circumstances, Such as Abusive Family Life and Mental Retardation

In paragraphs 268-75 of his amended petition, Petitioner argues that the trial court did not properly consider non-statutory mitigating circumstances, such

as Smith's abusive family life and his mental retardation. The record wholly contradicts this allegation. See Smith I, 795 So. 2d at 839 (citing R. 190) ("Therefore, these nonstatutory circumstances, though thoughtfully considered and applied, do not merit significant consideration." (emphasis added)). Claim 34 is without merit and is **DENIED**.

> **7)  Claim 35: Court Improperly Applied the Heinous, Atrocious or Cruel Aggravating Circumstance Without Sufficient Basis for Its Finding**

In paragraphs 276-78 of his Amended Petition, Petitioner argues that the trial court improperly found that the murder was especially heinous, atrocious or cruel. Petitioner contends that "the evidence at trial did not reliably establish that the length of time for the victim to die reflects any information about whether or not this death was indeed more heinous, atrocious or cruel than other murders." Am. Pet. ¶¶ 278. But this is not the standard articulated by the Supreme Court or applied by Alabama courts. In line with federal constitutional requirements, "Alabama courts have limited 'especially heinous, atrocious, or cruel' crimes to those 'conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'" Hallford, 459 F.3d at 1205-06 (quoting Ex parte Kyzer, 399 So. 2d 330, 334 (Ala. 1981)). Evidence that a victim's death was prolonged or protracted is not required in order to sustain a finding that a murder was especially heinous, atrocious or cruel. See id. at 1206 (upholding finding that murder was especially heinous, atrocious or cruel where five minutes elapsed between initial shooting and final two shots). In this case, the forensic pathologist testified that Durk Van Dam's death was caused by "approximately thirty-five (35) separate, distinct exterior

injuries to the victim's head, torso, and appendages and eleven (11) separate, distinct injuries which caused internal trauma," all of which were sustained over a period of approximately 45 minutes. Smith I, 795 So. 2d at 840-41. Thus, the record was more than sufficient to support a finding that Van Dam's murder was especially heinous, atrocious or cruel. Claim 35 is **DENIED**.

### 8) Claim 37: Trial Court Improperly Relied on Sentence Recommendation of Victim's Family

In paragraphs 283-84 of his Amended Petition, Petitioner argues that, in sentencing Smith to death by electrocution, the trial judge relied impermissibly upon written statements made by victim Durk Van Dam's family members that were included in the presentence investigation report.[30] Though the trial judge expressed that he was "quite familiar" with the pre-sentence investigation report that included the victim-impact evidence to which Smith objects, Petitioner has not shown that the trial judge ever considered the family's statements. To the contrary, the trial judge implicitly acknowledged that the victim-impact evidence was not to be considered when he stated at Petitioner's sentencing hearing that "[t]he law

---

[30]   Specifically, those statements were:

> HE CANNOT BE ALLOWED TO EVER HURT ANOTHER INNOCENT PERSON. THAT IS WHY, WE THE FAMILY OF DURK VAN DAM UPHOLD THE VERDICT MADE BY THE JURY. GUILTY OF CAPITAL MURDER, DEATH BY ELECTROCUTION.

> MY PARENTS FELL [sic] VINDICATED KNOWING THAT YOU ARE TO BE ELETRICUTED [sic] BUT FOR ME, THE ONLY REAL JUSTICE WOULD BE FOR YOU TO HAVE INFLICTED UPON YOU THE SAME TORTUROUS METHOD OF DEATH AS BESTOWED UPON MY BROTHER.

T.R. 910-11.

requires that the Court weigh the statutorily enumerated aggravating circumstances against both the statutory enumerated mitigating circumstances, as well as any other factor which might reasonably be considered in mitigation." #R.30 at R-19. The Court therefore agrees with the Court of Criminal Appeals that "the record reflects that the trial court did not consider any sentencing recommendations of the victim's family when imposing sentence," Smith I, 795 So. 2d at 838, and finds Petitioner's claim to be without merit.

