## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOSEPH CLIFTON SMITH,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 05-00474-CG** |
| | ) | |
| | ) | |
| **JEFFERSON S. DUNN,** | ) | |
| **Commissioner, Alabama** | ) | |
| **Department of Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### ORDER

This case is before the Court on remand from the Eleventh Circuit. (Docs. 72, 73). For reasons which will be explained below, the Court finds that the Petitioner is intellectually disabled.  Accordingly, Petitioner's Writ of Habeas Corpus will be granted, and his death sentence will be vacated.

### BACKGROUND

The Eleventh Circuit found that the factual determination by the Alabama Court of Criminal Appeals that "Smith conclusively did not possess significantly subaverage intellectual functioning was an unreasonable determination of the facts." (Doc. 72, PageID.958).  The Eleventh Circuit noted that the Alabama Court of Criminal Appeals came to that conclusion without conducting an evidentiary hearing and despite there being "trial evidence pointing to significant deficits in Smith's intellectual functioning." (Doc. 72, PageID.957).[1]  The Eleventh Circuit

---

[1] The Eleventh Circuit found that the Alabama appellate court was unreasonable in finding that

found the determination unreasonable given the record evidence and "the fact that Alabama does not employ a strict IQ cut-off score of 70." (Doc. 72, PageID.957-958). The Court also found that "the Alabama Court of Criminal Appeals' finding that there was 'no indication that Smith had significant defects in adaptive behavior' is unsupported (and, in fact, contradicted) by the record and therefore unreasonable."[2] (Doc. 72, PageID.960 (internal citations omitted)).  The Eleventh Circuit reversed and remanded the case indicating that Smith should be allowed "to present an expert witness on his behalf" and directing the district court to determine whether to order discovery or an evidentiary hearing. (Doc. 72, PageID.961-962).  The Eleventh Circuit stated that "[i]n doing so, we express no opinion as to whether Smith is intellectually disabled." (Doc. 72, PageID.962).

Upon remand, this Court ordered discovery (Doc. 78), and held an evidentiary hearing.  The parties filed post hearing briefs. (Docs. 126, 129, 130).

## DISCUSSION

### A. Standard of Review

Since the Eleventh Circuit has found the Alabama Court of Criminal Appeals unreasonably determined the facts, this Court must conduct an independent review

---

Smith had pled only conclusory allegations that he met each of the three requirements for intellectual disability under *Perkins* and was also unreasonable in its determination of the merits – that Smith was not mentally retarded and could never meet the *Perkins* requirements. (Doc. 72, PageID.955, 957-958).  There was trial evidence that Smith's IQ could be as low as 69, given a standard error of measurement of plus-or-minus three points, and that Smith had deficits in intellectual functioning. (Doc. 72, PageID.957).

[2] As this Court will discuss herein, there was evidence "that would support a fact finding that Smith had significant limitations in at least two of the adaptive skills identified by both clinical definitions: (1) social/interpersonal skills and (2) self-direction." (Doc. 72, PageID.959).

of the merits of the petitioner's claim – without deferring to the state court's factual findings. *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007).  "Petitioner has the burden of proof by a preponderance of the evidence not only with regard to IQ (intellectual functioning) and onset age, but also as to related limitations in the adaptive skill areas." *Holladay v. Campbell*, 463 F. Supp. 2d 1324, 1341 n.21 (N.D. Ala. 2006), aff'd sub nom. *Holladay v. Allen*, 555 F.3d 1346 (11th Cir. 2009).

## B. Intellectual Disability

As the Eleventh Circuit explained, "the United States Supreme Court held in *Atkins* that the execution of 'mentally retarded' individuals violates the Eighth Amendment of the Constitution." (Doc. 72, PageID.951, citing *Atkins v. Virginia*, 536 U.S. 304, 321 (2002)).  "The *Atkins* Court, however, left 'to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.' " (Doc. 72, PageID.951).  In Alabama, there are three requirements to establish intellectual disability: (1) "significantly subaverage intellectual functioning (an IQ of 70 or below)," (2) "significant or substantial deficits in adaptive behavior," and (3) manifestation of "these problems . . . during the developmental period (i.e., before the defendant reached age 18)." (Doc. 72, PageID.951-952, quoting *Ex parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002)).  Though there has been some overlap in the evidence and arguments regarding these three requirements the Court will attempt to separate and discuss each below.

### 1. Significantly Subaverage Intellectual Functioning

Petitioner contends that the Court should take into account the Flynn Effect[3] and the standard margin of error when considering Petitioner's IQ exam scores. Petitioner points to two Supreme Court cases to support his Atkins claim – *Hall v. Florida*, 572 U.S. 701 (2014) and *Moore v. Texas*, 137 S.Ct. 1039 (2017).   Respondent denies that these cases entitle Petitioner to relief in this case.

In *Hall*, the Supreme Court ruled that Florida could not maintain a strict adherence to a cutoff IQ score of 70. *Id.* at 1994.  The Court concluded "that a State cannot execute a person whose IQ test score falls within the test's margin of error unless he has been able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *In re Henry*, 757 F.3d 1151, 1154 (11th Cir. 2014) (citing *Hall*, 572 U.S. at 723).  Respondent argues that *Hall* does not apply because Alabama courts have not interpreted Alabama's intellectual disability law to preclude consideration of other evidence of intellectual disability, including testimony regarding adaptive deficits when a person has an IQ over 70. However, *Hall* also made clear that courts should be "informed by the medical community's diagnostic framework" which means "courts must consider the standard error inherent in IQ tests when a defendant's test scores put him 'within the clinically established range for intellectual-functioning deficits.' " *Smith v. Comm'r, Alabama Dep't of Corr.*, 924 F.3d 1330, 1337 (11th Cir. 2019) (quoting *Hall* and *Moore*).