### 9) Claim 40: State Misstated the Law During Closing Arguments

In paragraphs 295-97 of his Amended Petition, Petitioner argues that the prosecutor misstated the law to the jury when she said, "I told you if the Judge let you hear it you could consider it. If the Judge let you see it, then it was evidence and you could consider it." Am. Pet. ¶ 297 (quoting T.R. 658). The Court agrees with the Court of Criminal Appeals' analysis that "the trial court repeatedly told the jurors that comments of counsel were not evidence and that it was the court's duty to instruct them on the law." Smith I, 795 So. 2d at 826; T.R. 122-23, 647. As the Eleventh Circuit recently explained, improper argument by counsel is not grounds for a mistrial unless that argument did "so prejudicially affect the [Petitioner's] rights that a different outcome might have been achieved in its absence." United States v. McGarity, 669 F.3d 1218, 1246 (11th Cir. 2012). Therefore, the Court finds and adopts the Court of Criminal Appeals' conclusion that the prosecutor's closing argument statements did not "infect[] the trial with unfairness" such that Smith was denied due process under Darden v. Wainwright, 478 U.S. 1036 (1986). Petitioner's Claim 40 is therefore, **DENIED**.

## 10) Claim 41: State Impermissibly Argued That Smith Was More Worthy of the Death Penalty Because He Was Mentally Retarded

In paragraphs 299-300 of his Amended Petition, Petitioner argues that during closing arguments, the prosecutor impermissibly argued that Smith was more worthy of receiving the death penalty because he was mentally retarded. Smith's grievance relies on a gross distortion of the record. In support of his claim, Smith quotes the prosecutor's following remarks:

> [F]rom your own common sense, from your own experience you know it to be true, there are folks out there with marginal IQs who are streetwise. They get along they get by, they survive sometimes better than the rest of us in certain situations. This man's been in prison, this man's been around, this man is streetwise. He knew what he was doing.

T.R. 831.

The Court agrees with the Court of Criminal Appeals that "[t]he above comment did not imply that Smith should be sentenced to death because he is mentally retarded," <u>Smith I</u>, 795 So. 2d at 832, and that the prosecutor's remarks were based on Dr. Chudy's testimony that there are people with low IQs who are streetwise. <u>See</u> T.R. 797.[31]

---

[31]     Q [prosecutor]: There are people with low IQ's [sic] who are what we would call "streetwise," aren't there?

A [Dr. Chudy]: Yes.

Q: And folks who can survive in places where you and I couldn't even survive?

A: Yes.

This Court finds no error in the Court of Criminal Appeals' adjudication of this claim. Claim 41 is hereby **DENIED**.

### 11) Claim 42: State Impermissibly Argued That a Sentence Other Than Death Would Insult Victim's Family

In paragraphs 301-02 of his Amended Petition, Petitioner argues that, in violation of the Supreme Court's ruling in <u>Payne v. Tennessee</u>, 501 U.S. 808, 830 (1990) the prosecutor improperly argued to the jury that a sentence other than death would insult the victim's family. The prosecutor argued in closing arguments:

> "Life without parole means just that. That he would serve the rest of his natural life in prison. But what does that say to Durk Van Dam's family? What does that say to them about their brother, about their father, about their son, about their uncle? It says Durk's life was valueless. There was no value in his life and there was no meaning in his death. You see, life without parole means that Jody would live."

<u>Smith I</u>, 795 So. 2d at 834-35. Petitioner contends that the prosecutor's argument violates <u>Payne</u> because "evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing." <u>Payne</u>, 501 U.S. at 830 n.2. Petitioner fails to present a compelling case that his issue falls within the purview of <u>Payne</u>. <u>Payne</u> stands for the proposition that "evidence of family members' opinions and characterizations of the crime, the defendant, and the appropriate sentence" are improper. <u>United States v. Brown</u>, 441 F.3d 1330, 1351 (11th Cir. 2006). However, here, the prosecutor did not express any opinions or characterizations of the *victims*. Rather, the prosecutor's statement was a reminder "that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and, in particular, his family." <u>Smith I</u>, 795 So.