---

[3] The "Flynn Effect" is a theory that IQ scores have been increasing over time and should be recalibrated in order to reflect this increase.

In *Moore*, the Supreme Court reiterated that "where an IQ score is close to, but above, 70, courts must account for the test's 'standard error of measurement.' " *Moore,* 137 S.Ct. at 1049 (citing *Hall*). The Supreme Court in *Moore* vacated the determination by the Texas Court of Criminal Appeals, which utilized court-created factors (set forth in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004)) in lieu of considering clinical definitions of adaptive functioning. 137 S.Ct. at 1044. The Supreme Court found that by rejecting the medical guidance and clinging to the *Briseno* factors the Texas court had "failed adequately to inform itself of the 'medical community's diagnostic framework'." *Id*. at 1053.

It remains clear that the Court should consider the standard error inherent in IQ tests and in cases where a defendant's test scores fall "within the clinically established range for intellectual-functioning deficits", "defendants must be allowed to present additional evidence of intellectual disability, including testimony on adaptive deficits." *Smith v. Comm'r, Alabama Dep't of Corr.*, 924 F.3d 1330, 1337 (11th Cir. 2019).[4] In the instant case, the Defendant had IQ test scores as low as 72, which according to testimony could mean his IQ is actually as low as 69 if you take into account the standard error of measurement.

There is expert testimony that Smith's intelligence is higher than his

---

[4] The Court notes that in *Smith*, the Eleventh Circuit refused to apply *Moore* because *Moore* was decided after the state court made its determination. However, in the case at hand the state court's decision has been found to be unreasonable. As such, this Court is no longer constrained to consider only the reasonableness of the state court's determination given the record before the state court but is instead tasked with conducting an independent determination of Petitioner's intellectual functioning. Additionally, neither party has argued that *Moore*, *Hall*, or other cases decided after Petitioner's state court proceedings should not apply for that reason.

previous scores indicated.  Dr. Glen King, testified at the May 2017 hearing before this Court. Dr. King had reviewed some of Smith's history and met with Smith to evaluate him. Dr. King met with Smith for approximately three hours and spent about 20 minutes interviewing and giving Smith a mental status examination. (Doc. 125-1, PageID.2029-31).  King administered the WAIS-IV IQ test to Smith and testified that Smith's full-scale score on the test was 74. (Doc. 125-1, PageID.1983-84).  The composite of Smith's verbal comprehension and perceptual reasoning indexes (or GAI) on the WAIS-IV was 77. (Doc. 125-1, PageID.1984).  Dr. King said Smith's scores "can be an indication of a learning disability" rather than an intellectual disability. (Doc. 125-1, PageID.1985).  Dr. King found Smith did not have significantly subaverage intellectual functioning and diagnosed Smith "as having likely a learning disability." (Doc. 125-1, PageID.1988).  Smith's perceptual reasoning score was 86 but his verbal score was lower. (Doc. 125-1, PageID.1985).  "[W]here a person has some average abilities and then is not functioning up to academic achievement expectations, that can indicate that that's the reason for that." "They will typically have lower verbal scores." (Doc. 125-1, PageID.1985-86).  Dr. King's testimony only indicates that a learning disability *might* be the cause of Smith's poor performance. Dr. King said his disability is "not otherwise specified," because "I think there would have to have been additional assessment to determine the presence of that or to rule out the possibility that he really is functioning in the borderline range of ability." (Doc. 125-1, PageID.1988).  Petitioner points out that Smith's school records do not indicate that there was ever a finding that Smith had

a learning disability. (Doc. 130 PageID.4449, Doc. 126, PageID.2087-90).  Even if Smith's scores do not result from a learning disability, Smith's overall score of 74 on the test administered by King was still above what is considered significant subaverage intellectual functioning. Dr. King testified that the WAIS-IV test indicated a 95 percent confidence level that Smith's IQ was between 70-79. (Doc. 125-1, PageID.1985).

Dr. King also testified that if there are multiple sources of IQ over a long period of time it contributes to the construct of validity indicating what a true IQ score is for an individual. (Doc. 125-1, PageID.1987).  In Smith's case, multiple IQ scores (in fact, all of Smith's scores if you do not consider the standard error) taken over a long period of time place him in the borderline range, functioning just above intellectual disability. (Doc. 125-1, PageID.1987-1988).  Dr. King testified that there "are five IQ scores that were obtained over a lengthy period of time by different examiners under different conditions and they are all in the borderline range of intellectual functioning." (Doc. 125-1, PageID.2020). While this leans in favor of finding that Smith does not have significant subaverage intellectual functioning, the Court does not find it strong enough to conclude that Smith is not intellectually disabled without considering evidence of his adaptive deficits. Smith did not consistently score so high that the Court is confident that the lowest score can be thrown out as an outlier or that the standard error for the tests can be disregarded. Although some tests indicate Smith does not have significant subaverage intellectual functioning, this Court concludes that additional evidence must be

considered, including testimony on the Defendant's adaptive deficits.