2d at 834 (quoting Payne, 501 U.S. at 824).  Whereas Payne clearly allows for the admission of evidence showing the victim's "uniqueness as an individual human being," Payne, 501 U.S. at 823-24 (quotation marks omitted), Claim 42 was properly denied by the state court and is hereby **DENIED** by this Court.

**12)  Claim 43:  The Court Should Consider the Cumulative Effect of Prosecutorial Misconduct**

In Claim 43, Petitioner argues that the cumulative effect of the prosecutorial misconduct alleged in Claims 39-42 violated Petitioner's constitutional rights to a fair trial and due process.  Am. Pet. ¶ 303.  The only case cited in support, Kyles v. Whitley, 514. U.S. 419 (1995), is inapposite.  In Kyles, the United States Supreme Court held that, in determining the materiality of evidence that was not disclosed to the defense as required by Brady v. Maryland, courts must evaluate the suppressed evidence collectively rather than considering each item individually.  Id. at 436.  Not only are the facts of Kyles distinguishable from the facts of the instant case, but the legal proposition for which Kyles stands has no significance here.  In any event, Petitioner's claim is meritless, insofar as this Court has failed to find any prosecutorial misconduct.[32]  See United States v. Hardy, 389 F. App'x 924, 926-27

---

[32]   On direct appeal, Petitioner cited Ex parte Tomlin, 540 So. 2d 668 (Ala. 1988), in support of his cumulative effect argument.  #R-31 at 60.  In Ex parte Tomlin, the Alabama Supreme Court declined to determine whether, standing alone, any of the prosecutor's improper comments during closing argument constituted reversible error.  Id. at 672 ("We must conclude . . . that errors did occur. . . . We need not decide whether either of the two errors, standing alone, would require a reversal; we hold that the cumulative effect of the errors probably adversely affected the substantial rights of the defendant and seriously affected the fairness and integrity of the judicial proceedings.").  Here, however, this Court and the state courts have failed to find any error whatsoever, rendering moot the question of sufficiency.

(11th Cir. 2010) ("[W]here there is no error or only a single error, there can be no cumulative error."). Petitioner's cumulative effect claim is therefore **DENIED**.

### 13) Claim 44: Smith's Statements Were Improperly Introduced into Evidence

In paragraphs 304-15 of his Amended Petition, Petitioner argues that his custodial statements to the police were inadmissible because they were made subsequent to an illegal arrest and were compelled by police coercion. Petitioner's first argument is foreclosed by <u>Stone v. Powell,</u> 428 U.S. 465 (1976). In <u>Stone</u>, the United States Supreme Court held that federal courts are precluded from conducting post-conviction review of Fourth Amendment claims where state courts have provided "an opportunity for full and fair litigation" thereof. <u>Stone</u>, 428 U.S. at 494. In the context of the Fourth Amendment, "full and fair consideration" includes at least one evidentiary hearing in a trial court and the availability of meaningful appellate review. <u>Bradley</u>, 212 F.3d at 565. In this case, the record shows that Petitioner was afforded the opportunity in the state courts to fully, fairly, and adequately litigate the admissibility of the evidence in question. <u>See</u> <u>Smith I</u>, 795 So. 2d at 806-07 (describing suppression hearing held to determine whether Smith's statements were voluntary).[33]

---

[33] Smith argues, citing <u>Tukes v. Dugger</u>, 911 F.2d 508, 514 (11th Cir. 1990), that <u>Stone</u> does not apply because he did not receive meaningful appellate review of his Fourth Amendment claim. Am. Pet. at 168 n.32. However, Smith's case is distinguishable from <u>Tukes</u>. In <u>Tukes</u>, the Eleventh Circuit stated that <u>Stone v. Powell</u> does not apply when the state trial court does not make explicit factual findings relating to the Fourth Amendment issue and the state appellate court summarily affirms. <u>See</u> <u>Tukes</u>, 911 F.2d at 514. Here, the trial court made specific factual findings that the <u>Miranda</u> warnings were satisfied, Smith's statements were voluntarily given, and probable cause existed. <u>See generally</u> #R.8 (hearing on motion to suppress). Therefore, <u>Stone</u> applies, and Petitioner's claim is barred from federal review.