The Court declines to apply the Flynn Effect. "While [the Eleventh Circuit has] previously said that the Flynn Effect may be considered in determining a defendant's IQ, *see Thomas v. Allen*, 607 F.3d 749, 753 (11th Cir. 2010), neither [the Eleventh Circuit] nor the Supreme Court has required courts to do so." *Smith v. Comm'r, Alabama Dep't of Corr.*, 924 F.3d 1330, 1342 (11th Cir. 2019). There was expert testimony at the hearing before this Court that there are conflicts within the research about whether to apply the Flynn effect. (Doc. 125-1, PageID.1991). The Flynn effect is a "theory" and there are problems with the research supporting it. (Doc. 125-1, PageID.1990-1991). According to testimony before this Court, neither the American Psychological Association nor the Division of Developmental Disabilities of the Alabama Department of Mental Health and Mental Retardation apply the Flynn effect. (Doc. 125-1, PageID.1964-1965, 1968-1969). The Flynn effect is reportedly not applied in social security cases, in vocational rehabilitation cases or in school admission testing. (Doc. 125-1, PageID.1992). Moreover, the utility of applying it here is questionable since there is already expert evidence to demonstrate that Defendant's IQ, after considering the standard error of measurement, may be as low as 69. The Court merely notes that if the Flynn Effect were taken into consideration, Smith's scores would likely be adjusted lower.

At the time of his criminal trial, Smith was examined by Dr. James F. Chudy who produced a Psychological Evaluation report dated Sept. 6, 1998. (TR Transcript VOL. 6, pp. 912-21). The Court notes that prior to *Atkins*, evidence of intellectual

disability (then termed "mental retardation") was considered "a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Burgess v. Comm'r, Alabama Dep't of Corr.,* 723 F.3d 1308, 1318 (11th Cir. 2013) (citation omitted). "Because evidence of mental retardation was a 'two-edged sword' a defendant could reasonably decide not to highlight his mental retardation." *Id.* (citations omitted). Thus, at the time of his trial, Smith had no real incentive to present testimony to support a finding that he was intellectually disabled. At trial, Dr. Chudy found that Smith "was mentally competent and capable in assisting his attorney in his defense and that Smith knew right from wrong. (TR Transcript VOL. 6, p. 916). Dr. Chudy also found that:

> Mr. Smith's thinking was coherent and for the most part logical but that at times it was necessary to re-state questions in more elementary forms so that he could understand them. His comprehension is limited and it is clear that he lacks much insight or awareness into his behavior. During the course of the interview and test administrations there were no signs of psychotic behavior or deviations from reality. When he did not understand a question, he was not reluctant in asking for clarification. He even went so far as to ask for clarification several times so that he could answer questions to the best of his ability.
>
> During the administration of the tests, Mr. Smith maintained a fairly good attitude and seemed to put forth his best effort, showing fairly good persistence. However, he struggled at times in understanding some of the tasks which required repeating the instructions on several occasions.

(*Id.* at p. 917). Dr. Chudy reported that Smith was administered the WAIS-R and that he scored a Verbal IQ of 73, a Performance IQ of 72 and a Full-Scale IQ of 72 which places him at the 3rd percentile in comparison to the general population.

(*Id*.).  Dr. Chudy further found the following:

> These scores place him in the Borderline range of intelligence which means that he operates between the Low Average and Mentally Retarded range. Actually these scores place him at a level closer to those individuals who would be considered mentally retarded.
>
> Analysis of the specific subtests of the WAIS-R showed that Mr. Smith displayed major deficiencies in areas related to academic skills. He functioned well below average in his recall of learned and acquired information. (Information). He was also quite weak in word knowledge and usage (Vocabulary) and mental mathematical computation (Arithmetic). Other areas of noted weakness had to do with his social skills. He scored well below average in skills having to do with social reasoning and learning how to respond effectively in social situations (Comprehension). He also showed a major deficiency in his ability to predict social sequences of action (Picture Arrangement).

(*Id*.).  Dr. Chudy found that Smith did not seem to learn from his experiences because he "does not think through things" and "his mind-set provides little basis for acting in a consistently sensible manner or learning from experience." According to Dr. Chudy, Smith's thinking was "vague, easily confused and he is often overwhelmed with incomprehensible feelings or impulses that he does not understand." (*Id*. at p 919).

After considering the above, the Court finds it is not clear whether Smith qualifies as having significantly subaverage intellectual function. The only thing clear is that Smith strives to answer questions to the best of his ability and is not malingering. As stated above, additional evidence must be considered, including testimony on the Defendant's adaptive deficits to determine whether Smith is intellectually disabled. This is a close case, and the Court concludes that at best Smith intelligence falls at the low end of the Borderline range of intelligence and at

worst at the high end of the required significantly subaverage intellectual functioning. As such, the Court finds that whether Smith is intellectually disabled will fall largely on whether Smith suffers from significant or substantial deficits in adaptive behavior, as well as whether his problems occurred during Smith's developmental years.

### 2. Deficits in Adaptive Behavior

Because IQ test scores are approximations of conceptual functioning, IQ scores alone "may be insufficient to assess reasoning in real life situations and mastery of practical tasks." *See Freeman v. Dunn*, 2018 WL 3235794, at *70 (M.D. Ala. July 2, 2018) (quoting AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 37-38 (5th ed.) ("DSM-V")).

> For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

*Id.* (quoting DSM-V at p. 37). "[T]he Diagnostic Statistical Manual of Mental Disorders states that adaptive functioning refers 'to how well a person meets standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." *Schrader v. Acting Com'r of the Soc. Sec. Admin.*, 632 F. App'x 572, 576 n.3 (11th Cir. 2015) (quoting DSM-V at p. 37).