However, even if this fruit-of-the-poisonous-tree claim were not foreclosed by Stone, Petitioner still would not be entitled to habeas relief. Having reviewed the record in this matter, the Court concludes that the state court's factual findings were reasonable, that Petitioner has not met his burden of rebutting the presumption of correctness of the state court's factual findings by clear and convincing evidence, and that the state court's legal analysis was neither contrary to, nor an unreasonable application of, federal law.

With respect to Petitioner's Fifth Amendment claim that his statements were involuntary because they were coerced and Smith was not properly Mirandized, Petitioner's arguments fail. On direct appeal and in his Amended Petition, Petitioner asserted that his post-arrest statements to police should not have been admitted because: 1) they were involuntary because his IQ is low, 2) Miranda warnings were not repeated prior to making his first custodial statement, and 3) the police coerced his second statement by telling him that his co-defendant had implicated him in the robbery-murder. Doc. 31 at 78-82; Am Pet. ¶¶ 310-15.

As to the first issue, Smith's mental deficiency was not before the trial court when it held that Smith's statements were given voluntarily. However, Smith did assert this claim on direct appeal, and the Court of Criminal Appeals concluded that "even considering evidence of the defendant's mental subnormality . . . the defense testimony does not show that the defendant was so mentally deficient that he was incapable of being able to make a knowing and intelligent waiver." Smith I, 795 So. 2d at 810 (punctuation omitted). The Court of Criminal Appeals found that Smith

was lucid, coherent, aware of his circumstances, not clearly under the influence of drugs or alcohol, and indicated that he could read, write, and understand English. Id. at 809. The Court of Criminal Appeals also found significant the fact that Smith had prior involvement with the police and the criminal justice system. Id. at 809-10. Pursuant to AEDPA, this Court treats these factual findings as correct. See 28 U.S.C. § 2254(e)(1). Given the aforementioned factual context, the Court cannot conclude that Smith's borderline IQ rendered his statements involuntary. Compare United States v. Calles, 271 F. App'x. 931, 939 (11th Cir. 2008) ("A district court may find a knowing and intelligent waiver . . . where the defendant with a low IQ voluntarily and knowingly waived his Miranda rights where he 'interacted normally and intelligently with the arresting agents and . . . was familiar with the criminal justice system.'" (quoting United States v. Glover, 431 F.3d 744, 748 (11th Cir. 2005)) with Cooper v. Griffin, 455 F.2d 1142, 1144-45 (5th Cir. 1972) (waiver not knowing or voluntary where evidence was "undisputed" that defendants were mentally retarded with IQs of 61 and 67).[34] The evidence presented does not reflect that Smith's statement was involuntarily provided.

Petitioner next argues that his statement was involuntary because the police Mirandized him five hours prior to his first custodial statement by which time the initial warning was stale. All Petitioner says in support of this argument is that he

---

[34] Smith also claims that, in examining the totality of the circumstances as required by Edwards v. Arizona, 451 U.S. 477, 482 (1981), the Court should consider that Smith "is mentally retarded, dyslexic and suffers from several other mental illnesses." Am. Pet. ¶ 311. However, as noted above, the record does not support Smith's claim of mental retardation, and Smith does not indicate how his alleged dyslexia or unspecified "mental illnesses" could have affected his ability to knowingly and voluntarily waive his right to remain silent.

"did not make 'an independent and informed choice of his own free will,' when he gave inculpatory statements" and that his "impairments and the length of time he was in custody are factors to be considered in determining the voluntariness of his statement" under Schneckloth v. Bustamonte, 412 U.S. 218 (1973). Am. Pet. ¶ 312. "[A]n accused does not have to be continually reminded of his Miranda rights once he has knowingly waived them." Shriner v. Wainwright, 715 F.2d 1452, 1456 (11th Cir. 1983); see also Jarrell, 735 F.2d at 1253-54 (where Miranda warnings given were complete and defendant understood them, confession given four hours later was not inadmissible because of failure to refresh). Based on the totality of the circumstances surrounding the statement, the evidence presented confirms that Smith voluntarily waived his right to remain silent and there was no evidence that the police improperly coerced him.