The Eleventh Circuit explained the general standard for determining

whether Smith has significant or substantial deficits in adaptive behavior as

follows:

> Neither the Alabama legislature nor the Alabama Supreme Court has defined what constitutes "significant or substantial deficits in adaptive behavior." *See id.* But the Alabama Supreme Court has applied generally the "most common" or "broadest" definition of mental retardation, which reflects "the clinical definitions considered in *Atkins*." *In re Jerry Jerome Smith v. State*, No. 1060427, 2007 WL 1519869, at *7 (Ala. May 25, 2007). And "significant or substantial deficits in adaptive behavior" means, under the clinical definitions considered in *Atkins*, a petitioner must show limitations in two or more of the following applicable adaptive-skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, health and safety, functional academics, leisure, and work." *Atkins*, 536 U.S. at 308 n.3, 122 S. Ct. at 2245 n.3 (citing the American Association on Mental Retardation and American Psychiatric Association's definitions of mental retardation). Thus, we use that common clinical definition in considering this case. *Cf. Lane v. State*, ___ So.3d ___, ___ No. CR-10-1343, 2013 WL 5966905, at *5 (Ala. Crim. App. Nov. 8, 2013) ("In order for an individual to have significant or substantial deficits in adaptive behavior, he must have concurrent deficits or impairments in . . . at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety." (quotation marks omitted)).

(Doc. 72, PageID.952-953, footnote omitted). The Eleventh Circuit found there was

evidence "that would support a fact finding that Smith had significant limitations in

at least two of the adaptive skills identified by both clinical definitions: (1)

social/interpersonal skills and (2) self-direction." (Doc. 72. PageID.959).

According to Dr. King, Smith's prison records indicate Smith functioned

normally in prison. (Doc. 125-1, PageID.2016).  At the May 2017 hearing in this

case, Sergeant Christopher Earl, a correctional sergeant over the segregation and

death row units at Holman prison, testified that Smith functions as a "tier runner"

on his tier which has 20-24 inmates. (Doc. 125, PageID.1818-19).  As a tier runner,

Smith passes out juice and trays, microwaves things for inmates, "get lists up when

we're putting out walks or church lists, things like that." (Doc. 125, PageID.1819).

Earl testified that the way tier runners are chosen is as follows:

> We talk to the other inmates on the tiers and make sure that they all
> get along with them. Typically you want somebody that's clean, takes
> care of theirself. You know, somebody that can get along with
> everybody on a tier.

(Doc. 125, PageID.1819).  According to Earl, Smith does a good job as a tier runner

and does not need much supervision. (Doc. 125, PageID.1819).  Earl also testified

that he has conversations with Smith about things going on inside the prison,

things going on in the news and current events. (Doc. 125, PageID.1819-20).  Earl

testified that Smith seems to understand what they talk about and Smith responds

appropriately when Earl asks him questions. (Doc. 125, PageID.1820).  Earl also

said Smith seems to have no problem making the "walk list" which consists of going

down the tier and writing down the cell numbers of prisoners that want to go on a

walk each day. (Doc. 125, PageID.1820-21).

Earl's testimony indicates Smith possesses or has developed some functional

skills that have enabled him to perform certain tasks well in prison. However, the

Eleventh Circuit has made clear that "the focus of the adaptive functioning inquiry

should be an individual's adaptive deficits—not adaptive strengths. *Smith v.

Comm'r, Alabama Dep't of Corr.*, 924 F.3d 1330, 1337 (11th Cir. 2019) (citing *Moore*).

"After *Moore*, states cannot 'weigh' an individual's adaptive strengths against his

adaptive deficits." *Id.*  Additionally, there can be little reliance on Smith's behavior

in prison because "[c]linicians ... caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." *Moore v. Texas*, 139 S. Ct. 666, 669 (2019)("Moore II"). As Dr. Fabian noted, Smith's prison records do not mean a lot because it is such a controlled and structured setting there and a lot is provided for him. (Doc. 125, PageID.1903-04) Smith "doesn't need to go get health insurance, buy a car, pay for a cell-phone bill, pay for rent, get a job, fill out applications, see a doctor, pay for medical insurance" or perform many other normal independent living requirements. (Doc. 125, PageID.1903) The Court also notes that while Earl believed Smith understood their conversations, it has not been suggested that Earl has any expertise in assessing a person's intellectual functioning.

Dr King believes the only standardized instrument available to assess Smith's adaptive functioning is the ABAS-3, on which Smith has no score of three or below. Based on those scores as well as Dr. King's interview with Smith, the history Smith gave and other records, Dr King opined that Smith has no significant deficiencies in adaptive functioning. (Doc. 125-1, PageID.2023) Dr. King testified that Smith had a pretty good memory of his life events and family history and that he recalled educational placements from early childhood which were quite cogent and coherent and more detailed that Dr. King expected. (Doc. 125-1, PageID.1980) Dr. King testified that Smith provided the following information:

> He was able to tell me that his mother was deceased recently at age 69
> and he was able to tell me that she had apparently had a fall or an
> accident and that she had high blood pressure, back problems,
> indicated that -- spontaneously with me -- that she loved him and all of

the brothers and sisters. He was able to report that his parents
divorced when he was approximately age nine, that his father deceased
at approximately age 70, when he had complications from hip surgery,
with a resultant cerebral vascular accident, which he referred to, I
think, as a stroke.

It was also reported that his father may have lingered to some extent
in terms of his stroke and that he also added spontaneously that he
and his father never got along very well.

He reported that when he was approximately age nine his parents
divorced and he was back and forth between the two parents, but his
mother remarried when he was approximately age 11 to Hollis Luker
and that his mother eventually divorced Mr. Luker after Mr. Smith
was incarcerated.

He reported his father had remarried when he was approximately age
11 or 12 and that he was able to identify his stepmother as Connie
Dickinson; reported that they eventually divorced as well.

(Doc. 125-1, PageID.1980-81).  Petitioner argues that these supposed strengths

should not be relied upon because they come solely from Smith's self-reports. Dr.

King stated that he had no records to check that these facts were correct but that he

interviewed one of Smith's sisters who supported some of the information. The

sister indicated that Smith "did in fact get moved back and forth between the two

families on a fairly consistent basis" but she "was somewhat young by the time that

he first left the family." (Doc. 125-1, PageID.1981).

There was expert testimony at the hearing before this Court that the

American Association of Intellectual and Developmental Disabilities (AAIDD)

cautions against reliance on self-reporting. Self-reports are often inaccurate

"because persons with mild ID tend to try to mask or hide their intellectual

disability" and "often claim capabilities they don't have." (Doc. 125, PageID.1720).

Dr. John Fabian testified that he concluded from his interviews with Smith that Smith "has not wanted to be found intellectually disabled" and "is embarrassed/ offended by this." (Doc. 125-1, PageID1914).  Dr. Fabian opined that Smith is at risk for exaggerating his skills and abilities because he does not have insight and he does not want to look deficient. (Doc. 125-1, PageID.1914).  Self-reports are used as "the last resort when there are, you know, no other collateral informants or the individual cannot be assessed one-on-one with other means." (Doc. 125, PageID.1913).  Petitioner points out that some of the details reported by Smith to Dr. King were wrong. For instance, Smith's mother was 63 (not 69) when she died, and Smith's father was 64 (not 70) when he died. Dr. King also acknowledged that Smith told him he had not attended school beyond the sixth grade, but records show he did not leave school until he was in the eighth grade. (Doc. 125-1, PageID.2026). Smith also reported to Dr. King that he was drinking on a daily basis from the age of 20 until age 27 when he was arrested. But Smith was actually incarcerated from age 19 to 26 and then again at 27. (Doc. 125-1, PageID.2027-28).

Dr. King also relied on Smith's self-report that Smith never had a driver's license or permit but that he drove anyway, and he indicated that he had possession of his own vehicles and that he had quite a few of them. Smith reported that the last vehicle he had was an 84 Ford pickup that he bought himself. (Doc. 116-6, PageID.4160).  However, Smith's mother had previously reported to Dr. Fabian that Smith had never owned a vehicle and Melissa Espinal reported that she never saw Smith drive a vehicle. (Doc. 116-1, PageID.2317).

Smith reported to Dr. King that he had a significant work history. Smith reported that he first started mowing grass and doing light lawn maintenance between the ages of 13 and 14 and that he made $400 or $500 per week and that was more than his father was making. Smith reported that he did roofing, painting, and he worked offshore on rigs and supply boats and would also install swimming pools and do landscaping. Smith's last job was landscaping which he reports he did for two years. According to Smith, he always had money in his pocket and he always worked full time and got along well with fellow employees and his employers. (Doc. 116-6, PageID.4160).

Smith's social security records do not show regular or consistent employment or income. (Doc. 116-1, PageID.2111-15). However, at the hearing before this Court Smith reported that he did whatever he could do "as long as I didn't have to pay no taxes." (Doc. 125, PageID.1847). Thus, Smith could have had income that did not show up in his social security records. But other facts indicate Smith had little income. Smith's mother and Melissa Espinal both reported to Dr. Fabian that Smith never consistently held a job. Smith's mother reported that Smith did not work full time and did not have a bank account. (Doc.125-1, PageID.1913). Dr. King testified that he did not believe Smith had much money, he never saved any money and would spend any money he got. (Doc.125-1, PageID.1912). And Smith was incarcerated from the age of 19 until present, except for approximately one year from the age of 26 until the age of 27 when he went back in prison. (Doc. 125, PageID.1846-47). Smith was released from prison at the age of 27 and was out for

three days before the incident for which he is now incarcerated.

Smith was able to tell Dr. King about some current events (specifically that the President of the United States had fired the Attorney General) and that he knew who the current and past president was. Smith could reportedly identify his Social Security number, his AIS number, his address at Holman Prison, and was oriented as to person, place, and time. (Doc. 125-1, PageID.1989). Dr. King testified that although an intellectually disabled person might know some of these facts it is not likely that an intellectually disabled person would know all of these facts. (Doc. 125-1, PageID.1990).

However, Dr. Reschly disagreed with Dr. King. Dr. Reschly testified that he had "evaluated a number of persons who clearly meet the criteria for intellectual disability who have known those things generally because they are used over and over and they are memorized over time." Dr. Reschly also noted that Smith was not able to give his full Social Security number -- he was not able to give the first five digits and could only remember and give the last four digits of his social security number. (Doc. 125-1, PageID.2074).

Dr. King administered "the assessment for adaptive functioning, the ABAS-3," and Smith "generated scores that were well above the cutoff that we use typically for consideration of intellectual disability in terms of adaptive functioning." (Doc. 125-1, PageID.2017). Dr. King testified that he read the questions to Smith because he was concerned about Smith's reading capability – the ABAS allows the reports to be read when somebody does not have the ability to read

or there is a question about vision. (Doc. 125-1, PageID.2032-34).  The ABAS-3 measures eight different areas and usually, a score of three or below in any area would be considered a significantly deficient score. (Doc. 125-1, PageID.2017). Smith's lowest score was a six and ranged from six to ten, ten being average. (Doc. 125-1, PageID.2017-18).

As to records from Smith's youth, Dr. King testified that Smith "may have had some problems with adaptive functioning when he was in school, but I don't think that that was the result of intellectual deficiency." Dr. King explained that he thought "it was just as easily or more easily explained by what was going on at home" that Smith had "[s]ome lower, perhaps, intellectual ability" and also that he started to use alcohol at a fairly young age. (Doc. 125-1, PageID.2018).  Dr. Reschly admitted that if Smith continued to consume alcohol at a high level around the ages of 11, 12 and 13 as reported it would have affected both his intellectual performance, his academic skill acquisition and possibly his social relations. (Doc. 125, PageID.1812).  Dr Reschly also admitted that the fact that Smith was physically abused and that his parents divorced and shifted him back and forth between them and between schools might have also affect his development of adaptive functioning and his acquisition of social skills. (Doc. 125, PageID.1812-13). Dr. King noted that Smith was placed in EC classes, which are for emotionally conflicted students – "children who are determined to be having a lot of behavioral problems, psychological adjustment problems." (Doc. 125-1, PageID.2005).  Dr. King testified that emotional handicaps do not mean a person has limitations in adaptive

functioning. (Doc. 125-1, PageID.2005).  Dr. King stated that there was only one or two pages out of Smith's entire school record that designated Smith as EMR. (Doc. 125-1, PageID.2005-06).  According to Dr. King, Smith's poor behavior at school is an indication "of what was happening with this child at that time overall in his life." (Doc 125-1, PageID.2007).  However, the Supreme Court has found that a detrimental home life - such as one that involves traumatic experiences like childhood abuse and suffering – is considered a risk factor for intellectual disability. *Moore v. Texas*, 139 S. Ct. 666, 669 (2019)("*Moore II*") (citing *Moore*).  "Clinicians rely on such factors as cause to explore the prospect of intellectual disability further, not to counter the case for a disability determination." *Moore*, 137 S. Ct. at 1051 (citation omitted).  Additionally, evidence of a personality disorder or of mental-health issues is "not evidence that a person does not also have intellectual disability." *Moore II*, 139 S. Ct. at 671 (quoting *Moore*).  Mental-health professionals recognize that "many intellectually disabled people also have other mental or physical impairments, for example, attention-deficit/hyperactivity disorder, depressive and bipolar disorders, and autism." *Moore*, 137 S. Ct. at 1051 (citation omitted).

Dr. Fabian points to Dr. Chudy's findings at the time of trial which indicated Smith had emotional problems. Dr. Fabian found that Smith has difficulties coping with his emotional problems. Dr. Fabian pointed to Dr. Chudy's opinion and stated that he agreed completely with the following points made by Dr. Chudy:

> [Smith] takes little notice of things around him unless it's intended to protect him from potential harm. Does not think through things. This

> mindset provides little basis for acting in a consistently sensible
> manner or learning from experience. He did not seem to learn from
> experience even when it involves bringing pain to himself or those
> closest to him. In essence, his thinking is vague, he's easily confused ...,
> he's often overwhelmed with incomprehensible feelings or impulses
> that he does not understand.

(Doc. 125, PageID.1899).  Dr. Fabian went on to say that Dr. Chudy talks about

Smith's emotional personality functioning as being equally dysfunctional. Dr.

Fabian testified that "these points" "can be related to other disorders potentially,

but also would be consistent with intellectual disability." (Doc. 125, PageID.1899).

Dr. Fabian found that looking at Smith's employment history, the jobs were

not complicated and were consistent with his intellectual disability and adaptive

deficits. (Doc 125, PageID.1893-94).

According to Dr. Fabian his interviews with Smith's mother and Melissa

Espinal and her sister Melanie Espinal indicated that Smith had deficits in

communication, reading, writing, functional academics, self-direction, and social

skills. (Doc. 125, PageID.1989-1901).  Melanie and Melissa were mid-teenagers

when they knew Smith, who was about 10 years older. They reported that Smith,

though much older, was easily led and wanted to fit in. They indicated that Smith

did not think about what he wanted to do in the future and was more impulsive,

living day by day in a hotel without a lot of goals. He was really "gullible, naïve,

wasn't really self sufficient or independent in living. Didn't seem to cook food, buy

groceries, was often hanging around them." Smith "was a grown man trying to

impress me, as a kid" and had difficulties understanding things. (Doc. 124,

PageID.1900-01).

Smith's mother also indicated he was a follower, he did not work consistently, had difficulties in school, was in special education classes, did not have insurance or a bank account and had problems with frustration tolerance and attention. (Doc. 125, PageID.1901).

Dr. Fabian also pointed out that Smith had difficulties with following laws and with reckless behaviors that were impulsive and not thought out well. (Doc. 125, PageID.1902). Smith was not in the community very long to demonstrate, but he was not able to maintain independent living skills from a practical or adaptive domain perspective. Dr. Fabian opined that Smith falls in the "mild intellectually disabled range." (Doc. 125, PageID.1902).

Dr. Fabian administered the Independent Living Scales test or ILS on Smith. The ILS assesses "one-on-one functional adaptive function":

> So basically I bring in a phone book, I'm bringing in a watch, or I'm asking him what the purpose of a will is, what would he do if he had a pain in his chest, things like that. How he feels about himself relative to his self-esteem, how many friends he has. So it gets at a number of areas of adaptive functioning – memory, managing money, health/safety needs – where I assessed him one on one.

(Doc. 125, Page ID.1879). According to Dr. Fabian the ILS test indicated Smith had deficits in most areas.

> [H]e had difficulties with memory orientation, giving him some different information that he had to recall over time. His ability to use money, to understand how money works was impaired. I mean, he had, I mean deficits in every area. So we look at the areas of memory orientation, money management, managing home transportation, those questions, you know, how he gets things fixed in his home versus using a map, you know, to drive from point A to point B.

Health and Safety really gets into taking care of his hygiene and communicating with doctors, for example. Now he scored well on that. And I think, by my experience interviewing him, he's been knocking out his hygiene pretty well in prison.

He also had significant difficulties or deficits with social adjustment. This is more how he feels about himself, his emotional perception of himself. Granted he's on death row and his relationships and interpersonal functioning is, you know altered. But some of these questions had to do with values of self/others, for example.

(Doc. 125, PageID.1889-90).  Smith scored a standard score of 59 on the ILS, which Dr. Fabian testified was consistent with those in the mild intellectually disabled group which ranges from 57.4 to 78.4. (Doc. 125, PageID.1890).

Dr. King criticized Dr. Fabian's use of the ILS to assess Smith's adaptive functioning. According to King, the ILS is not recommended for assessing adaptive behavior. Dr. King testified that he uses the ILS "quite frequently," for other situations, typically when he is asked to "evaluate individuals who are in need of a conservatorship or guardianship, as an older adult, to determine whether they can manage their financial affairs and to determine whether they can manage themselves personally." (Doc. 125-1, PageID.2013).

Dr. Fabian on the other hand testified that "the ILS is probably the most readily used adaptive functioning one-on-one test used nationally in forensic psychology, [and] forensic neuropsychology." (Doc. 125-1, PageID.1959). Additionally, the Court questions the veracity of Dr. King's criticism since Dr. King utilized the ILS test in a prior Atkins case and testified that "the ILS measures a person's 'ability to live independently, and it measures adaptive functioning in a number of different domains,' including health and safety, money management,

23

social adjustment, and problem solving." *Tarver v. State*, 940 So. 2d 312, 324 (Ala. Crim. App. 2004).

Dr. Fabian administered other tests that were not specifically geared toward adaptive functioning deficits but that he found indicated such deficits. According to Dr. Fabian, Smith's results on the Neuropsychological Assessment Battery showed that Smith's verbal abstract reasoning skills "were mildly to moderately impaired which ... showed me that he had a difficulty with abstract reasoning when given information about different people and he had put them together in different groups." (Doc. 125, PageID.1876-77).

Also, the Green Emotional Perception Test is correlated with intelligence, but there is also "an emotional, intellectual, and a perception and an adaptive component to it essentially assessing his ability to not really focus on what is said but how it's said for emotional tones: angry, sad, happy, what tone is the person saying." According to Dr. Fabian, Smith had some significant impairments on that test regarding "emotional perception, which is very adaptive as well." (Doc. 125, PageID.1878).

The Expressive One-Word Picture Vocabulary Test is a test of language. Smith showed significant impairments on that test, as well as on the Receptive One-Word Picture Vocabulary test. These tests correlate to intelligence, but also relate to functional academics or conceptual areas of adaptive functioning and academic achievement. Smith's scores on these tests indicate his ability to express and receive language is significantly impaired on the first percentile for expressive

and the third percentile for receptive.  Dr. Fabian testified that those scores are consistent with someone who is intellectually disabled. (Doc. 125, PageID.1880-81).

Additionally, Dr. Fabian administered the Social Cognition Test, which focuses on social perception and being able to process "not only affect and emotion to pictures and faces, but it gets more difficult, where they have to select a photograph, then interacting pairs of people, they listen to a statement made by a person and they have to decide which person or which couple, group of people, that statement went to."  Dr Fabian found that Smith's results were similar to his results on the Emotional Perception Test and indicated significant impairments to the social functioning prong of intellectual disability. (Doc. 125, PageID.1882-83).

According to Dr. Fabian, Smith meets the adaptive functioning prong and the intellectual functioning prong of intellectual disability. (Doc. 125, PageID.1903). Dr. King clearly disagrees.  As mentioned above, the Court finds this to be a close case and whether Smith has significant or substantial deficits in adaptive behavior largely comes down to which expert is believed. After reviewing the testimony of the experts and Smith's own testimony, the Court concludes that Smith has significant deficits in adaptive behavior. The Court finds Smith has significant deficits in social/interpersonal skills, self-direction, independent home living, and functional academics[5]. Although Smith has been able to function sufficiently in a controlled

---

[5] Functional academics has been defined as: "cognitive abilities and skills related to learning at school that also have direct application in one's life (e.g., writing; reading; using basic practical math concepts ... )." *Tharpe v. Humphrey*, 2014 WL 897412, at *23 (M.D. Ga. Mar. 6, 2014), aff'd sub nom. *Tharpe v. Warden*, 834 F.3d 1323 (11th Cir. 2016).  "It is important to note that the focus of this skill area is not on grade-level academic achievement but, rather, on the acquisition of academic skills that are functional in terms of independent living." *Id.*

prison setting, he appears incapable of behaving as a socially responsible adult or of living independently outside of prison. The Court finds Smith has shown by a preponderance of the evidence that he has significantly subaverage intellectual functioning and significant deficits in adaptive behavior.

### 3. Manifestation During the Developmental Period

The "sub-average intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18." *Smith v. State*, 213 So. 3d 239, 248 (Ala. 2007).  Smith's earliest records indicate that he seemed to do okay in first grade but made no progress in reading in second or third grade, and that prompted his referral by the school district to special services for evaluation. (Doc. 125, PageID.1759).  The ultimate recommendation placed Smith in EC Resource classes,[6] requiring 10-20 hours in classes for emotional conflict issues and special education. (Doc. 125 PageID.1765).  When Smith was in third grade his reading level was at the first grade, third month level, his math was at the second grade, first month level, and his language was at the zero (or kindergarten) grade, first month level. (Doc. 125, PageID.1760).  At the age of 12 when Smith was repeating the sixth grade, he was tested again on the WISC-R and received a full-scale score of 74 and was found to be reading at the fourth-grade level, fifth month, he was spelling at the third grade, sixth month level and he performed in math at the third

---

[6] "EC" stood for "emotionally conflicted" which was the term Alabama used at that time for what was called elsewhere "emotional behavior." (Doc. 125 PageID.1765).

grade, ninth month level. (Doc. 125, PageID.1767-1771).  There are records that indicate Smith was enrolled in EC resource classes during his 6th grade year and records that indicate Smith was enrolled in EMR classes in the 7th and 8th grades. (Doc. 116-1, PageID.2116-2208). "EMR" referred to "educable mentally retarded," which was a term used in Alabama in the late 70s and early 80s for a person with an IQ score below 75 who also had deficits in adaptive behavior and was "largely parallel to the criteria used to identify mild intellectual disability today." (Doc. 125, PageID.1754-55).

Dr. Reschly[7] testified that Smith's school records show the kinds of behaviors that are associated with and denote mild intellectual disability or what was called EMR. (Doc. 125, PageID.1781).  A Walker Problem Behavior Checklist was administered on Smith in the fourth grade that indicated Smith had problems acting out, he was withdrawn, he had issues with distractibility and problems with peer relations. (Doc. 125, PageID.1766-67).  In 1982 Smith was reevaluated because regulations required that a child's disability status be reevaluated every three

[7] The Court notes that Respondent contends that the undersigned should refuse to credit Dr. Reschly's testimony because he did not personally evaluate Smith. Most of Dr. Reschly's testimony consisted of an overview of intellectual disability and a review of Smith's school records. Dr. Reschly opined that Smith met the requirements for intellectual disability before the age of eighteen. Obviously, Reschly could not go back and interview Smith at an early age. The school records and family accounts of Smith's childhood are the best information available now on Smith's intellect prior to the age of eighteen. The Court agrees that the reliability and validity of opinions based merely on past records is limited but also recognizes that Dr. Reschly has specialized knowledge on special education and the assessment of intellectual disability in school age children.
Respondent also points to cases where Dr. Reschly's testimony has been discredited. However, as Smith argues, disagreements and different opinions are the very heart of litigation and the fact that a court disagreed with one expert in favor of another does not mean the expert's testimony should henceforth be disbelieved. The expert's testimony was simply not enough to overcome the opposing testimony in these prior cases.

years. (Doc. 125, PageID.1767).  Smith scored a full-scale IQ of 74 or 75 which would be adjusted to 72 and which fell within the State of Alabama's requirements for diagnosis as EMR. (Doc. 125, PageID.1768-69).  Much of the Walker Problem Behavior Checklist relates to social functioning or the social domain of adaptive behavior. (Doc. 125, PageID1779-80).  Reschly testified that Smith's peer relations were rated as being very low or poor and some of the descriptions of Smith's behavior, such as not complying and making an inappropriate comment about a teacher, "reflect social domain deficits in adaptive behavior." (Doc. 125, PageID.1780).

Dr. Fabian also found Smith's school records indicated social domain problems.  Dr. Fabian noted that during the developmental years, Smith had not been given a formal adaptive functioning test such as the ABAS or Vineland, but Fabian testified that Smith's records indicate adaptive functioning problems:

> ... we're starting to see global impairment, where he's academically behind two years, he's acting out, low frustration tolerance, aggression, behavioral problems, and that's often consistent when someone has those adaptive behavioral deficits and the intellectual functioning deficits so that would be consistent with intellectual disability.

(Doc. 125, PageID.1894-95).  According to Dr. Fabian, Smith's adaptive functioning fell in the mild intellectually disabled range before the age of 18. (Doc. 1225, PageID.1902).

Dr. King, on the other hand, found that there was no evidence of intellectual disability before the age of 18. (Doc. 125-1, PageID.2021).  According to Dr. King, there was only one page in Smiths records that said EMR – indicating he was

educably mentally retarded, but the "overwhelming evidence" indicated "he was not functioning highly, but he was not functioning as an intellectually disabled individual." (Doc. 125-1, PageID.2021-22). Dr. King testified that Smith's IQ scores "were all in the borderline range of ability from childhood to adulthood." (Doc. 125-1, PageID.2022). It is Dr. King's opinion that Smith has never been intellectually disabled. (Doc. 125-1, PageID.2022). Smith "has no testing that indicates that he functions with an IQ of 70 or below in consistent fashion." (Doc. 125-1, PageID.2022).

After reviewing the testimony concerning Smith's early years, the Court finds that Smith's intellectual and adaptive functioning issues clearly arose before he was 18 years of age. As the Court stated previously, this is a close case, but the evidence indicates that Smith's intelligence and adaptive functioning has been deficient throughout his life. The Court found above that Smith falls in the upper end of the required significantly subaverage intellectual functioning and that he has significant deficits in adaptive behavior. The evidence indicates these deficits did not begin during Smith's adult years but were present at an early age. The Court finds Smith's intellectual and adaptive functioning issues manifested during his developmental period.

## CONCLUSION

For the reasons explained above, the Court finds that Petitioner Joseph Clifton Smith is intellectually disabled. Accordingly, Smith's petition for writ of habeas corpus is **GRANTED** with respect to his *Atkins* claim, and his death

29

sentence is **VACATED**.  Smith is intellectually disabled and cannot constitutionally be executed.

      **DONE** and **ORDERED** this 17th day of August, 2021.

                       /s/ Callie V. S. Granade
                       SENIOR UNITED STATES DISTRICT JUDGE