Lastly, Petitioner has argued that the police improperly coerced his second statement, citing, in support, Spano v. New York, 360 U.S. 315 (1959). In Spano, the evidence was overwhelming that the police had violated the defendant's constitutional rights. There, the defendant was questioned for nearly eight hours during the late evening and early morning hours, by fifteen separate individuals, who denied his requests to speak to his attorney. Id. at 321-22. The police also played on the defendant's vulnerability by misrepresenting that his friend would lose his job as a police officer if he failed to cooperate. Id. at 322. Spano is completely inapposite to the facts presented here. Whereas Smith has failed to demonstrate that the state court's adjudication of his Miranda claims was contrary

to or involved an unreasonable application of clearly established federal law, Claim 44 is **DENIED**.

> **14) Claim 46: Court Improperly Granted State's Challenge for Cause and Excused a Prospective Juror with Death Penalty Reservations**

In paragraphs 319-22 of his Amended Petition, Petitioner argues that the trial court improperly dismissed a potential juror because that potential juror expressed reservations about the death penalty. As the Court of Criminal Appeals recognized when it adjudicated this claim on direct appeal, the controlling United States Supreme Court precedent is <u>Wainwright v. Witt</u>, 469 U.S. 412 (1985). In <u>Wainwright</u>, the Supreme Court held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." <u>Id.</u> at 424. The Court of Criminal Appeals found that the dismissed juror "never wavered in his conviction that he would be unable to consider a death sentence under any circumstances," <u>Smith I</u>, 795 So. 2d at 802, and supported that finding by noting that the potential juror stated in response to questioning by defense counsel that he would not recommend a death sentence even if, hypothetically, his own brother were killed in the course of a robbery. <u>Id.</u>; T.R. 91-96. Whereas the potential juror's response to counsel's questions did not reveal any equivocation as to his inability to recommend a sentence of death, the court properly granted the state's challenge for cause. <u>See Morgan v. Illinois</u>, 504 U.S. 719, 728 (1992) "[A] juror who in no case would vote for capital punishment, regardless of his

or her instructions, is not an impartial juror and must be removed for cause."). Claim 46 is, therefore, **DENIED**.

### 15) Claim 49: Cumulative Effect of All Above Claims of Error Violated Petitioner's Constitutional Rights

Lastly, Petitioner argues that the cumulative effect of all his alleged claims of error violated his rights under the Constitution. Am. Pet. ¶ 327. Petitioner raised this claim on direct appeal, but the Court of Criminal Appeals did not address it explicitly. However, this Court, when called upon to adjudicate a claim pursuant to the cumulative error doctrine, "must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution." United States v. Baker, 432 F.3d 1189, 1203 (11th Cir. 2005); see also Hardy, 389 F. App'x at 926 ("We address a claim of cumulative error by first considering the validity of each claim individually, and then examining any errors in the aggregate and the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial."). After careful consideration, the Court finds that Petitioner's trial was not so replete with errors that he was denied a fair trial. Claim 49 is, therefore, **DENIED**.

## IV. CONCLUSION

For the reasons set forth herein, it is **ORDERED** that the claims for habeas corpus relief asserted in Smith's § 2254 amended petition (Doc. 52) are **DENIED**. Specifically, Claims 2, 4, 6, 8, 17-18, 29, 32-33, 36, 38, and 47 are **DENIED** because they are procedurally defaulted in their entirety, and those portions of the claims

that are not procedurally defaulted or barred are **DENIED** because the undersigned finds that Smith's constitutional rights were not violated.

After reviewing the issues raised in Smith's § 2254 petition, it is **FURTHER ORDERED** that a Certificate of Appealability (COA) not be issued to Petitioner Smith. The Court finds that Smith has failed to make a substantial showing of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its rulings as to each and all of the remaining issues in his habeas petition. See 28 U.S.C. § 2243(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." (internal quotation marks omitted)). Therefore, a COA is hereby **DENIED** as to all issues.

**DONE** and **ORDERED** this 30th day of September, 2013.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE